**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ARTHUR JACKSON, III | : | CIVIL ACTION |
| | : | |
| vs | : | |
| | : | |
| DELAWARE COUNTY; WACKENHUT | : | |
| CORRECTIONS CORPORATION C/O | : | |
| PRENTICE HALL CORP.; WACKENHUT | : | |
| CORPORATION; DELAWARE COUNTY | : | |
| BOARD OF PRISON INSPECTORS; | : | |
| CHARLES SEXTON, CHAIRMAN OF | : | |
| DELAWARE COUNTY BOARD OF | : | |
| PRISON INSPECTORS; GEORGE HILL, | : | |
| SUPERINTENDENT OF DELAWARE | : | |
| COUNTY PRISON (GEORGE W. HILL | : | NO. 02-3230 |
| CORRECTIONAL FACILITY); JAMES | : | |
| JANECKA, WARDEN OF DELAWARE | : | |
| COUNTY PRISON; DEBORAH | : | |
| PERRETTA, HEALTH SERVICES | : | |
| ADMINISTRATOR OF DELAWARE | : | |
| COUNTY PRISON; MARGARET | : | |
| CARRILLO, M.D., DELAWARE | : | |
| COUNTY PRISON; DR. FREDERICK, | : | |
| DELAWARE COUNTY PRISON; DR. | : | |
| HOLLAND HULL, DELAWARE | : | |
| COUNTY PRISON; MERIAN BYRD, | : | |
| NURSE, DELAWARE COUNTY | : | |
| PRISON; CAROL SNELL, NURSE, | : | |
| DELAWARE COUNTY PRISON | : | |

**DEFENDANTS WACKENHUT CORRECTIONS CORPORATION,**
**THE WACKENHUT CORPORATION, JAMES JANECK, DEBORAH**
**PERRETTA, MARGARET CARRILLO, M.D., DR. FREDERICK, DR.**
**HOLLAND HULL, MERIAN BYRD AND CAROL SNELL'S BRIEF IN**
**SUPPORT OF  MOTION FOR SUMMARY JUDGMENT**

Defendant Wackenhut Corrections Corporation (hereinafter referred to as "Wackenhut"),

by and through their attorneys, Kelly, McLaughlin, Foster, Bracaglia, Daly, Trabucco and White,

LLP, hereby moves for Summary Judgment and in support thereof states the following:

## I.    <u>FACTS</u>

Plaintiff, Arthur Jackson was convicted of driving under the influence in the fall of 1999 and was sentenced to thirty days at the George W. Hill Correctional Facility, to be served on fifteen consecutive weekends between February and May, 2000.  The "weekender" program was developed by Delaware County and sanctioned by the Commonwealth of Pennsylvania to allow certain classes of offenders to retain their employment while serving their sentence.

Generally speaking, a "weekender" is someone who is ordered by the Court to serve their time on weekends, rather than consecutive days.  This is usually done by the Court to allow the offender the opportunity to work during the week.

Although Mr. Jackson had not been employed since 1991, and at the time of his sentence was receiving Social Security disability payments, he was granted the concession to serve his sentence on weekends.

Mr. Jackson was no stranger to the George W. Hill Correctional Facility, having served a sentence there in 1998 for receiving stolen property.  In that instance, he was incarcerated in the main jail, while his DUI sentence was to be served in a dormitory-barracks structure off the main prison building that had been designated for the "weekend" inmates.

Mr. Jackson's slip-and-fall accident occurred on May 28, 2000.  He had been serving as a weekend inmate since January of 2000.  This was his 14th weekend out of 15 sentenced.

The "weekender" program, by necessity, employed a number of modifications to the regular prison rules.  One of these modifications concerned prescription medications of inmates. While the prison infirmary uses an outside pharmacy and stocks the medications for the inmates in the regular prison, "weekenders" are instructed to arrive with any required medications each

weekend, along with a copy of their prescriptions or a doctor's note establishing that the medications are legitimate.  Each weekend the medications are then taken by the intake corrections officers to the prison infirmary, where they are kept and administered.  Insulin is an exception and the "weekenders" are not required to bring their own.  Insulin is managed and administered to the "weekenders" from infirmary stock, primarily due to its injectable nature.

A weekend inmate must arrive at the prison at 6:00 P.M. on Friday night and is released at 6:00 P.M. on Sunday.  During the week, they are considered "furloughed" and are free to do as they wish.  The prison system has no control over these individuals from 6:00 P.M. Sunday to 6:00 P.M. Friday, although these individuals, especially the DUI offenders, are prohibited from taking illicit drugs and drinking alcohol during this furloughed time.  Random urinalysis tests are performed at intake.

Mr. Jackson, on at least two occasions, presented himself at the prison in an obviously inebriated state.  (See Exhibit "A" – Prison Housing database, 4/16/00 and 4/22/00; Exhibit "B" – Deposition Transcript of former corrections officer Sean Gardner, p. 10-12).  On these occasions, he was immediately sent up to the main prison to serve his weekend.  Mr. Jackson admits that he was actively drinking during the months that he  was serving his weekends.  (See Exhibit "C" – Deposition transcript of Arthur Jackson, III, part II, pp. 44-45)

Mr. Jackson was a chronic alcoholic.  This particular sentence was due to a conviction for driving under the influence.  In addition to his alcoholism, the Plaintiff also suffered from hypertension, diabetes, a previous stroke, acute pancreatitis, alcoholic liver disease, sepsis, osteomyelitis, hyperglycemia and back problems.

During his incarceration Mr. Jackson arrived with prescriptions for Insulin, Klonopin, Effexor, Trazadone,  (See Exhibit "D" – Medication Administration Records).  Initially, Mr. Jackson would bring his medications and they would be administered by the infirmary medical

personnel.  However, on the occasions he was perceived to be intoxicated, the medical staff would administer Librium as an aid to alcohol withdrawal instead of his other medications which were contraindicated when combined with alcohol.  (See Exhibit "D" – Medication Administration Records).  Librium was also given to Mr. Jackson, along with his other medications, when he was withdrawing from alcohol and visibly sick, but had not had a drink for a few days.  (See Medication Administration Records, May 6, 2000 and Exhibit "O", deposition transcript of Nurse Meriam Byrd, pp. 73-74.

If an inmate was, as most inmates are, residents of the prison 24 hours a day, 7 days a week, they would be supplied with their prescribed medication by the prison.  That is when the prison had complete control over them.

The reason that the weekenders are treated differently is that the prison officials have no control over the activities of the inmates when they are not in the prison, i.e., during the week.

If, for example, a doctor wished a prescription to end on a Monday, the prison medical staff would have no way of knowing that when the prisoner shows up on the following weekend. Therefore, if the weekend prisoner does not bring his medication, then he can not get it from the prison supply.

At some point, Mr. Jackson avers that he was told that his medications were "lost" by the medical staff (See Exhibit "E" – Dep. Transcript of Arthur Jackson, part I,  p.53-54).  Mr. Jackson was aware that he would not receive any medication, with the exception of Insulin, if he did not bring it to the prison each weekend.  There is no record of any medication being "lost" or misplaced. Mr. Jackson unilaterally decided he was not going to bring his medications to the prison, knowing full well that, as a "weekender", the policy was to bring any medications needed to the prison when reporting.  (See Exhibit "F" – Deposition Transcript of Arthur Jackson, part I, p. 54)

On the weekend of his accident, May 26-28, 2000, Mr. Jackson arrived at the prison on Friday at 6:00 P.M. without his medications. He was administered insulin on Saturday, believes he was given insulin early Sunday morning, and does not know if he was given insulin on Sunday afternoon. (See Exhibit "G" - Deposition Transcript of Arthur Jackson part II (3/12/03), p. 51, 20-23). He was not given any other medication during his forty-eight hour stay, as he did not bring any to the prison as required.

Sometime prior to 6:00 P.M. on Sunday, May 28, 2000, the weekend prisoners were gathered to be released. They were waiting for the bus to take them from the barracks to the front gate. Mr. Jackson's name was called by the corrections officer, who heard a "yelp" and was then summoned over by some inmates. Mr. Jackson had apparently passed out, lying on the floor, possibly experiencing a seizure. Medical personnel were summoned from the prison infirmary, as well as outside emergency medical technicians. Mr. Jackson was taken to Crozer-Chester Hospital emergency room.

At Crozer, Mr. Jackson was examined and blood tests were performed. He was initially diagnosed with a subdural hematoma, caused by hitting his head when he passed out. The blood tests revealed a blood sugar count of 461, no traces of benzodiazapene (Klonopin), and a dangerously low level of sodium. (See Exhibit "S" – Crozer Chester Emergency Room Records, blood tests taken on 5/28/00).

Mr. Jackson was later diagnosed at Crozer with hyponatremia, a condition resulting from low sodium levels. He informed some of the medical staff at Crozer that he had been "flushing out his system" by drinking gallons of water. (See Exhibit "H" Crozer-Chester Hospital Discharge Summary, 6/7/00) Low sodium hyponatremia can be caused by drinking excessive amounts of water (See Exhibit I – internet article by Tom Brody and Exhibit "J" – Initial report

by Dr. James Menapace (Defense Expert) dated 5/27/03) In addition,  Hyponatremia can cause seizures (See Exhibit "I"  – internet article by Tom Brody)

As Mr. Jackson had no trace of benzodiazapene (Klonopin) in his system and this drug has a lengthy half-life. It is apparent that no "sudden withdrawal" of this medication was the cause of Mr. Jackson passing out.  (See Exhibit "J" – Initial report of Dr. James Menapace dated 5/27/03; Exhibit "K", Deposition of Dr. Victoria Gessner, p. 110-111).  The blood sugar level of 461 determined in the emergency room would not have caused Mr. Jackson's accident, as this level is fairly high and it is a low blood sugar level that would cause fainting and seizures. (See Exhibit "J" – Report of Dr. James Menapace dated 5/27/03).

Plaintiff's experts have not contradicted the blood test results regarding the blood sugar count, the low sodium level or the lack of even a trace amount of benzodiazapene.  Plaintiff's have no expert to contradict the opinions of Dr. Menapace.  In addition, there are no Plaintiff's experts regarding prison conditions, policies, standards or custom and practice.

Mr. Jackson, in his complaint, has alleged violations of his civil rights under 42 U.S.C. § 1983, a breach of the duty to provide reasonable health care and reasonable access to health care, negligence, intentional infliction of emotional distress, and a count under the "state created danger" theory expressed in Kneipp v. Tedder, 95 F. 3d 1199 (3rd Cir. 1996).


## II.    STANDARD FOR SUMMARY JUDGMENT

The standard for summary judgment in federal court is clear.  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56 (c). The moving party has the burden of demonstrating the absence of any genuine issue of material fact.

See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn therefrom in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In other words, if the evidence presented by the parties conflicts, the court must accept as true the allegations of the non-moving party.   However, Rule 56 'mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' See Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548." Williams v. Hartford Cas. Ins. Co., 83 F.Supp.2d 567, 570 n.7 (E.D.Pa. 2000).

Summary judgment is appropriate if an essential element of a claim is supported only by sham evidence, a scintilla of evidence, or mere allegations.  Liberty Lobby at 252; See Aini v. Bloomsburg University Faculty, 826 F. Supp. 882, 885 (M.D. Pa. 1993).  A court will grant summary judgment against a party who fails to provide support for an essential element on which the party will bear the burden of persuasion at trial.  Muslim v. Frame, 854 F. Supp. 1215, 1222 (E.D. Pa. 1994).  If proof is absent or insufficient regarding any necessary elements of a claim, the claimant can not win at trial and trial is therefore unnecessary.  Muslim at 1222.

If factual matters are clear due to the strength of movant's evidence or weakness of non-movant's evidence and a purported factual dispute can be decided only one way as a matter of law then summary judgment may be granted: "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted".  Liberty Lobby at 249-250, citing First National Bank of Arizona v. Cities Services Co., 391 U.S. 253 U.S. 253, 288 – 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968),  Dombrowski v. Eastland, 389 U.S. 802, 88 S.Ct. 13, 19 L.Ed. 2d 57 (1967).

III.    **LEGAL ARGUMENT**

A.    **PLAINTIFF'S HAVE NOT PROVEN WITH SUBSTANTIAL EVIDENCE THAT DEFENDANTS WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S SERIOUS MEDICAL NEEDS AS REQUIRED BY 42 U.S.C. § 1983**.

To state a claim under 42 U.S.C. § 1983 for lack of adequate medical care, a prisoner must depict conduct so cruel or unusual as to approach a violation of the Eighth Amendment's prohibition of such punishment in order that a colorable constitutional claim is presented. Gittlemaker v. Prasse, 428 F.2d 1 (3rd Cir., 1970). The prisoner must show that prison officials were deliberately indifferent to his serious medical needs, and to establish deliberate indifference the inmate must show that the Defendants knew of, yet deliberately disregarded, an excessive risk to his health. U.S.C.A. Constitutional Amendment 8; 42 U.S.C.A. § 1983; Kessler v. King, 130 F.3d 1309 (8th Cir. 1997).

All Federal circuits have addressed this issue, and all are in agreement that the level of egregiousness necessary to state a §1983 claim is very high. Many circuits have found that the mistreatment must "shock the conscience" of the judge or sink to the level of a "barbaric act". Ammlung v. City of Chester, 355 F. Supp. 1300 (E.D. Pa., 1973); McDuffie v. Hopper, 982 F. Supp. 817 (M.D. Ala. 1997);

The alleged tortious conduct must be so "grossly incompetent, inadequate or excessive as to shock the general conscience or be intolerable to fundamental fairness." Gittlemaker at 6. When the denial of medical care is the result of mere negligence, with no deliberately indifferent, conscience-shocking exceptional circumstances, relief under § 1983 will be denied. Gittlemaker at 6; Derrickson v. Keve, 390 F.Supp. 905 (D. Del., 1975).

In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976), the United States Supreme Court articulated the requirements for stating an Eighth Amendment claim relating to medical care in prison.

To state a colorable claim for the denial of adequate medical assistance, the complaint must allege "deliberate indifference to serious medical needs of prisoners." *Id.* at 104, 97 S.Ct at 290. The Court stated that not every claim of inadequate treatment would suffice; "…medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id*. at 106, 97 S. Ct. at 292. Thus, the requirement is two-fold. The claim must indicate: (1) a culpable state of mind on the part of the officials, *viz*., deliberate indifference, and (2) a serious medical need. *Id*. at 106, 97 S.Ct. at 292; See West v. Keve,  571 F.2d 158, 161 (3d Cir. 1978); Johnstone v. United States, 980 F.Supp. 148 (E.D. Pa. 1997).

No evidence has been presented by Plaintiff that would satisfy either the first requirement or the second requirement of Estelle. Even the allegation that Mr. Jackson's insulin was not administered on the day of his accident fails in light of the blood sugar level reading that was indicated in the emergency room where he was taken after his fall and his subsequent testimony that he believes he at least received his morning dose. As a matter of fact, Mr. Jackson does not know if he did or did not receive his afternoon dose of insulin.  (See Exhibit "G" – Deposition Transcript of Arthur Jackson, Part II (3/12/03), p.51.20-23)  Mr. Jackson's blood sugar level on the evening of May 28, 2000 was not at a level that would have caused fainting or seizures, and no opinion has been presented by Plaintiff's experts indicating that it could.  (See Exhibits "J" and "L" – Reports of James Menapace, M.D.)    There has simply been no substantial evidence that Mr. Jackson did not receive his insulin on May 28, 2000 or that any lack of insulin caused his accident.

Rather than a mere medical malpractice case cognizable under state tort law, the indifference required to state a § 1983 claim "... must be deliberate and actions intentional; neglect, carelessness or malpractice is more properly the subject of tort action in state courts." Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3rd Cir. 1976). Claimed deficiencies in a prison facility's treatment of an inmate does not rise to the level of constitutional deprivation where the inmate adduces no facts to suggest deliberate indifference to the inmate's medical needs. Mastrota v. Robinson, 534 F.Supp. 434 (E.D. Pa. 1982). In the instant case, there have been no facts suggesting deliberate indifference or, even, simple negligence.

To state an Eighth Amendment claim for denial of adequate medical care, a Plaintiff must allege: (1) a sufficiently serious condition, one that may produce death, degeneration or extreme pain; and (2) that Defendant acted with a culpable state of mind which **must be the equivalent of criminal recklessness**. Boyd v. Rhode Island Dept. of Corrections, 160 F. Supp. 2d 213 (D.R.I. 2001) (emphasis supplied). No jury could reasonably conclude that any of the prison staff had a criminally reckless state of mind when presented with the evidence at hand.

Arthur Jackson was a "weekend" inmate. This relatively rare designation describes a convict who has been allowed to serve his sentence on weekends to permit him to retain his employment by continuing to work during the week. Although Mr. Jackson had not worked for close to nine years, he was somehow granted the privilege of arriving at the prison at 6:00 P.M. on Friday and being released at 6:00 P.M. on Sunday for fifteen successive weekends rather than serving thirty consecutive days. These weekend inmates are only held for forty-eight hours at a time, and are free the rest of the week.

The "weekenders" are instructed to bring their own prescription medications to the prison, as stocked medication is only kept for full time prisoners. (See Exhibit "M" – GWHCF "Weekender" Policy, Exhibit "K" – Deposition transcript of Dr. Victoria Gessner, p. 95.13-21)

Along with the medications, they must arrive with a note from their physicians affirming that the medication they arrive with was actually prescribed.  (See Exhibit "M" – GWHCF "Weekender" Policy).    This policy was created to alleviate any added stress on the infirmary when presented with a hundred or more inmates on a weekend who are only incarcerated for a forty-eight hour period.  By having these inmates bring their own medication for each forty-eight hour period, the infirmary is able to operate the medical administration of the long term prisoner's needs with as little disruption as possible.

      The reason that the weekenders are treated differently is that the prison officials have no control over the activities of the inmates when they are not in the prison, i.e., during the week.

      If, for example, a doctor wished a prescription to end on a Monday, the prison medical staff would have no way of knowing that when the prisoner shows up on the following weekend.  Therefore, if the weekend prisoner does not bring his medication, then he can not get it from the prison supply.

      It is logically expected that these "weekenders" will administer their medications on their own on Friday's before reporting to the prison, and it is typical for many to wait until release early Sunday evening to take their Sunday medication.  (See Exhibit "N" – Deposition Transcript of nurse Meriam Byrd, pp. 46-48).  If an inmate fails to bring his own prescribed medications to the prison on Friday, they will not receive medicine that weekend unless symptoms are exhibited showing the medication is medically necessary and there is actually extra stock of that particular medication not designated for the full time inmates.  A significant exception to this policy is insulin, which is provided as needed by the prison infirmary nurse upon proof of such need.  (See Exhibit "O" – Deposition of  Nurse Meriam Byrd, p. 94 1-17).  The intravenous nature of the administration of insulin necessitates this policy.

349976-1

No medications, not even over-the-counter aspirin, is allowed to be kept by the weekend prisoners in their barracks.  (See Exhibit "B" – Deposition Transcript of former Corrections Officer Sean Gardner pp. 36-36; Exhibit "P" – Deposition transcript of former Corrections Officer Ernie Gratz, pp. 14-15, 38).  All approved prescription medication is sent to the infirmary for dispensing.   Any unapproved medication, tobacco, or personal items not listed on the approved list  in the "Weekender" Policy are considered contraband and are taken from the prisoner after a strip search at intake on Friday evenings.  (See Exhibit "M" – GWHCF Weekender Policy; Exhibit "B" – Deposition transcript of former Corrections Officer Gardner, pp. 34-35;  Exhibit "P" – Deposition transcript of Corrections Officer Gratz, pp. 14-15).

By his own admission, **Mr. Jackson stopped bringing his medications to the prison on his own accord.** (See Exhibit "E" – Deposition transcript of Arthur Jackson, Part I, p. 54.11). He admits that he was told to bring his medications in, but claims that one weekend after he brought them he was informed by one of the medical staff that they had either "lost" his medication or that they thought that he had been released so they "threw away" his medication. (See Exhibit "E" – Deposition transcript of Arthur Jackson, Part I,  pp. 53-54).   There has been absolutely no substantiation of such a claim.  Even if such an allegation were true, it does not negate the fact that Mr. Jackson's decision to stop bringing his medications on subsequent weekends, and notably the weekend of his accident, was the reason he did not receive his medications on those weekends.  Mr. Jackson  deprived himself of his medications.

## B.    DEFENDANT'S MEDICAL DECISIONS REGARDING ARTHUR JACKSON CAN NOT BE THE BASIS FOR A CLAIM UNER 42 U.S.C. § 1983.

The medical decision as to whether a certain medication is so necessary that its absence would create a serious risk of harm to life or health is left to the discretion of the medical personnel.   The courts have addressed this issue numerous times and have found that such a

decision is merely a difference of opinion as to treatment, and such an allegation is not a constitutional violation.    The judgment and decision of the medical staff as to the necessity of certain medications during Mr. Jackson's two day stays at the prison could not be the basis of a claim under 42 U.S.C. § 1983.  In Johnstone v. United States  980 F. Supp. 148 (E.D. Pa. 1997), the Court, quoting Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980),  *Cert. denied,* 450 U.S. 1041, 101 S.CT. 1759, 68 L.Ed. 2d 239 (1981)., stated that:

> Mere difference of opinion between the prison's medical staff and
> the inmate as to the diagnosis or treatment which the inmate receives
> does not support a claim for cruel and unusual punishment.

In Johnstone, the plaintiffs' Eighth Amendment medical maltreatment claims against individuals at five federal prisons and at the Greater Philadelphia Center for Community Corrections were dismissed, as the Court found nothing in the Complaint that would "support even the most slender inference of deliberate indifference." Johnstone at 153.

Medication Administration Records indicate that Mr. Jackson's contraindicated medications were withheld when he would report in an intoxicated state on various Fridays to begin his weekend sentence.  (See Exhibit "D" – Medication Administration Records; Exhibit "B" – Deposition transcript of former Corrections Officer Sean Gardner, pp. 10-12).   Several of his medications were contraindicated when combined with alcohol.  (See Exhibit "K" – Deposition of Victoria Gessner, M.D., p. 106).    When Mr. Jackson would appear in an inebriated state, he was given Librium as an aid to alcohol withdrawal instead of being administered his anti-depressants.  This was a medical decision made by the medical director of the prison, Victoria Gessner, M.D. due to Mr. Jackson exhibiting alcohol withdrawal symptoms (See Exhibit "D" – Medication Administration Records; Exhibit "K" – Deposition of Victoria Gessner, M.D., p. 70-71). Mr. Jackson would often appear "falling down drunk" on Friday

evenings.  (Exhibit "B" – Deposition Transcript of former Corrections Officer Sean Gardner, pp. 10-12).

On at least two occasions, Mr. Jackson was so obviously intoxicated when he reported that he was sent to the main prison to serve that particular weekend.  (See Exhibit "A" – Printouts of Prison Housing Database 4/16/00 and 4/22/00 and Exhibit "B" -  Deposition Transcript of former Corrections Officer Sean Gardner, pp. 73-74)  Normally, the "weekenders" would be kept in a dormitory – like barracks separated from the main prison.  Mr. Jackson, as a "weekender" was to bring in his own medications (except for insulin),  and if he failed to do so, he would not receive his medication for the forty-eight hour period he would serve on that particular weekend unless it was medically determined that a forty-eight hour lapse of the medication would be a serious risk to life or health. (See Exhibit "O" – Deposition transcript of Nurse Byrd, pp. 65 - 66).

    **C.    PLAINTIFF'S HAVE FAILED TO PROVIDE SUBSTANTIAL EVIDENCE  THAT DEFENDANTS POSSESSED SUBJECTIVE KNOWLEDGE THAT A TWO DAY DEPRIVATION OF MEDICATION WAS CAUSING OR WOULD CAUSE HARM OR THAT MR. JACKSON HAD INDEPENDENTLY DECIDED TO STOP TAKING HIS MEDICATION.**

To state a colorable claim under § 1983, prison staff must possess subjective knowledge that any deprivation of medication would cause serious harm.  There must be obvious symptoms of this harm.  Arthur Jackson showed no symptoms related to any deprivation of medications, and was medically determined to be withdrawing from alcohol when, at times, he was vomiting or had diarrhea and was medically treated accordingly.  (See Exhibit "K" – Deposition Transcript of Victoria Gessner, M.D., pp. 70-71)  The court in Mahan v. Plymouth County House of Corrections, 64 F.3d 14 (D. Mass. 1995) held that Defendant jail employees **could not be held liable for depriving a pre-trial detainee of anti-depressant medication for seven days**, not

withstanding officials' knowledge of a valid prescription and delivery of medication to the jail. Where, because the detainee did not manifest symptoms suggesting the deprivation was causing harm, thus without proving **the requisite subjective knowledge of risk of harm**, the prison could not have been deliberately indifferent.

Mr. Jackson, as is evident from the medication charts, was treated as medically necessary.   However, his particular treatment depended on his physical state during any particular weekend.   Although he claims that he had weekends of vomiting, diarrhea  and shaking while incarcerated, this was recognized, and treated, as an alcohol withdrawal problem. (See Exhibit "K" – Deposition Transcript of Dr. Victoria Gessner, p. 106).   He was given Librium, Kaopectate and Maalox when exhibiting such symptoms.   (See Exhibit "D" – Medication Administration Records).  The medical staff would never have given Mr. Jackson the contraindicated medications he claims he was deprived of when he presented himself at the prison in an inebriated state.  (See Exhibit "K" – Deposition transcript of Victoria Gessner, M.D., pp. 70-71, 106)

D.    **PLAINTIFF'S HAVE NOT PRODUCED ANY SUBSTANTIAL EVIDENCE THAT PLAINTIFF'S ACCIDENT WAS  CAUSED BY A SUDDEN WITHDRAWAL OF MEDICATION OR LACK OF INSULIN.**

Plaintiff's expert opines that Mr. Jackson's fall and subsequent seizure was caused by withdrawal from  Klonopin, an anti-depressant medication.  (See Exhibits "Q" and "R" – Reports of Dr. Silverman dated January 22, 2003 and February 2, 2004).   However, when Mr. Jackson fell at the prison on May 28, 2000, he had no Klonopin  in his system at all. (See Exhibit "S" – Crozer-Chester Hospital Emergency Room records regarding blood tests performed 5/28/00). Benzodiazepines, (which includes Klonopin), have a lengthy half-life and a chronic user, as Mr. Jackson claims to have been, would have measurable amounts of the drug in his system for

weeks, and a significant level after forty-eight hours. (See Exhibit "J" – Report of Dr. James Menapace; Exhibit "K" – deposition transcript of Dr. Victoria Gessner, pp. 110-111, 119-121).

The fact that his system had no trace of Klonopin establishes that Mr. Jackson had voluntarily and unilaterally stopped taking Klonopin long before the weekend of his accident. In fact, he stated to his own private treating physician after his accident that he had stopped taking Klonopin "several days" before his accident. (See Exhibit "T" - Letter of Daniel Gzesh, M.D.(Plaintiff's expert) to Dr. Silverman dated July 25, 2000). He had not brought any medications to the prison that weekend as per his own admission that he had previously decided to stop bringing them altogether. (See Exhibit "F" – Deposition transcript of Arthur Jackson, Part I, p. 54.11).

Mr. Jackson also readily admitted that before he decided to stop bringing his medication, he was administered his medication by the infirmary staff when he brought it to the prison for his weekend incarceration. (See Exhibit "G" – Deposition transcript of Arthur Jackson, Part II, p. 52.12-14).

The blood test taken in the emergency room on the day of the accident indicated that there was no trace of benzodiazapene (Klonopin) in his system. It is the "sudden withdrawal" of benzodiazepam that Plaintiffs' expert, Dr. Silverman, finds mainly responsible for Mr. Jackson's seizure. (See Exhibit "Q" – Report of Dr. Silverman dated January 22, 2003). However, with no trace in his system, there could have been no "sudden withdrawal" on the evening of May 28, 2000, and any withdrawal at all would be attributable to Mr. Jackson's actions.

Putting aside the admitted fact that Plaintiff did not bring his medications to the jail on the weekend of the accident, and taking all the facts plead by Mr. Jackson as true, his claims, at best, constitute a two day delay on the weekend of May 28, 2000 in receiving some of his medications. On Sundays at 6:00 P.M., Mr. Jackson was free to medicate himself and was no

longer a prisoner[1]  What medications Mr. Jackson took, or didn't take, during the furloughed weekdays was entirely his decision.

A delay of only two days does not rise to the level of deliberate indifference to serious medical needs of prisoners under the Eighth Amendment.  See Lewis v. Turner, 16 Fed. Appx. 302 (6th Cir. 2001); Smith v. Franklin County, 227 F. Supp. 2d 667 (E.D.KY. 2002);  Cummings v. McCarter, 826 F.Supp. 299 (E.D. MO. 1993). In Mahan, supra, the Court held that a Defendant's jail employees could not be held liable for depriving a prisoner of anti-depressant medication for (7) seven days.

There was no action or omission on the part of Wackenhut or its employees that caused Mr. Jackson's injuries or increased the risk of harm.  There has been no evidence presented, expert or otherwise, that has established any such liability.  Mr. Jackson, if there was any increased risk, brought that risk on himself.  He admittedly stopped bringing his medications to prison, reported to the prison inebriated at various times, refused or simply did not show up for medications at certain times, and caused a dangerous condition of hyponatremia by ingesting inordinate amounts of water prior to reporting to the prison.  (See Exhibit "S" – Crozer – Chester Hospital ER records).

Hyponatremia, a condition caused by low sodium levels, can cause seizures and various other serious health problems.  (See Exhibit "I" – Hyponatremia internet article by Tom Brody; Exhibit "J" – Report of James Menapace, M.D.;  Exhibit "K" – Deposition of Victoria Gessner, M.D., pp. 108-109)   Mr. Jackson admittedly attempted to flush his system with excessive water before reporting on the Friday before his accident. This "flushing" is typically done by weekenders in any attempt to pass any random urinalysis tests at intake.   (See Exhibit "H" – Crozer-Chester ER Discharge Record).

---

[1] "Weekenders" were considered "furloughed" following dismissal on Sundays and before reporting on Fridays (See Exhibit "M" – Weekender Policy).

349976-1

After being taken to Crozer- Chester Hospital on the evening of May 28, 2000, Mr. Jackson was found to have dangerously low levels of sodium and was diagnosed as hyponatremic.  (See Exhibit "S" – Crozer-Chester Emergency Room Records).  Hyponatremia, combined with likely alcohol withdrawal, was the most plausible cause of Mr. Jackson's accident.  There is no other logical reason Mr. Jackson would have attempted to flush his system other than the fact that he had been drinking alcohol during the week before his accident.  Mr. Jackson has admitted  that he was actively drinking alcohol during the time of his incarceration (See Exhibit "C" , Deposition Transcript of Arthur Jackson, Part II,  p. 44-45).  He states he would stop drinking before 3:00 P.M. because he would have to report at 6:00 P.M. on Friday.  (See Exhibit "C" – Deposition Transcript of Arthur Jackson, Part II, pp. 44-45).  "Weekenders", especially those who are incarcerated for driving under the influence, are strictly forbidden to have any traces of alcohol in their systems.   As evident and plausible as this is from the facts, Plaintiff's expert neither addresses this alternate cause or negates it.  The appropriate Daubert motion is being filed.

Considering  all of the facts gathered throughout the discovery process, Plaintiff's have failed to prove that Mr. Jackson's fall was due, in any way, to a lack of medical care by the prison employees.  It was not the "sudden withdrawal" of Klonopin for a two day period or a low blood sugar level that caused Mr. Jackson to fall, and no sufficient evidence has been presented by Plaintiffs to advance such an argument.  Plaintiffs have not met their burdens of proof or persuasion in presenting facts to establish their conclusory allegations.  What the evidence does show, inarguably, is that Mr. Jackson had not been taking Klonopin for some time, that his sodium levels were dangerously low, that his insulin level was not low, and that he was likely withdrawing from alcohol.

The facts establish that Mr. Jackson decided to intentionally refrain from bringing his medication to the prison facility and that, arguably, he should have had no reasonable expectation of receiving any medication at the prison except for insulin, which was constantly and consistently monitored and administered as necessary.  (See Exhibit "D" – Medication Administration Records)  His other medications were also consistently administered – when he remembered to bring them, when he was not considered to have been ingesting alcohol, and before he decided to stop bringing them all together.  (See Exhibit "D" – Medical Administration Records)

All Federal circuits that have addressed the issue of Federal involvement in state run prisons have recognized that the courts should not interfere with the internal administration and normal process of a state prison and that wide discretion is allowed  prison officials in maintaining order and discipline.  The courts should not inquire into the adequacy or sufficiency of medical care of state prison inmates unless there is evidence of an abuse of the broad discretion as to the type of medical treatment required under particular circumstances that prison officials possess in this area.  Newman v. Alabama, 349 F. Supp. 278 (M.D.Ala.1972), remanded without opinion, 503 F.2d 565 (5th Cir. 1974), and Aff'd 503 F.2d 1320 (5th Cir. 1974), reh den 506 F.2d 1056 (5th Cir. 1975), and cert den 421 US 948, 44 L.Ed.2d 102, 95 S.Ct. 1680, and vacated in part on other grounds 522 F.2d 71 (5th Cir. 1975); Campbell v. Beto, 460 F.2 765 (5th Cir. 1972); Coppinger v. Townsend, 398 F.2d 392 (10th Cir. 1968); Mathis v. Pratt, 375 F.Supp. 301 (N.D. Ill. 1974).

### E.    PLAINTIFF'S HAVE NOT ADEQUATELY CHALLENGED THAT ANY POLICY OR CUSTOM OF THE PRISON WAS THE MOVING FORCE OF A CONSTITUTIONAL VIOLATION

The Third Circuit has set the bar even higher and has established the requirement that allegations of deliberate indifference to an inmate's medical needs is not enough to state a claim

under § 1983, absent some allegations as to what policy or custom of the jail is challenged. Grayson v. Mayview Hospital, 293 F.3d 10 (3rd Cir. 2002). Plaintiff Jackson has not challenged any specific policy or custom of the George W. Hill Correctional Facility. The bald statement that Mr. Jackson's injuries were caused by the "policies" of Defendants without enumerating which policy or policies they are alluding to fails to state a colorable claim under § 1983. Mr. Jackson did not claim to suffer any injury during his initial thirteen weekends of incarceration, but only on the fourteenth weekend. As the "weekenders" are furloughed during the week, each weekend is separate and distinct. Mr. Jackson admits that he stopped bringing in his medications and he does not allege that he brought them on the weekend of his accident. The policy that "weekenders" must bring in their own medications was not challenged, although Defendants' would certainly prevail as to the constitutionality of such a policy.

The Grayson court stated that neither the pro se Plaintiff's complaint nor his "Memorandum Order" alleged that the jail facility had a "policy of denying medical treatment to inmates". Nor did the Plaintiff allege that other inmates suffered similar deprivations of medical attention that might establish a custom. Grayson at 108. Mr. Jackson, likewise, fails to allege a specific policy or custom of denial of medication. His self-serving allegation regarding his prior incarceration years before is not proof of any policy or custom of the prison facility and the vague allegations in Plaintiff's complaint point to no specific policy or custom whereby prisoners are denied medication. Similar to Jackson, the Plaintiff in Grayson alleged that a constitutional violation was committed by the jail's employees. The Grayson court stated that the Plaintiff, to satisfy the requirement that a policy or custom was the "moving force" of a constitutional violation, must allege that the jail was deliberately indifferent to the possibility that such a violation would occur. Grayson at 108. The foregoing arguments regarding § 1983 apply. No evidence of a policy or custom to deny medical treatment has been presented by Plaintiff. There

349976-1

has been no expert report regarding a specific policy or custom to prove deliberate indifference as required to prove a violation of § 1983.

### F.    NO DENIAL OF MEDICATION HAS BEEN ESTABLISHED BY PLAINTIFFS

There was no denial of medication, as there is no evidence that  Mr. Jackson was ever told that the infirmary was refusing to give him the approved medications that he brought into the facility except when he reported inebriated.   Thus, the only possible claim is for inadequate medical treatment.  In <u>Fear v. Pennsylvania</u>, 413 F.2d  88 (3rd Cir.1969), the Court rejected a complaint claiming "denial of medical care" on the ground that the action of the prison employee amounted to nothing more than a claim of improper medical care and that such an allegation is legally insufficient to establish a denial of rights secured under the Federal Constitution.

The courts in all jurisdictions distinguish between cases where the complaint alleges a complete denial of medical care and those alleging inadequate treatment.   In <u>United States ex rel. Walker v. Fayette County</u>, 599 F.2d 573 (3rd Cir. 1979)  the Court stated that:

> Where a prisoner has received **some medical attention** and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.

*Id* at F.N. 2; (emphasis supplied) quoting <u>West Lake v. Lucas</u>, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).

In <u>Walker</u>, the Plaintiff claimed that he was left completely untreated for his heroin withdrawal symptoms for ten days.  The Court pointed to 61 P.S.A. § 1 and 37 Pa. Code § 95.232 a (1) to assert that the rule in Pennsylvania requires that any person admitted to a jail or penal institution must be physically and mentally examined within forty-eight hours of their admission.  Arguably, there was no duty for the prison personnel in the instant case to assess Mr.

Jackson, or any of the "weekenders", as their time at the prison never exceeded forty-eight hours. It is clear that the legislature deemed a stay of forty-eight hours with absolutely no medical treatment beyond emergency procedures to be adequate under the circumstances of penal incarceration. In regard to the "weekender" situation, it was fully expected that these inmates, if needed, would be treating during the weekdays with their private doctors, and that they would bring any necessary medications with them to the prison. It is abundantly clear from the deposition testimony and records that Mr. Jackson not only received "some medical attention", but was more than adequately treated in relation to his physical condition on each respective weekend.

In the Third Circuit, a plethora of cases support the general principal that no relief under 42 U.S.C.A. § 1983 is warranted in cases where a prisoner complains that the medical care received was improper or inadequate as opposed to completely denied. This rationale is two-fold: (1) Such a charge sounds in negligence, which is generally held not to reach constitutional proportions, and (2) the courts are inclined to follow the "hands-off" approach to prisoner complaints because of their disinclination to interfere in internal prison administration, especially in situations where they feel they lack the requisite expertise. Pennsylvania ex rel. Gatewood v. Hendrick, 368 F2d 179 (3rd Cir. 1966), cert den 386 US 925, 17 L Ed 2d 797, 87 S Ct 899; United States ex rel. Gittlemacker v. County of Philadelphia 413 F.2d 88, (3rd Cir. 1969), cert den 396 US 1046, 24 L Ed 2d 691, 90 S Ct 696; Fear v. Pennsylvania, 413 F.2d 88, (3rd Cir. 1969) 396 US 935, 24 L ed 2d 234, 90 S Ct 278; Gittlemacker v. Pennsylvania, 428 F.2d 1 (3rd Cir.1970); Isenberg v. Prasse 433 F.2d 499 (3rd Cir.1970); Kontos v. Prasse, 444 F.2d 166; (3rd Cir.1971); United States ex rel. Johnson v. Prasse, 450 F.2d 946 (3rd Cir.1971); Nettles v. Rundle  453 F.2d 889 (3rd Cir.  1971); Fischer v. Cahill, 474 F.2d 991 (3rd Cir. 1973); United States ex rel. Gittlemacker v. Pennsylvania 281 F. Supp. 175, (E.D. Pa. 1968), 413 F.2d 84, (3rd

Cir. 1969) cert den 396 US 1046, (1970) 24 L Ed 2d 691, 90 S Ct 696; <u>Eddings v. Pennsylvania</u> 311 F.Supp. 944, (E.D. Pa. 1970),;    <u>Shaffer v. Jennings</u> 314 F. Supp. 588 (E.D. Pa. 1970), <u>Brown v. Cliff</u>, 341 F. Supp. 177 (E.D. Pa. 1972); <u>Buscka v. Johnson</u>, 351 F. Supp 771, (E.D. Pa. 1972); <u>Connor v. Jeffes,</u> 67 F.R.D. 86; (M.D. Pa. 1975); <u>DiFebo v. Keve</u> 395 F. Supp. 1350 (D. Del. 1975).

> **G.    NO DUTY WAS BREACHED AND NO CAUSATION HAS BEEN ESTABLISHED REGARDING PLAINTIFF'S NEGLIGENCE CLAIM, AND, AS AN AFFIRMATIVE DEFENSE,  PLAINTIFF WAS CONTRIBUTORILY NEGLIGENT AS A MATTER OF LAW**

Any claim of deprivation of medication as the cause of Mr. Jackson's injuries is solely attributable to Mr. Jackson's failure to bring his medications to the facility as required.  As stated previously, Mr. Jackson unilaterally decided he was not going to bring his medications after he was allegedly told the infirmary had "lost" them.  There is no record of the infirmary "losing" any of Mr. Jackson's medications.  He knew the infirmary would not supply him with medications other than insulin, so he fully expected that he would have to wait until his release on early Sunday evening to self-administer the medications he claimed to have been deprived of.

Mr. Jackson had no trace of benzodiazapene (Klonopin) in his system. This drug has a half life of weeks, not days.  Mr. Jackson's own non-compliance with his medications, his constant alcohol abuse, and his self-inflicted low sodium levels, all combined to compromise his system.  (See Exhibit "J" – Report of James Menapace, M.D.).

Defendant Wackenhut's duty was to provide adequate medical care to prisoners, but this duty does not extend to providing every medication a prisoner desires or is prescribed, especially when that prisoner will only be residing at the facility for forty-eight hours at a time.  The policy in place was for every weekend prisoner to obtain a note and copy of their prescription and to

supply their own medications for that forty-eight hour period.  Mr. Jackson was aware of this. Under these circumstances, the care provided to Mr. Jackson through his fourteenth successive weekend at the facility was more than adequate.

As the "weekender" system is a rare concession for the benefit of the inmate, and is found in very few jurisdictions, there is virtually no case law or statute regarding the modification necessary in housing these particular inmates, feeding these inmates, exercising these inmates or providing adequate medical care to these inmates.

The "weekender" program was created by the Delaware County Court System, and sanctioned by the Commonwealth of Pennsylvania, more than likely in an attempt to alleviate prison crowding and as a concession to allow the offender to continue his employment. However, the reality of the situation is that an entire new policy and program has had to be implemented on top of the standard prison system.  With the benefits of the concession comes the responsibility of the inmates to abide by the policy.  Along with the courtesy afforded these inmates in allowing them to remain gainfully employed and to spend the intervening weekdays with their families, there are certain modifications to the regular prison incarceration system that must be introduced.  These modifications, while still not alleviating the extreme hardship to the prison system that this sort of program entails, ("a nightmare", according to Nurse Meriam Byrd – See Exhibit "O" Deposition Transcript of Meriam Byrd, pp. 43-44) allows the prison to function when each weekend brings in another hundred or so inmates that must be dealt with differently than the inmates in the main prison.

If these "weekenders" were forced to serve their sentences on consecutive days, they would be placed in the main prison where a long standing and well tested system has been in place and where no special concessions are given or rules that need to be modified.  However, to continue functioning with the resources at hand, the facility has instituted a policy and program

to adequately meet the needs of the weekend inmates and the penal system.  It is incumbent on the weekend inmates to follow the policy, and Arthur Jackson did not.

Mr. Jackson's own negligence in not bringing his medications to the prison, not being compliant with his prescriptions, continuing to abuse alcohol and in attempting to mask his alcohol abuse by flushing his system with extreme amounts of water was the proximate cause of his accident.    Mr. Jackson's contributory negligence goes well beyond the percentage that would allow him to recover under a negligence theory.

The prison has no control of the weekend inmates Monday through Friday,  nor does the prison have a duty to these inmates during the five days that they are not incarcerated.   An inmate serving a regular sentence can be constantly monitored, observed and restrained from committing any abuses.  A regular inmate's medication is constantly monitored and any non-compliance noted and addressed.  However, the weekend inmate is free to do as he will during the week, and also conversely, is free to treat as necessary with any medical caregiver he chooses.

There is absolutely no evidence that Mr. Jackson was concerned enough about any alleged mistreatment during his weekends at the prison facility to seek any further medical help during his weekdays of freedom.   Even after his alleged weekends of severe vomiting,  diarrhea and shaking, there is no evidence that Mr. Jackson sought out a hospital emergency room or even his regular doctor to complain of a deprivation or inadequate administration of medication at the prison facility on the weekends.   As is evident from the depositions and the records, Mr. Jackson's physical condition during these weekends was a result of his alcohol abuse and withdrawal.  (See Exhibit "O" – Deposition Transcript of Nurse Meriam Byrd, pp. 73-74.)

### H.    MOVING DEFENDANTS ARE IMMUNE FROM SUIT PURSUANT TO 42 Pa. C.S.A. § 8541  REGARDING PLAINTIFF'S STATE TORT CLAIMS

Plaintiff, in asserting a claim of a violation of 42 U. S. C. § 1983, must aver that the moving Defendants were acting "under color of state law".  In acting "under color of state law" and performing an essential or traditional governmental function, the moving Defendants were acting as agents of the municipality, Delaware County.  As agents of the County, moving Defendants are immune from the state tort claims of breach of duty to provide reasonable healthcare and reasonable access to healthcare, negligence and intentional infliction of emotional distress pursuant to 42 PA C.S.A. § 8541 et.seq..

42 PA C.S.A. § 8541 provides:

> except as otherwise provided in this sub-chapter, no local agency shall be liable for any damages on account of any injury to a person or a property caused by any act of the local agency or an employee thereof or any other person.

The question as to whether a private company and its employees can be immune from suit under 42 PA C.S.A. § 8541 et.seq. has been addressed by a number of courts.  Although the qualified immunity afforded to state actors in the face of allegations of violations of § 1983 is arguably not available to private prison management or their employees [2], the governmental immunity afforded under 42 PA C.S.A. § 8541 et.seq. as to state tort claims applies if the private entity is performing the essential and traditional governmental function of incarceration.

In McCullum v. City of Philadelphia, 1999 LEXIS 10423 (E.D. PA), Judge Bechtle held that a private food service company (Aramark) that provided service to the city jail was acting as a state agency by performing a traditional government function.

The function of incarcerating people, whether done publicly

---

[2] In Richardson v. McKnight, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed. 2d 540 (1997), the Supreme Court held that private prison guards were not afforded the federal qualified immunity typically afforded to public prison officials in a § 1983 claim.  However, since Richardson, several courts have held that private companies who provide services in prison facilities are state actors for purposes of  § 1983.  Kessler v. King, 29 F. Supp. 2d 356, 370-71 (S.D. Tex. 1998); Giron v. Corrections Corporation of America, 14 F. Supp. 2d 1245, 1247-51 (D.N.M. 1998); Nelson v. Prison Health Services, 991 F. Supp. 1452, 1463 (M.D. Fla. 1997).

> or privately, is the exclusive prerogative of the state.  Providing
> food service, **like medical care**, to those incarcerated people
> is one part of the government function of incarceration.

McCullum at 9 (emphasis added).

In Mark v. Borough of Hatboro, 51 F.3d  1137 (3rd Cir. 1995), the court addressed the issue as to whether a volunteer fire company was a state actor under Pennsylvania law by virtue of performing an exclusively governmental function.  Although the case was focused on whether the government was responsible for specific conduct  (arson) of a volunteer fireman under § 1983, the court did an analysis of governmental immunity under 42 Pa. C.S.A. § 8541 et.seq. applying to a private entity who performs an essential and traditional governmental function. The Mark court considered the following factor in determining whether the services provided by the private entity was a traditional public function in Pennsylvania:  Does Pennsylvania impose a duty to perform the function?

It is inarguable that the incarceration of law offenders is an imposed public duty on the respective municipalities within a state and that the provision of medical services to those incarcerated persons is not only an essential government function, but is a guaranteed right under the U.S. Constitution.  See DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed. 2d 249 (the due process clause requires the state to provide adequate medical care to incarcerated prisoners who are unable to procure such care for themselves.)

The Mark court cited Guinn v. Alburtis Fire Co., 531 Pa. 500, 614 A.2d 218, 219, 220 (Pa. 1992), which held that a volunteer fire company was a local agency entitled to governmental immunity under Pa. C.S.A. § 8541 et.seq.  The rationale behind Mark and McCullum is that the state imposes a duty on the municipality to provide certain essential services, and any entity that performs these services and are subject to the regulations and liabilities should also be afforded

the same immunities the government would be afforded had the government performed the services itself.

It is not being argued by moving Defendants that they are not state actors in the context of a § 1983 claim.  In fact, moving Defendants will stipulate that they are indeed state actors acting under color of state law.  Plaintiff has certainly alleged, by virtue of his §1983 claim and the claim under the state created danger theory, that moving Defendants <u>are</u> state actors.  Thus, if moving Defendants are state actors under § 1983 by virtue of performing a governmental function as alleged by Plaintiff, then moving Defendants are certainly state actors performing essential and traditional governmental functions in the context of Plaintiff's state tort claims. Thus, moving Defendants must be afforded immunity under 42 PA C.S.A. § 8541 et.seq. Plaintiff cannot have it both ways.

While there are enumerated exceptions to immunity under 42 Pa. C.S.A. 8542, none of moving Defendants' alleged actions come under any of the eight enumerated exceptions. Although sovereign immunity for Commonwealth entities under 42 Pa. C.S.A. § 8522 contains an exception for medical and professional services, 42 Pa. C.S.A. § 8542 does not.  The immunity under § 8541 et.seq. applies to medical and professional services.

Under 42 Pa. C.S.A. § 6602 (e) (2) of the Pennsylvania Prison Litigation Reform Act, a claim must be dismissed if:

> (e) Dismissal of litigation.  Not withstanding any filing fee which has been paid, the court <u>shall dismiss prison conditions litigation at any time,</u> including prior to service on the Defendant if the court determines the following:

> …(2) the prison conditions litigation is frivolous or malicious or fails to state a claim upon which relief may be granted or the Defendant is <u>entitled to assert a valid affirmative defense, including immunity which if asserted would preclude the relief.</u>

(Emphasis added).

As the foregoing arguments have demonstrated that immunity under 42 Pa. C.S.A. § 8541 et.seq. applies to Moving Defendants, the state tort allegations of Plaintiff in the instant case, which all concerned prison conditions, must be dismissed.

Moving Defendants, by providing medical, correctional and food services to incarcerated persons at the George W. Hill Correctional Facility/Delaware County Prison, perform essential governmental functions that the government is under a duty to perform and would have to perform itself in the absence of Moving Defendant's services. In performing these government functions, Moving Defendants are acting as agents of the government and, as Plaintiff argues, they would be considered state actors under a claim for § 1983; therefore, they are state actors and immune from state tort claims pursuant to 42 Pa. C.S.A. § 8541 et.seq. To hold otherwise would be entirely inconsistent and a miscarriage of justice.

Thus, as there are no exceptions to immunity that apply, Moving Defendants are immune from Plaintiff's state tort claims of breach of duty to provide reasonable health care and reasonable access to health care, negligence and intentional infliction of emotional distress. These claims, rendered frivolous by the immunity, must be dismissed pursuant to the instant motion.

I.    PLAINTIFF FAILS TO STATE A CLAIM AGAINST MOVING DEFENDANTS UNDER A "STATE CREATED DANGER" THEORY

The "state created danger" theory of liability is but one of many theories regarding the liability of an entity acting "under color of state law" in a claim brought under § 1983. Its origin is found in <u>Deshaney v. Winebago County Department of Social Services</u>, 489 U.S. 189, 197,

103 L.Ed. 2d 249, 109 S.Ct. 998 (1989).    The <u>Deshaney</u> Court, in a substantive due process

analysis, explained that:

> …[I]t is the states' affirmative act of restraining the individuals freedom
> to act on his own behalf through incarceration, institutionalization, or other
> similar restraint of personal liberty which is the "deprivation of liberty"
> triggering the protections of the due process clause, not its failure to act
> to protect his liberty interest against harms inflicted by other means.

<u>Deshaney</u> at 200 (footnote omitted).

<u>Deshaney</u> required a "special relationship" between the state actors and the alleged victim

of the state action.  One such "special relationship" is that of the entity that retains custody and

control of an incarcerated person  (jail or prison) and the particular incarcerated person.

In <u>Kneipp v. Tedder</u>, 95 F.3d 1199 (3rd Cir. 1996), the Third Circuit stated that the factual

background of the case was the first appropriate "trigger" they had been presented with to apply

the "state created danger" theory.  <u>Id</u> at 1205.  The theory relies on a factual scenario whereby

Plaintiff has been affirmatively placed in a position of danger by an entity acting under color of

state law with a "special relationship" to the Plaintiff.

Affirmative action, as opposed to passive action, is the key element in establishing a

colorable "state created danger" theory.  <u>Id</u> at 1206.  The inquiry to be posed is:

> [W] hether the state actors involved <u>affirmatively acted to create Plaintiff's
> danger, or to render him or her more vulnerable to it</u>.

<u>Id</u>. at 1207, <u>quoting D.R. by L.R. v. Middle Bucks Area Vocational Technical School</u>, 972 F.2d
1364 (3d Cir.1992)(emphasis added).

In the instant case, Plaintiff's allegations allude to passive actions, or "failures", of the

prison and its personnel to adequately treat Mr. Jackson.    <u>Kneipp</u> provides guidelines for

determining whether "state created danger" applies.

The four common elements in <u>Kneipp</u> are:

> 1) <u>foreseeability</u>:   Were the type of injuries suffered foreseeable?;

2) Willful disregard:  Did the state act or intentionally disregard a danger created by state agents?;

3) Relationship between the state and the person injured;

4)  Did the state actors create a dangerous situation or make the Plaintiff more vulnerable to danger?

Moving Defendants could certainly not have foreseen that Mr. Jackson had placed himself in a position of possible danger by refusing to bring his medications with him during his 48 hour stay on the weekend of May 26 – 28, 2000.  Moving Defendants could not have guessed when Plaintiff stopped taking his Klonopin – Monday, Tuesday, Wednesday, Thursday?  Moving Defendants could not have foreseen that Mr. Jackson would have attempted to flush his system of alcohol prior to appearing at the prison that weekend and caused a hyponatremic condition.

As to "willful disregard", this necessary element was not even plead by Plaintiff.  There was, inarguably, no willful or intentional conduct by moving Defendants to deprive Mr. Jackson of any medical care and there have been no facts or evidence presented by Plaintiff as to such conduct.

As Mr. Jackson was in custody, the relationship element is concededly present.  The fourth element, creating a danger or making a person more vulnerable to a danger, is not present.  Moving Defendants did not place Mr. Jackson in a vulnerable situation, as Mr. Jackson did so himself by deciding to leave his medications at home, to flush out his system  and, more than likely, drinking alcohol during the weekdays before arriving at the prison that weekend.

Regardless, all of the foregoing arguments regarding §1983, governmental immunity and contributory negligence are valid as to Plaintiff's count of "state created danger".  As there is no showing of "deliberate indifference", there is certainly no showing of "willful disregard".  Plaintiff's contributory negligence created any danger that existed and that negligence rendered

him vulnerable.  Again, to advance a "state created danger" theory, state action must be involved. If Moving Defendants acted "under color of state law" in performing a governmental function, then the immunity provided by 42 Pa. C.S.A. § 8541 et.seq. applies and Plaintiff's claim is rendered frivolous.

### J.    PLAINTIFF'S CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS MUST BE DISMISSED

In Valentino C. v. School District of Philadelphia, 2004 WL 225038 (E.D. Pa. February 03, 2004), the court held that to state a claim for intentional influction of emotional distress, Plaintiff must establish four elements:

    (1)    the conduct of the defendant must be intentional or reckless;

    (2)    the conduct must be extreme and outrageous;

    (3)    the conduct must cause emotional distress; and

    (4)    the distress must be severe.

See Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265 (3d Cir. 1979);  Hitchens v. County of Montgomery, No. 01-2564, 2002 U.S. Dist. LEXIS 2050 (E.D. Pa. Feb. 11, 2002). Moreover, "only the most egregious conduct will be sufficient basis for the tort" of intentional infliction of emotional distress.  Patterson v. School District of Philadelphia, 2000 WL 1020332 E.D. Pa. July 19, 2000).  "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, utterly intolerable in a civilized society."  Sostarecz v. Misko, 1999 WL 239401 (E.D. Pa. Mar. 26, 2999) (quoting Buczek v. First National Bank of Mifflintown, 366 Pa. Super. 551, 531 A.2d 1122 (Pa. Super. 1987).  In Pennsylvania, recovery under IIED has generally been reserved for only the most abominable cases.  See Chuy, 595 F.2d 1265. No evidence of such conduct has been advanced by Plaintiff in the instant case and this count must be dismissed.

**K.     PLAINTIFF'S HAVE FAILED TO PRESENT SUBSTANTIAL EVIDENCE OF DELIBERATE INDIFFERENCE OR NEGLIGENT OR INTENTIONAL CONDUCT BY THE INDIVIDUAL DEFENDANTS**

In their individual capacities, Warden James Janecka, Deborah Perretta, Margaret Carrillo, M.D., Dr. Frederick, Dr. Holland Hull, Meriam Byrd, Nurse, and Carol Snell, nurse were mere agents of Defendants Wackenhut Corrections Corporation and the Wackenhut Corporation. Plaintiff has presented no evidence that any of these individuals participated in a denial of medication or inadequate medical care regarding Arthur Jackson.

James Janecka, Deborah Perretta, Margaret Carrillo, Dr. Frederich and Dr. Holland Hull had no contact with Mr. Jackson at all. There has been no evidence presented that any of these individuals implemented or participated in the creation of any policy or procedures regarding "weekend" prisoners. There has certainly been no evidence presented that any of these Wackenhut employees were deliberately indifferent to Plaintiff's medical needs.

Nurses Meriam Byrd and Carol Snell administered medications to the prisoners in the weekend building. There has been no evidence that either of these nurses denied Mr. Jackson his medication or that they were deliberately indifferent to his medical needs. On the contrary, the records show that the nurses administered Mr. Jackson's medications when deemed appropriate and that they complied with any medical decisions regarding replacements or non-administration of medications according to Mr. Jackson's physical conditions and assessment by the doctor.

All the foregoing arguments regarding Plaintiff's § 1983 claims apply to these individuals as well. Plaintiff has failed to show deliberate indifference on the part of any of the defendants. As a matter of law, none of the individual Wackenhut employees named in this lawsuit are liable to Plaintiff under the claim of violations of § 1983.

Regarding the state tort claims, the immunity under 42 Pa. C.S.A. §8541 et.seq. applies to the individual defendants who acted as agents of Wackenhut. All were in the scope of their employment. All were following protocols of Defendant Wackenhut. There has been no evidence or argument advanced by Plaintiff that any of the individual defendants performed any intentional action to deny Mr. Jackson medical treatment or that any action or inaction was the cause of Mr. Jackson's injuries.

Plaintiff has failed to present sufficient evidence of deliberate indifference or any negligent or intentional conduct by any of the individual defendants, and all counts against these defendants must be dismissed as a matter of law.

## L. **CONCLUSION**

Plaintiff fails, as a matter of law, to state a claim for a violation of his constitutional rights under 42 U.S.C. § 1983. According to <u>Anderson v. Liberty Lobby, Inc</u>., 477 U. S. 242, 106 S. Ct. 2505, 91 L. Ed Zd 202 (1986), a non-movant's evidence in opposing summary judgment must be "substantial". The evidence presented by the non-moving opposing party must be sufficient to withstand a Motion for Directed Verdict and support the verdict of a reasonable jury. <u>Id</u> at 250-254. If the summary judgment movant does not bear the burden of persuasion at trial, and Defendant Wackenhut and its agents do not, the movant's burden to show presumptive entitlement to summary judgment is satisfied if the movant points to the absence of any factual support for an essential element of a Plaintiff's claim. If the movant makes this showing, the non-movant bearing the burden of persuasion must then, pursuant to Rule 56 (e), introduce specific facts showing a need for trial. <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 322-324, 106 S.Ct. 2548, 911.Ed 2d 265 (1986).

In the instant case, there is a complete and utter absence of any factual support for Plaintiff's claims of a constitutional violation under § 1983 or for the state tort claims for

negligence and emotional distress.  There have been no facts establishing deliberate indifference, no facts supporting that any action or omission on the part of Defendants' was the proximate cause of Plaintiff's injuries,  and no facts supporting that Defendants' breached a duty owed to Plaintiff.  Conversely, moving Defendants', with the burden to prove that Arthur Jackson was contributory negligent to such an extent that he is precluded from recovering, have introduced specific and irrefutable facts on the record that, even if Mr. Jackson's allegations are taken as true, establish a level of comparative negligence that exceeds the minimum fifty percent necessary for Mr. Jackson to recover any damages under Pennsylvania law.

No specific facts have been advanced by Plaintiff regarding any of the numerous individuals named as Defendants.  Claims against Wackenhut employees James Janecka, Deborah Perretta, Margaret Carillo, M.D., Dr. Frederick, Dr. Holland Hull, Meriam Byrd and Carol Snell must be dismissed as no evidence has been presented by Plaintiff's that these individuals breached a duty of care to Mr. Jackson that was the proximate cause of his injuries, and, certainly, no substantial evidence has been submitted that these individuals violated Mr. Jackson's Eighth Amendment constitutional rights.  As the doctrine of respondeat superior does not apply to § 1983 actions.  Little v. Lycoming County, 912 F. Supp. 809 (1996).  Wackenhut Corrections Corporation, The Wackenhut Corporation, Delaware County, the prison itself and its Board can not be liable absent proof that these entities had subjective knowledge of a denial of medication and serious medical needs.

There has been no evidence presented regarding any specific policy or custom that contributed to Plaintiff's injuries.  There has been no expert testimony regarding standards of practice in a prison infirmary situation advanced by Plaintiff.

As to the state tort claims, Moving Defendants are immune pursuant to 42 Pa. C.S.A. § 8541 et.seq. as state actors performing an essential government function, the immunities afforded by § 8541 apply to Moving Defendants and the individual Defendants acting as their agents.

WHEREFORE, moving Defendants Wackenhut Corrections Corporation, the Wackenhut Corporation, James Janecka, Deborah Perretta, Margaret Carrillo, M.D., Dr. Frederick, Dr. Holland Hull, Meriam Byrd and Carol Snell respectfully request that this Honorable Court grant summary judgment as to all claims of Plaintiff Arthur Jackson against them, including violation of Civil Rights pursuant to 42 U.S.C. §1983, negligence and emotional distress.

Respectively submitted,

**KELLY, MCLAUGHLIN, FOSTER, BRACAGLIA, DALY, TRABUCCO & WHITE, LLP**


By: /s/ Dennis P. Herbert
    DAVID F. WHITE, ESQUIRE
    Attorney I.D. No. 55738
    DENNIS P. HERBERT,  ESQUIRE
    Attorney I.D. No. 65847
    Kelly, McLaughlin, Foster, Bracaglia
    Daly, Trabucco & White, LLP
    620 W. Germantown Pike, Suite 350
    Plymouth Meeting, PA  19462
    Attorneys for Defendants,
    Wackenhut Corrections Corporation,
    The Wackenhut Corporation
    and James Janecka, Deborah Perretta,
    Margaret Carrillo, M.D., Dr. Frederick,
    Dr. Holland Hull, Meriam Byrd, and Carol Snell

Dated:  March 18, 2004

349976-1

ARTHUR JACKSON, III     :  CIVIL ACTION

  vs.          :
               :
DELAWARE COUNTY; WACKENHUT :
CORRECTIONS CORPORATION C/O :
PRENTICE HALL CORP.; WACKENHUT :
CORPORATION; DELAWARE COUNTY :
BOARD OF PRISON INSPECTORS; :
CHARLES SEXTON, CHAIRMAN OF :
DELAWARE COUNTY BOARD OF :
PRISON INSPECTORS; GEORGE HILL, :
SUPERINTENDENT OF DELAWARE :
COUNTY PRISON (GEORGE W. HILL :  NO. 02-3230
CORRECTIONAL FACILITY); JAMES :
JANECKA, WARDEN OF DELAWARE :
COUNTY PRISON; DEBORAH :
PERRETTA, HEALTH SERVICES :
ADMINISTRATOR OF DELAWARE :
COUNTY PRISON; MARGARET :
CARRILLO, M.D., DELAWARE :
COUNTY PRISON; DR. FREDERICK, :
DELAWARE COUNTY PRISON; DR. :
HOLLAND HULL, DELAWARE :
COUNTY PRISON; MERIAN BYRD, :
NURSE, DELAWARE COUNTY :
PRISON; CAROL SNELL, NURSE, :
DELAWARE COUNTY PRISON :

## CERTIFICATE OF SERVICE

   I, Dennis P. Herbert, do hereby certify that a true and correct copy of the Motion for Summary Judgment has been

served by U.S. Mail, First Class, postage prepaid, to the following at the addresses and on the date listed below:

        Derrick Howard
        John Rollins, Esquire
        HOWARD ROLLINS & JONES
        1319 South Broad Street
        Philadelphia, PA  19147

        Kathleen E. Mahoney, Esquire
        Robert M. DiOrio, Esquire
        Front and Plum Streets
        P.O. Box 1789
         Media, PA  19063

        William C. Reil, Esquire
        42 S. 15th Street
        210 Robinson Bldg.
        Philadelphia, PA  19102

          /s/ Dennis P. Herbert
          Dennis P. Herbert

March 18, 2004
Date

                 349976-1

## **AFFIDAVIT**

I, Dennis P. Herbert, Esquire, swear and affirm that all portions of deposition transcripts, infirmary records, hospital records, prison records and expert reports attached as exhibits to this summary judgment motion are true and correct copies of these documents and that these have been produced and exchanged between moving counsel and non-moving counsel throughout the discovery process.


Dennis P. Herbert
Dennis P. Herbert


March 18, 2004
Date

349976-1