EXHIBIT L

**JAMES F. MENAPACE, M.D.**
341 E. Casals Place
Ambler, PA 19002

Telephone: (215) 653-0270

February 9, 2004

David F. White, Esquire
Kelly, McLaughlin, Foster,
Bracaglia, Daly, Trabucco & White, LLP
620 West Germantown Pike
Suite #350
Plymouth Meeting, PA   19462-1056

RE: <u>Jackson v Wackenhurt, et al.</u>

Dear Mr. White:

  At your request, I reviewed the letter written by Lee D. Silverman, M. D. addressed to Mr. John L. Rollins in reference to Arthur Jackson, the letter being dated 2/2/04. The letter written by Dr. Silverman is in reference to his review of the records of Arthur Jackson, III regarding the injury which he suffered at Delaware County Prison on 5/28/00. Dr. Silverman states in his first paragraph that, "On that date, Mr. Jackson fell and injured his head while he was in the process of being discharged from the prison." In his letter, Dr. Silverman describes a discontinuation syndrome. I must assume that Dr. Silverman is equating this with a withdrawal syndrome as related to Mr. Arthur Jackson and his injuries dated 5/28/00.

  I have reviewed the medical records of Mr. Arthur Jackson and have submitted a written report to you dated 5/27/03. In that report to you I do not support the contention that Mr. Jackson had withdrawal syndrome and a possible seizure as the result of not

RE: <u>Jackson v Wackenhurt, et al.</u>

receiving his Klonopin and other psychiatric medicines while incarcerated at Delaware County Prison.

In Dr. Silverman's report dated 2/2/04 he states, and I quote, "The seizure was caused by the failure of the prison to give the man his psychiatric medications and/or his insulin.

I disagree with Dr. Silverman's statement that Mr. Jackson's injuries were the result of his not receiving his psychiatric medications including Effexor, Trazodone and Klonopin.

I have been a practicing Emergency Medicine physician for the past 20 years, board certified in Internal Medicine as well as Emergency Medicine. For the last 15 years I have been practicing full time emergency medicine in a community based hospital with an inpatient psychiatric unit as well as an inpatient detoxification unit. (The detoxification unit was closed two years ago). During my tenure as a practicing emergency physician in this community hospital it was my responsibility, while on duty in the emergency room, to evaluate, treat and medically clear patients admitted to the inpatient psychiatric unit as well as the detoxification unit. I have seen hundreds of patients who have abruptly discontinued their psychiatric medicines, including Klonopin, Effexor and Trazodone, but in my 15 years experience, I have never encountered a patient who has had a seizure as a result of the abrupt discontinuation of their psychiatric medicines. This includes patients who have been treated with short acting, intermediate and long acting benzodiazepines. In my experience, I have treated many patients who have experienced seizure or withdrawal syndrome as the result of abrupt cessation of alcohol intake, this being much more common than benzodiazepine withdrawal. The literature reflects, as stated in my report to you of 5/27/03, that seizures as the result of withdrawal from benzodiazepines is very rare in occurrence.

Again, as stated in my report dated 5/27/03, it is my medical opinion that if Mr. Jackson did suffer a seizure, he did so as the result of alcohol withdrawal. It is also conceivable that Mr. Jackson passed out, fell, hit his head and suffered a seizure. Again, I base this on review of the medical records given to me for review concerning Mr. Jackson's treatment at Crozer Chester Medical Center and Emergency Room.

Again, I must make mention Dr. Silverman's reference to insulin. Again, in my experience, I have never had a patient with an elevated glucose, especially in the range of 400 to 500, suffer a seizure as the result of elevated glucose. Again, had Mr. Jackson's blood sugar been low, it is conceivable that he could have suffered a seizure as a result of low blood glucose but again, there is no mention of low blood glucose rather his blood

RE: <u>Jackson v Wackenhurt, et al.</u>                                    **PAGE 3**

glucose was elevated at the time of his evaluation in the emergency room at Crozer Chester Medical Center.

All of the above opinions are made with a reasonable degree of medical certainty.

If I can be of any further assistance in this matter, do not hesitate to contact me.

Sincerely,

James F. Menapace, M. D., F.A.C.E.P.

JFM/lc

EXHIBIT M

| Chapter:<br><br>Weekender Program | Number: 1900.04 |
|---|---|
| Revised: 04/03<br><br>Subject:<br><br>Establishment and Coordination of the<br>Weekender Program | ACA: None<br>WCC: None<br>TITLE 37: None |

I.    POLICY

The Weekender Program is a form of alternative sentencing imposed by the Judges in the Court of Common Pleas, and in some cases by the District Magistrates.

In most cases, weekenders serve their sentences on Saturday and or Sunday but there are exceptions where the inmate is ordered to serve his/her sentence on two (2) days during the week.

These inmates are considered "furloughed" for the five (5) days of the week, therefore, with the five (5) days on furlough and the two (2) days in the jail, the total numbers of days in the minimum sentence are accounted for.

II.    RULES AND REGULATIONS

Weekend sentencing is a privilege and as such can be taken away if abused or if any of the following regulations are violated:

1.    Reporting time for all weekend-sentenced inmates is 6:00 PM unless specified by the sentencing judge. Lateness will not be tolerated unless prior approval is received from the Lieutenant in charge of Pre-Release.

2.    Weekenders will be required to submit to urinalysis test each weekend; and they are required to report to the prison in a drug and alcohol free condition.

3.  Weekender's vehicle and person are subject to search at all times while on prison property. No illegal or illicit items will be stored in their vehicle or on their person; no alcoholic beverages or weapons will be brought with the weekender when reporting.

Upon arrival to serve a weekend, any resident leaving a vehicle at the Front Gate will do the following:

1.  Notify the Front Gate Officer that the Weekender requests to leave their vehicle in the Front Gate Parking Lot for the weekend.

2.  Provide the Front Gate Officer with: a valid driver's license, a valid registration for the vehicle involved, and proof of insurance for the vehicle involved.

3.  If any of the above conditions are not met, the vehicle may not be left in the Front Gate Parking Lot, and will be towed at the owner's expense if the vehicle is left unauthorized.

The following is a list of items that will be accepted in the Intake Unit for weekenders:

- 2 pair of underwear
- 2 undershirts
- 2 bras
- 2 pair of socks
- 1 wedding band (if married only)
- 1 set of long underwear
- *One Towel and wash cloth*
- *One soap, shampoo (clear container)*
- *One toothpaste, toothbrush, deodorant (non-aerosol)*
- *Comb (plastic type)*
- *One pair of shower shoes (flip-flop type)*
- *Shirt (long/short sleeve), Sweat suit, gray in color, is considered 1 shirt and pant.*
- *One pair pants/shorts*
- *One pair shoes/sneakers*
- 1 medical alert bracelet or small link medical alert neck chain
- 1 religious medal (no larger that a .50 cent piece) on a small link chain

- *Money Order in the amount of $20.00 for Room and Board*
- *1 Money Order in the amount of $14.00 for urine testing (if required). All Money Orders are to made out to G.W.H.C.F.)*
- *Weekenders may also have Septa Tokens.*
- *All items are to be carried in a clear plastic bag.*

*Unauthorized items being brought in on subsequent weekends will be confiscated and destroyed.*

Weekender's taking prescription medication shall have their doctor fax a copy of the prescription to the Medical Division of the George W. Hill Correctional Facility, and if approved, the medication will be dispensed through the Medical Department.

*Money other than required Money Orders if found on reporting weekenders on the first will be confiscated and placed on the new weekender's account and will be returned after final discharge.*

*Money found on remaining weekends will be confiscated and deposited in the facility's Inmate Welfare account. Any other items found on the weekender that do not appear on the above list will be confiscated and returned at the time of discharge on their first Weekend. On remaining weekends items will be confiscated and destroyed.*

III.  <u>REPORTING FOR SENTENCE</u>

Weekenders reporting to the facility for the first time will be processed through the Intake Unit. *Weekenders will be required to give urine each weekend.*

Officers on duty in the Intake Unit will create a weekender folder, *on the weekender's first weekend,* containing a Weekender Status Report for tracking the inmate coming in for their weekends, Rules and Regulations (signed by the inmate), and a sentencing sheet. As soon as the inmate is processed through Intake, the inmate will be transferred to the Pre-Release enter.

A log book has been placed at the Pre-Release Officer's work area, and the weekenders are to be logged in documenting the date and time of their arrival and departure from the Pre-Release Center.

IV.    <u>WEEKENDER REMOVAL</u>

1.    *When positive urine result comes back from the lab, a Correctional officer will complete an Incident Report and a Disciplinary Action. A letter will be sent to the director of Programs.*

2.    *A copy of these reports will be left for the Pre-Release Lieutenant and a copy will be submitted to the counselor to be placed in the Weekender's file.*

3.    *Upon the weekender's return, the Disciplinary Action will be served and the weekender will be transferred to 4d or 2A (if female). The weekender will be held for a hearing on the next business date.*

4.    *The Hearing Sergeant will hold the weekender in revoking their status pending notification from the Sentencing Judge*

5.    *Weekender's found with tobacco products will be transferred to 4D or 2A (if female). The Correctional officer will complete an Incident and Disciplinary Action report.*

6.    *The Hearing Sergeant will review the evidence and if a guilty verdict is determined; the Hearing sergeant will revoke the Weekender's status.*

7.    *If the contraband involves illegal substances or weapons, the AOD will be notified as well as CID, as soon as possible. Any evidence is to be maintained following current procedures.*

8.    *The Correctional officer will complete an Incident report and a Disciplinary action.*

9.    *The weekender will be transferred to Unit 8 SMU (male), Unit 2A (female), placed on Administrative Segregation pending a hearing.*

10.    *The Disciplinary Action will be served and the weekender held in for a hearing on the next business day. The Assistant Warden of Programs will send a letter to the sentencing Judge.*

11.    *The Hearing Sergeant will review the evidence and if a guilty verdict is determined, the Hearing sergeant will revoke the weekender's status.*

12.   *When the weekender is found guilty of any offense, by the hearing sergeant, a copy of the results will be sent to the Assistant Warden of Programs.*


V.   <u>WEEKENDER NO SHOW</u>

In the event that a Weekender does not report when scheduled, the Correctional Officer on duty shall:

1.   Immediately notify the Pre-Release Lieutenant/ Shift Commander and brief him/her on the situation and then complete an Incident report and Disciplinary report.

2.   On the first business day following the incident, the secretary for the Assistant Warden *of Program's* will send a letter to the sentencing judge, providing him /her with information on the incident after the Lieutenant forwards a copy of the report along with the sentence sheet.

3.   The Records Department will retain the weekender's file until the weekender is returned to the GWHCF.

4.   When the weekender returns, the Disciplinary action will be served and the weekender will be held in 8C or SMU (male) or 2A (female) on Administrative Segregation status pending a hearing.

5.   The Hearing Sergeant will hold a hearing on the next business day.

6.   Following the hearing, the secretary for the Assistant Warden of Programs sends a letter to the Sentencing judge in the case, advising him/ her that the inmate is back at the facility, and has had a full hearing.

7.   The records Department, which has the weekender's file, will compute any additional time.

VI.    OFFICE OF PRIMARY RESPONSIBILITY

Questions or suggestions concerning this policy should be addressed to the
Assistant Warden *of Programs*.

APPROVED: _____    DATE: _4/2/03_

EXHIBIT N

## In The Matter Of:

*Arthur Jackson, III   v.*
*Delaware County, et al*

---

*Miriam A. Byrd*
*December 17, 2003*

---

*Farrell Court Reporting*
*3223 Polk Road*
*Norristown, PA   19403*
*(610) 584-8787*

Original File MB121703, 95 Pages
Min-U-Script® File ID: 0213091183

## Word Index included with this Min-U-Script®

Arthur Jackson, III   v.
Delaware County, et al

Miriam A. Byrd
December 17, 2003

Page 44

[1] this. You don't have the time to do that.

[2]    **Q:** So, it was pretty difficult to

[3] administer the old system; is that a fair

[4] statement?

[5]    **MR. HERBERT:** Objection

[6] to the form.

[7]    **MS. MAHONEY:** Objection.

[8]    **THE WITNESS:** It needed

[9] improving.

[10]                **BY MR. REIL:**

[11]    **Q:** As we sit here, do you have any

[12] personal recollection of Arthur Jackson?

[13]    **A:** No, sir.

[14]    **Q:** Do you recall, as we sit here,

[15] ever meeting the man? I'm talking about

[16] professionally here at the prison, do you

[17] recall ever meeting with him, interacting

[18] with him?

[19]    **A:** I don't recall Mr. Jackson, but

[20] according to the records, I did.

[21]    **Q:** Okay.

[22]    Do you have any idea

[23] from the records how many times that you

[24] gave Mr. Jackson medication?

Page 45

[1]    **A:** No, sir.

[2]    **Q:** I think earlier when you had

[3] your records there you said something

[4] about Trazadone on fifteen weekends;

[5] right? That was his stay, fifteen

[6] weekends. Do you remember that?

[7]    **A:** I remember saying that, yes,

[8] sir, reading it.

[9]    **Q:** Can you tell me, based on those

[10] records, I had to go through a few things,

[11] of those fifteen weekends, how many of

[12] those fifteen weekends do the records

[13] indicate that Mr. Jackson got the

[14] Trazadone?

[15]    **A:** I'd have to count it.

[16]    **Q:** Please.

[17]    **MR. HERBERT:** Is this

[18] complete? I guess it is.

[19]    **THE WITNESS:** What is

[20] this April? How many times?

[21]    **MR. REIL:** Yes.

[22]    **MS. MAHONEY:** Do you

[23] want to know how many weekends he received

[24] Trazadone on both days, on one day?

Page 46

[1]                **BY MR. REIL:**

[2]    **Q:** Let me rephrase the question. Of

[3] those fifteen weekends, are there any of

[4] those weekends where there's no indication

[5] that Mr. Jackson received Trazadone, and

[6] if so how many?

[7]    I think we talked that

[8] the 26th, 27th and 28th was one where

[9] there was no record. Are there other ones,

[10] and if so, how many?

[11]    **A:** Do you want me to give specific

[12] dates that he didn't get it?

[13]    **Q:** Yes.

[14]    **MR. HERBERT:** I believe

[15] Mr. Jackson's sentence began February

[16] 14th, if I'm not mistaken.

[17]    **MS. MAHONEY:** I think it

[18] was February 26th.

[19]    **THE WITNESS:** So the

[20] 26th would be a Friday. If it was a

[21] Friday, he would not receive it, because

[22] by the time he gets down to DUI, it's like

[23] 10:00, 11:00, 12:00 at night, so no one

[24] would give him his HS meds on Friday. You

Page 47

[1] assume that the weekenders take it before

[2] they come in.

[3]                **BY MR. REIL:**

[4]    **Q:** When you say HS meds?

[5]    **A:** Hour sleep.

[6]    So he did not receive

[7] it the 26th, the 27th and the 28th, I

[8] think he went home. Is that what you're

[9] saying?

[10]    **MR. HERBERT:** According

[11] to the calendar, the 26th would have been

[12] a Saturday. So it would have been the

[13] 25th, 26th, 27th of February.

[14]    **THE WITNESS:** 27th he

[15] received nothing.

[16]                **BY MR. REIL:**

[17]    **Q:** Keep going, please.

[18]    **A:** You want that included, May?

[19]    **Q:** Yes, May of 2000. Would you tell

[20] us what happened in May of 2000.

[21]    **A:** He received no Trazadone May of

[22] 2000, according to this record.

[23]    **Q:** Keep going, please.

[24]    **A:** March of 2000, he received

Arthur Jackson, III   v.
Delaware County, et al

Miriam A. Byrd
December 17, 2003

Page 48

[1] Trazadone 200 every weekend with the
[2] exception of the 26th.
[3]     MR. HERBERT: Which
[4] would be Sunday?
[5]     THE WITNESS: Which
[6] would have been Sunday, he would have been
[7] home.
[8]                     BY MR. REIL:
[9]     Q: He would have been home at like
[10] 6:00?
[11]     A: Yes. He would leave the prison
[12] property at 6:00.
[13]     Q: Let me just establish for the
[14] record, generally speaking, his period of
[15] incarceration was from Friday at 6:00 to
[16] Sunday at 6:00?
[17]     A: Yes, sir.
[18]     Q: Thank you. Go ahead. Continue,
[19] please.
[20]     A: February 26th he received his
[21] Trazadone at bedtime, 200 milligrams on
[22] the 26th and the 27th.
[23]     MR. HERBERT: That would
[24] be a Saturday and Sunday, according to

Page 49

[1] this calendar.
[2]     THE WITNESS: April, he
[3] received Trazadone 200 on the 7th, the
[4] 8th, the 15th, the 17th, 22nd, 23rd, 28th,
[5] 30th. That's it for Trazadone
[6] BY MR. REIL:.
[7]     Q: Okay. Again, back around May of
[8] 2000, let me get an idea on the weekends.
[9]     A: Yes, sir.
[10]     Q: Can you give me an idea what the
[11] staffing was like in terms of health care
[12] personnel? How many nurses would be on or
[13] can you give me an idea what the medical
[14] personnel was like?
[15]     A: Okay. In 2000, we have two
[16] medication nurses. We're speaking of 7:00
[17] a.m. to 7:00 p.m., sir?
[18]     Q: Yes.
[19]     A: You have 8:00 a.m. to 8:00 p.m.
[20] you have two medication nurses. They
[21] leave at 8:00. Another nurse comes in at
[22] 8:00 p.m., and runs meds. That's all they
[23] do, pour meds for eighteen-hundred
[24] inmates.

Page 50

[1]     Q: Okay.
[2]     A: You have me and I pour and run
[3] the meds for PR, for pre-release DUI and
[4] twelve. I don't believe twelve was
[5] incorporated into the prison system in
[6] 2000. It looks like a boy scout camp down
[7] there now.
[8]     Q: You said that you worked on the
[9] meds for DUI; right?
[10]     A: Yes, sir.
[11]     Q: On the average, can you give us
[12] an idea of the DUI people? About how many
[13] people would be involved there with meds
[14] with the DUI? What are we talking about,
[15] fifteen hundred?
[16]     MR. HERBERT: I'm just
[17] going to object to the general tone of the
[18] question.
[19]                     BY MR. REIL:
[20]     Q: Let me rephrase. Let's talk
[21] about back in May of 2000. Roughly
[22] speaking, how many DUI people would be
[23] here on the weekends? Can you give me a
[24] rough idea?

Page 51

[1]     MR. HERBERT: Inmates
[2] you mean —
[3]     MR. REIL: Inmates, yes.
[4]     THE WITNESS: Sometimes
[5] as high as twenty-five to thirty.
[6]                     BY MR. REIL:
[7]     Q: Twenty-five to thirty?
[8]     A: Yes, sir.
[9]     Q: It would be your responsibility
[10] if they brought medication to look at that
[11] medication and decide whether they got it?
[12]     A: Yes, sir.
[13]     Q: Was there some medication which
[14] you wouldn't allow them to have because it
[15] was inappropriate?
[16]     A: There would be some medication
[17] that they wouldn't get because they didn't
[18] have an order for it.
[19]     Q: They didn't have an order for
[20] it?
[21]     A: Yes, sir.
[22]     Q: So besides just bringing the
[23] medication and the bottle and so forth,
[24] they needed an order for it; right?

EXHIBIT O

# In The Matter Of:

*Arthur Jackson, III   v.*
*Delaware County, et al*

---

*Miriam A. Byrd*
*December 17, 2003*

---

*Farrell Court Reporting*
*3223 Polk Road*
*Norristown, PA   19403*
*(610) 584-8787*

Original File MB121703, 95 Pages
Min-U-Script® File ID: 0213091183

# Word Index included with this Min-U-Script®

Page 40

[1]    **Q:** Yes.

[2]    **A:** They're only supposed to bring

[3]  maybe three pills.

[4]    **Q:** Who would monitor that? I mean

[5]  if an inmate brought in, a weekender

[6]  brought in a prescription, was the

[7]  procedure for the correctional officer to

[8]  take the prescription from the inmate and

[9]  then to check with you? How did that

[10]  work?

[11]    **A:** I think in 2000, if we're

[12]  referring to that date?

[13]    **Q:** Yes.

[14]    **A:** And time frame.

[15]    **MR. HERBERT:** Don't

[16]  guess. I told you at the beginning, if you

[17]  remember, tell him, but you said if I

[18]  remember. So, don't guess, but if you

[19]  remember, tell him.

[20]              **BY MR. REIL:**

[21]    **Q:** Give us your best recollection

[22]  of how it worked.

[23]    **A:** The best recollection I have

[24]  right now is, that he would come in with

Page 41

[1]  his medication. He would hand it over to

[2]  the CO that screened him. It would be

[3]  taken from him and taken up to the

[4]  infirmary under lock and key.

[5]    **Q:** Who would make the decision as

[6]  to whether or not the inmate actually

[7]  would receive the medication that he

[8]  brought in?

[9]    **A:** If everything coincided, the

[10]  name, the date, the dose and everything,

[11]  the inmate would receive it.

[12]    **Q:** Okay.

[13]      Who would make that

[14]  decision? Would you make that decision?

[15]  Would the doctor make that decision?

[16]    **A:** I can't remember back then.

[17]    **Q:** Well, maybe you can tell me what

[18]  the policy is now.

[19]    **A:** Yes.

[20]    **Q:** Okay.

[21]    **A:** The inmate must have his doctor

[22]  FAX in the prescription. By that I mean

[23]  the name, the inmate, the dose, the drug,

[24]  the amount and the times. It has to be

Page 42

[1]  faxed in to the health care supervisor.

[2]  And the inmate must bring it. It is taken

[3]  from him and locked up.

[4]    **Q:** Okay.

[5]      Do you know about when

[6]  that policy changed?

[7]    **MR. HERBERT:** You're

[8]  assuming there was a change?

[9]    **MR. REIL:** Well, she can

[10]  tell me. I thought she said it did change.

[11]    **MR. HERBERT:** She said

[12]  she can tell you what it is now. She

[13]  doesn't recall what it was then.

[14]    **THE WITNESS:** I don't

[15]  know when it changed.

[16]              **BY MR. REIL:**

[17]    **Q:** Well, back in 2000, I thought

[18]  you said that you recall that the policy

[19]  was for the inmate to bring the medication

[20]  in themselves; right?

[21]    **A:** Yes, sir.

[22]    **Q:** The policy now is for the

[23]  prescription to be faxed here?

[24]    **A:** Not the prescription, the order.

Page 43

[1]    **Q:** The order to be faxed here.

[2]    **A:** I'm sorry. The prescription

[3]  order.

[4]    **Q:** The prescription order?

[5]    **A:** Yes, sir.

[6]    **Q:** That's different than the way it

[7]  was done in 2000; right?

[8]    **A:** Yes, sir.

[9]    **Q:** Do you know when that changed,

[10]  roughly?

[11]    **A:** No, sir.

[12]    **Q:** Do you know why it was changed?

[13]    **MR. HERBERT:** Do you

[14]  know why it was changed?

[15]    **THE WITNESS:** It's a

[16]  nightmare.

[17]              **BY MR. REIL:**

[18]    **Q:** In what respect?

[19]    **A:** Well, they bring all their meds

[20]  in one bottle; three, four, five different

[21]  meds in one bottle that you have no way of

[22]  separating and knowing what they are. You

[23]  have no way of identifying unless you sit

[24]  down with a PDR, this is this. This is

Page 44

[1] this. You don't have the time to do that.

[2] **Q:** So, it was pretty difficult to

[3] administer the old system; is that a fair

[4] statement?

[5] **MR. HERBERT:** Objection

[6] to the form.

[7] **MS. MAHONEY:** Objection.

[8] **THE WITNESS:** It needed

[9] improving.

[10] **BY MR. REIL:**

[11] **Q:** As we sit here, do you have any

[12] personal recollection of Arthur Jackson?

[13] **A:** No, sir.

[14] **Q:** Do you recall, as we sit here,

[15] ever meeting the man? I'm talking about

[16] professionally here at the prison, do you

[17] recall ever meeting with him, interacting

[18] with him?

[19] **A:** I don't recall Mr. Jackson, but

[20] according to the records, I did.

[21] **Q:** Okay.

[22]    Do you have any idea

[23] from the records how many times that you

[24] gave Mr. Jackson medication?

Page 45

[1] **A:** No, sir.

[2] **Q:** I think earlier when you had

[3] your records there you said something

[4] about Trazadone on fifteen weekends;

[5] right? That was his stay, fifteen

[6] weekends. Do you remember that?

[7] **A:** I remember saying that, yes,

[8] sir, reading it.

[9] **Q:** Can you tell me, based on those

[10] records, I had to go through a few things,

[11] of those fifteen weekends, how many of

[12] those fifteen weekends do the records

[13] indicate that Mr. Jackson got the

[14] Trazadone?

[15] **A:** I'd have to count it.

[16] **Q:** Please.

[17] **MR. HERBERT:** Is this

[18] complete? I guess it is.

[19] **THE WITNESS:** What is

[20] this April? How many times?

[21] **MR. REIL:** Yes.

[22] **MS. MAHONEY:** Do you

[23] want to know how many weekends he received

[24] Trazadone on both days, on one day?

Page 46

[1] **BY MR. REIL:**

[2] **Q:** Let me rephrase the question. Of

[3] those fifteen weekends, are there any of

[4] those weekends where there's no indication

[5] that Mr. Jackson received Trazadone, and

[6] if so how many?

[7]    I think we talked that

[8] the 26th, 27th and 28th was one where

[9] there was no record. Are there other ones,

[10] and if so, how many?

[11] **A:** Do you want me to give specific

[12] dates that he didn't get it?

[13] **Q:** Yes.

[14] **MR. HERBERT:** I believe

[15] Mr. Jackson's sentence began February

[16] 14th, if I'm not mistaken.

[17] **MS. MAHONEY:** I think it

[18] was February 26th.

[19] **THE WITNESS:** So the

[20] 26th would be a Friday. If it was a

[21] Friday, he would not receive it, because

[22] by the time he gets down to DUI, it's like

[23] 10:00, 11:00, 12:00 at night, so no one

[24] would give him his HS meds on Friday. You

Page 47

[1] assume that the weekenders take it before

[2] they come in.

[3] **BY MR. REIL:**

[4] **Q:** When you say HS meds?

[5] **A:** Hour sleep.

[6]    So he did not receive

[7] it the 26th, the 27th and the 28th, I

[8] think he went home. Is that what you're

[9] saying?

[10] **MR. HERBERT:** According

[11] to the calendar, the 26th would have been

[12] a Saturday. So it would have been the

[13] 25th, 26th, 27th of February.

[14] **THE WITNESS:** 27th he

[15] received nothing.

[16] **BY MR. REIL:**

[17] **Q:** Keep going, please.

[18] **A:** You want that included, May?

[19] **Q:** Yes, May of 2000. Would you tell

[20] us what happened in May of 2000.

[21] **A:** He received no Trazadone May of

[22] 2000, according to this record.

[23] **Q:** Keep going, please.

[24] **A:** March of 2000, he received

Page 64

[1] Medical Department?

[2] **A:** Yes, sir.

[3] **Q:** Do you know whether there were

[4] minutes or notes taken at those meetings?

[5] **A:** I don't know back there then if

[6] they were. They are now.

[7] **Q:** Okay.

[8] Do you know who would

[9] be the person who keeps those minutes or

[10] notes now? Do you know who that be?

[11] **A:** That would be the health

[12] services, Deborah Perretta.

[13] **Q:** She was working at the prison

[14] back then?

[15] **A:** I don't know when she came.

[16] **MR. HERBERT:** Whatever

[17] you know.

[18] **THE WITNESS:** I don't

[19] recall when she was hired.

[20] **BY MR. REIL:**

[21] **Q:** When you said they couldn't

[22] honor the meds, I think were the words

[23] that you used?

[24] **A:** Yes, sir.

Page 65

[1] **Q:** Can you explain to me, a

[2] layperson, what that means?

[3] **A:** Well, it's what I said. The

[4] inmate's name may not be on it. You know,

[5] I'm digressing here. The name may not be

[6] on the prescription bottle. The drug may

[7] not be on the prescription bottle or the

[8] dose or the date or the time. It didn't

[9] coincide with what he was telling us.

[10] **Q:** Is it fair to say that there was

[11] concern among the staff under that policy

[12] that the inmates would not get their

[13] correct medication?

[14] **MR. HERBERT:** Objection

[15] to form. You can answer.

[16] **THE WITNESS:** No. Could

[17] I explain that?

[18] **MR. REIL:** Sure.

[19] **MR. HERBERT:** Please.

[20] **THE WITNESS:** Well,

[21] there are very few drugs, 48 hours that

[22] you go without them that's going to have

[23] an appreciable effect. By that I mean,

[24] Dilatin, seizure medication. Digisox, Oxin

Page 66

[1] that would be taken for your heart, you

[2] know, 48 hours is not a big time span.

[3] **BY MR. REIL:**

[4] **Q:** Okay.

[5] How about Klonopin?

[6] **A:** Klonopin, is a funny drug. You

[7] can't take it if you're an alcoholic. Most

[8] of our DUIs are alcoholics. It's counter-

[9] indicated, but it wouldn't — it would be

[10] locked up and dispensed if ordered

[11] irregardless.

[12] **MR. HERBERT:** Listen to

[13] Mr. Reil's question, if you can.

[14] **THE WITNESS:** Repeat the

[15] question.

[16] How about Klonopin,

[17] isn't that what you said?

[18] **BY MR. REIL:**

[19] **Q:** You were telling us about other

[20] drugs. You said Klonopin is a funny drug.

[21] I wanted you to elaborate on that.

[22] **A:** I elaborated because for

[23] alcoholics, Klonopin is indicated. But

[24] that would not affect whether you gave it

Page 67

[1] or not. You understand what I'm saying?

[2] If everything was in place, he would get

[3] it.

[4] **MR. HERBERT:** Miriam, I

[5] think the context of his question was, you

[6] were talking about 48 hours not ingesting

[7] certain drugs; correct? If I'm wrong —

[8] **THE WITNESS:** Yes, 48

[9] hours.

[10] **MR. HERBERT:** Then you

[11] said how about Klonopin.

[12] **THE WITNESS:** Right.

[13] **BY MR. REIL:**

[14] **Q:** Let's take a look at Page 14.

[15] I'm not certainly going to go through

[16] every page here. Let me show you where my

[17] 14 is.

[18] **A:** What are we talking about here?

[19] **Q:** Page 14 of Byrd-12. Up around 13

[20] or 14 because some tired person was

[21] numbering them in the middle of the night.

[22] **MR. HERBERT:** What

[23] number?

[24] **MR. REIL:** The first 14

Arthur Jackson, III   v.
Delaware County, et al

Page 72

[1]   **A:** Yes, sir.

[2]   **Q:** These are things that we
[3] received in discovery. What are the
[4] progress notes generally? As a nurse, can
[5] you describe what they're supposed to be?

[6]   **A:** Well, it's like a running
[7] documentary on an inmate or a patient's
[8] progress, any problems that you run into
[9] with the inmate. The doctor will write a
[10] note concerning the patient or the inmate.
[11] I'll say patient.

[12]   **Q:** Would it be like a chart in the
[13] hospital, analogous to that?

[14]   **A:** Yes, it would be like a chart;
[15] yes, sir.

[16]   For instance, if you
[17] saw somebody that had an altercation and
[18] their head was injured, you'd write a
[19] progress note.

[20]   **Q:** On those progress notes on Page
[21] 28, is that your writing or do you know
[22] whose writing that is?

[23]   **A:** On the 28th, no, that's not my
[24] writing. The next page is.

Page 73

[1]   **Q:** The next page is. So on the 28th
[2] is that the doctor's writing or do you
[3] know?

[4]   **A:** I assume it's the doctor's
[5] because I can't read it. It has holding
[6] insulin today.

[7]   **Q:** You can't read the 28th; right?

[8]   **A:** I can read it. Do you want me to
[9] read it?

[10]   **Q:** Tell me what you can read.

[11]   **A:** Sick during diabetic accu-check,
[12] chills, gagging, diarrhea, 24 hours temp.
[13] was 99.6, BP was 150/90. The pulse was
[14] 84. He had positive bowel sounds. He had a
[15] tender distended belly. His lungs were
[16] clear and the diagnosis by the doctor was
[17] gastroenteritis and hold the insulin
[18] today. Mallox and Kaopectate and rest.
[19] That was at 1510. On 1600 still shaking.
[20] Pulse 80; temperature 98.4; feeling he has
[21] an alcoholic problem. Last drink was
[22] Thursday daytime.

[23]   **Q:** Does it indicate anywhere there
[24] why Mr. Jackson was shaking? The reason

Page 74

[1] was?

[2]   **MR. HERBERT:** Other than
[3] the alcohol problem?

[4]   **MR. REIL:** Yes.

[5]         **THE WITNESS:**
[6] Gastroenteritis and drinking.

[7]       **BY MR. REIL:**

[8]   **Q:** Did you review any progress
[9] notes from the weekend of 5/28/00 when Mr.
[10] Jackson was injured?

[11]   **A:** I reviewed no progress notes,
[12] only the MARs.

[13]   **Q:** Now we look on Page 29, that's
[14] your writing; right?

[15]   **A:** I'm afraid so.

[16]   **Q:** Why don't you help me with that.

[17]   **A:** Want me to read what I wrote?

[18]   **Q:** Yes.

[19]   **A:** 1:00 a.m., inmate has prior
[20] medical history of insulin dependent
[21] diabetic. We received, then I gave the
[22] insulin doses for a.m. and insulin doses
[23] for p.m. NPH he got 10 units of NPH
[24] insulin on the 26th. Psych., Klonopin one

Page 75

[1] milligram TID, two milligrams HS.
[2] Trazadone, 100 milligrams, 200 milligrams
[3] HS.

[4]   Physical examination
[5] Dr. Gessner for coverage. Insulin psych
[6] coverage. That's it.

[7]   **Q:** Were you aware that Mr. Jackson
[8] in 1998 was here at the prison and
[9] attempted suicide?

[10]   **MR. HERBERT:** Objection.

[11]   **MS. MAHONEY:** Objection.

[12]   **MR. HERBERT:** Objection
[13] to the wording attempted. That's a
[14] psychological term. We don't know if
[15] there was an attempted suicide or a
[16] suicidal gesture, suicidal ideation.

[17]       **BY MR. REIL:**

[18]   **Q:** Were you aware, in 1998, that
[19] Mr. Jackson was involved in a suicidal
[20] incident?

[21]   **MR. HERBERT:** Objection.

[22] You can answer.

[23]   **THE WITNESS:** Aware
[24] when? When I came in?

Page 92

[1] **A:** It's a possibility. I don't know
[2] the dates he was held in, sir.
[3] **Q:** Fine.
[4] **A:** I don't know what day he was
[5] held in.
[6] **Q:** Okay.
[7] **A:** But I do know that he was
[8] somewhere.
[9] **Q:** If he was held in, right,
[10] there's nothing on the — if he was held
[11] in on the 11th and 12th, would there be
[12] necessarily something there on the 13th?
[13] **A:** Should be. I don't know if these
[14] are all in order.
[15] **MR. REIL:** That's all I
[16] have. Thank you, ma'am.
[17] **MS. MAHONEY:** No
[18] questions.
[19]
[20]               **BY MR. HERBERT:**
[20] **Q:** Just one clarification question.
[21] Miriam, when are the weekend inmates told
[22] to bring their own meds? When is that
[23] normally done and by who?
[24] **A:** I think — I really cannot give

Page 93

[1] you a definite answer, because my contact
[2] with them is — before they come in is
[3] nothing.
[4]     I assume when they sign
[5] up or when they're sentenced or when
[6] they're told or something, they receive a
[7] form that tells them to bring their —
[8] have their doctor FAX the medication
[9] orders in to the health department. I
[10] think there's a form that they have,
[11] because I hear the nurses that go down to
[12] intake and take the medications away from
[13] the inmate. I hear them say you were
[14] informed you can't bring Vicks cough drops
[15] and aspirin and Tylenol, unless — you
[16] can't bring all that junk in. You have to
[17] have an order for it. I hear the nurses
[18] complaining about it. To me, I don't run
[19] into that problem because, you know, I'm
[20] there 2:00 in the morning.
[21] **Q:** Is it still the policy that the
[22] weekenders bring their own medications?
[23] **A:** We would like them to, but, you
[24] know, if it's —

Page 94

[1] **Q:** Do they bring their own
[2] prescriptions in?
[3] **A:** If a diabetic comes in and he
[4] doesn't bring his insulin syringe in and
[5] he doesn't bring his insulin and he
[6] doesn't bring his machine to test his
[7] sugar, we do it.
[8] **Q:** Okay.
[9]     How about prescription
[10] medication, are they still supposed to
[11] bring their own prescription medication?
[12] **A:** Yes.
[13] **Q:** Get a copy of the doctor's
[14] prescription?
[15] **A:** Yes, sir.
[16] **Q:** Faxed in by the doctor?
[17] **A:** Ideally; yes, sir.
[18] **MR. HERBERT:** Okay.
[19] That's all I have.
[20]
[21]     (At 12:00 p.m.,
[22] proceedings were concluded.)
[23]
[24]

Page 95

**CERTIFICATE**

[1]
[2]     I, Renee
[3] Fazio-Callahan, being a Court Reporter, do
[4] hereby certify that the foregoing oral
[5] testimony of MIRIAM A. BYRD, was taken
[6] stenographically by me on Wednesday,
[7] December 17, 2003, after the said
[8] witness(es) was(were) duly sworn or
[9] affirmed prior to the commencement of
[10] his(her/their) testimony; and that this
[11] deposition transcript is a true and
[12] correct transcript of the same, fully
[13] transcribed under my direction, to the
[14] best of my ability and skill.
[15]     I further certify that
[16] I am not a relative, employee or attorney
[17] of any of the parties in this action; that
[18] I am not a relative or employee of any
[19] attorney in this action; and that I am not
[20] financially interested in the event of
[21] this action.
[22]
[23]     Renee Fazio-Callahan
[23] Court Reporter
[24]

EXHIBIT P

1      IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2                                        **COPY**

3
ARTHUR JACKSON, III        :    CIVIL ACTION
4                          :
          vs.              :
5                          :
DELAWARE COUNTY, et al     :    NO. 02-3230
6

7              THURSDAY, JANUARY 8, 2004
                    - - -

8
9              Oral deposition of ERNEST
10   W. GRATZ, JR., taken pursuant to notice,
11   taken in the Judge's Hearing Room at the
12   GEORGE W. HILL CORRECTIONAL FACILITY,
13   Cheyney Road, Thornton, Pennsylvania,
14   commencing at 2:24 p.m., on the above date,
15   before Irene Bernstein, a Federally
16   Approved Registered Diplomate Reporter and
17   Notary Public in and for the Commonwealth
18   of Pennsylvania.
19                   - - -
20
21
22

          LOVE COURT REPORTING, INC.
23       1422 Chestnut Street, Suite 512
          Philadelphia, Pennsylvania 19102
24             (215) 568-5599

Ernest W. Gratz, Jr.

1  names on that list.

2          My question to you is were you

3  involved in the -- when you worked with the

4  weekenders, were you involved with what's

5  called the count, when you worked with the

6  weekenders?

7          A.    No.

8          MR. HERBERT:  Did you

9  understand what he --

10         THE WITNESS:  Yeah, I

11  understand what he's saying.  If I

12  do a head count.

13         MR. REIL:  Okay.

14         THE WITNESS:  I'm not --

15  no.  Because usually what I was --

16  when we came on, what my

17  involvement was as an officer was

18  doing the stripping.

19         MR. REIL:  Okay.

20         THE WITNESS:  Was

21  strip-searching them as they were

22  coming in and checking them for

23  contraband, anything they were not

24  allowed to have, I took.

Ernest W. Gratz, Jr.

1    BY MR. REIL:

2         Q.    So everybody who would come in

3    on the weekend you would check for

4    contraband?

5         A.    Sure.

6         Q.    All right.  And you did that

7    many times, I take it?

8         A.    Correct.

9         Q.    All right.  And when you did

10   that, were you -- do you have any

11   recollection on how many people you would

12   do that on over the weekend?  Would it be

13   more than fifty?

14        A.    There would be usually between

15   three and four of us officers that would be

16   checking these now inmates as they would

17   come in the door.

18        Q.    But I mean, you said you

19   strip-searched the inmates as they came in?

20        A.    They came in.

21        Q.    You assisted in that?

22        A.    Correct.

23        Q.    My question is, I saw there's

24   a hundred and eight names on that list,

Ernest W. Gratz, Jr.

1  goes up, escorted by an officer, and they

2  call their name, and they're given

3  medications.  As they're called they come

4  to take their medication.

5          Q.    Are you talking about the

6  weekenders or the full-time inmates or the

7  --

8          A.    It's everywhere, it's

9  everywhere in the prison.

10          Q.    Have you ever seen weekenders

11  bring prescription medications to the

12  prison?

13          A.    Sure, and they have to be

14  turned over to Medical.

15          Q.    Okay.  Full-timers don't bring

16  in --

17          A.    No.

18          Q.    -- prescription medications,

19  do they?

20          A.    No.

21          Q.    When you were training here at

22  the prison, how -- when you started here,

23  how long did that training period last?

24          A.    It's approximately -- it's