**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


ARTHUR JACKSON, III                    :        CIVIL ACTION
                                       :
      vs                               :
                                       :
DELAWARE COUNTY; WACKENHUT             :
CORRECTIONS CORPORATION C/O            :
PRENTICE HALL CORP.; WACKENHUT         :
CORPORATION; DELAWARE COUNTY           :
BOARD OF PRISON INSPECTORS;            :
CHARLES SEXTON, CHAIRMAN OF            :
DELAWARE COUNTY BOARD OF               :
PRISON INSPECTORS; GEORGE HILL,        :
SUPERINTENDENT OF DELAWARE             :
COUNTY PRISON (GEORGE W. HILL          :        NO. 02-3230
CORRECTIONAL FACILITY); JAMES          :
JANECKA, WARDEN OF DELAWARE            :
COUNTY PRISON; DEBORAH                 :
PERRETTA, HEALTH SERVICES              :
ADMINISTRATOR OF DELAWARE              :
COUNTY PRISON; MARGARET                :
CARRILLO, M.D., DELAWARE               :
COUNTY PRISON; DR. FREDERICK,          :
DELAWARE COUNTY PRISON; DR.            :
HOLLAND HULL, DELAWARE                 :
COUNTY PRISON; MERIAN BYRD,            :
NURSE, DELAWARE COUNTY                 :
PRISON; CAROL SNELL, NURSE,            :
DELAWARE COUNTY PRISON                 :

**BRIEF IN SUPPORT OF MOTION IN LIMINE OF DEFENDANT WACKENHUT**
**CORRECTIONS CORPORATION TO EXCLUDE TESTIMONY OF LEE M.**
**SILVERMAN, M.D. UNDER F.R.E. 702 AS UNRELIABLE**

**STATEMENT OF FACTS**

      Arthur Jackson was convicted of DUI and sentenced to fifteen consecutive weekends in

the Delaware County prison.  During this period he was regularly taking several medications,

including Klonopin, a benzodiazapene, Effexor, and insulin.  He was also drinking regularly in

between weekends, per his own testimony and that of prison officials.

He was required to bring his medications with him each weekend to be dispensed by the prison, and he did so on an irregular basis.

On the fourteenth weekend, he did not bring his medications with him and while waiting to be released on Sunday, May 28, 2000 he collapsed and struck his head on concrete, sustaining a subdural hematoma and subarachnoid hemorrhage. He claims subsequent cognitive deficits which he attributes to the fall, which he alleges resulted from deprivation of his medications that weekend. Blood tests performed at Crozer Chester Medical Center immediately after the fall showed no trace of benzodiazapenes in his system and elevated glucose.

Among his treating physicians is his psychiatrist, Lee M. Silverman, M.D. who's three reports directed to Plaintiff's counsel are expected to be the basis for his testimony at trial concerning both the cause of his patient's fall at the prison and for the cognitive deficits from which Plaintiff contends he currently suffers.

## LEGAL ARGUMENTS:

A.      Dr. Silverman's expert testimony  must be excluded under F.R.E. 702, F.R.E. 403 and Daubert as inherently unreliable, without objective support and likely to confuse and mislead the jury, for the following specific reasons:

1.      *Dr. Silverman has formed his opinion on causation without consideration of any objective evidence inconsistent with it, including admissions of his patient to his other treating physicians, blood test results, and further makes no citation or reference to any objective evidence in support of his conclusions*

2.      *Dr. Silverman's testimony fails to meaningfully address alternative theories of causation relative to Plaintiff's fall at the Prison*

3.      *Dr. Silverman's expert opinion on causation is heavily based upon unreliable data, e.g. inaccurate and inconsistent statements of his patient to him made*

*regarding the degree and active nature of his alcoholism, despite his documented*

*awareness of and prior commentary upon Plaintiff's unreliability as a historian,*

*especially in regard to his drinking.*

4.      *Dr. Silverman himself makes at least two patent misstatements of objective facts*

        *regarding his own treatment of the plaintiff and the extent of his alcoholism.*

5.      *Dr. Silverman's conclusions regarding the causation of the incident and of the*

        *alleged cognitive deficits suffered by the Plaintiff subsequent to the incident are*

        *blatantly led by Plaintiff's counsel and further ignore the complaints made by the*

        *plaintiff in his disability application, a process in which the doctor participated.*

B.      Dr. Daniel Gzesh, MD's proffered testimony as set forth in his report of February 4, 2003

that the May 28, 2000 fall at the prison was a result of the deprivation of clonzapam[1] and

that the plaintiff's current cognitive deficits are the direct result of that fall is unreliable

under the Daubert standard and should be excluded by F.R.E. 702 for the following

reasons:

1.      *Dr. Gzesh's February 4 2003 report completely fails to address the possibility of*

        *alternate causes of Plaintiff's May 28, 2000 fall, including most obviously the*

        *possibility of acute alcohol withdrawal.*

2.      *Dr. Gzesh's February 4, 2003 report ignores the results of blood work done at*

        *Crozer-Chester Medical Center immediately following the fall which fail to show*

        *any trace of benzodiazapenes in Plaintiff's system, despite Plaintiff's chronic use*

        *(since at least 1996), and despite the fact that chronically used benzodiazapenes*

        *should remain in the blood for 5-6 weeks after discontinuation. It also ignores*

---

[1] A generic name for Klonopin

353328-1

*the plaintiff's admission to him, contained in a July 25, 2000 letter he authored to Dr.*

*Silverman that the plaintiff unilaterally discontinued his Klonopin at least several days*

*before the weekend admission in which he claims that he was deprived of it by prison*

*officials. These facts taken together are fundamentally inconsistent with his stated expert*

*opinion that the fall was due to the deprivation of clonzapam*

3.    *Dr. Gzesh's stated opinion regarding the cause of plaintiff's current cognitive*

*deficits completely fails to consider the fact that Plaintiff made substantially*

*similar complaints of cognitive deficits to the Social Security Administration in*

*1996, nearly four years prior to the fall at the prison on May 28, 2000.*

## DISCUSSION

A.    Dr. Silverman's expert testimony  must be excluded under F.R.E. 702, F.R.E. 403 and

Daubert as inherently unreliable, without objective support and likely to confuse and mislead the

jury, for the following specific reasons:

1.  *Dr. Silverman has formed his opinion on causation without consideration of any*
    *objective evidence inconsistent with it, including admissions of his patient to his other*
    *treating physicians, blood test results, and further makes no citation or reference to*
    *any objective evidence in support of his conclusions*

The United States Supreme Court has set out the criteria district courts are to follow in

assessing challenged expert testimony offered under F.R.E. 702.  "Proposed testimony must be

supported by appropriate validation, i.e. 'good grounds', based on what is known … The

requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of

evidentiary reliability." Greer v. Bunge Corp., 71 F.Supp. 2d 592 (S.D. Miss. 1999), citing to and

quoting from  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590, 113 S.Ct. 2786,

2795  (U.S. 1993).125 L. Ed. 2d 469, 481

So, whether an expert's testimony is based on 'scientific technical or other specialized
knowledge, Daubert and Rule 702 demand that the district court evaluate the methods,

analysis and principles relied upon in reaching the opinion. The Court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it 'will have a reliable basis in the knowledge and experience of the discipline.'

Greer, supra at 593, citing to Daubert.

Furthermore, the party sponsoring the expert testimony has the burden of showing that the expert's findings and conclusions are based on the scientific method and therefore, are reliable.  Id.  This requires some objective, independent validation of the expert's methodology. Id.

In Greer, the court excluded the proposed testimony of Plaintiff's expert witness, a veterinarian who was prepared to opine on the causal relationship between the presence of aflatoxin in corn feed allegedly sold by defendant to plaintiff and the death, illness, infertility and milk-producing deficits of plaintiff's dairy cattle.  The court found that the expert failed to perform or order objective tests to support his opinion purporting to rule out alternative causes, failed to acknowledge adverse test results, and ignored contradictory testimony regarding the composition of the feed given to plaintiff's cattle.  Id.  All of the foregoing justified exclusion of his testimony under Daubert.

In Total Containment, Inc. v. Dayco Products, Inc., 2001 U.S. Dist. Lexis 15838 (E.D.PA. September 6, 2001), the court granted Defendant's motion in limine to preclude the testimony of Plaintiff's economic expert on Daubert grounds due to the fact that the expert had ignored facts in evidence which did not support and in fact contradicted his conclusions, and further because the expert based his economic analysis on unreliable economic data.  The court concluded that Plaintiff had produced insufficient evidence that its expert's report was reliable and well grounded, and therefore must be excluded.  Id.

353328-1

A Court must conduct a threefold inquiry before permitting expert testimony.  It must:

come from a qualified expert witness, be based on reliable methods, and "fit" the facts of the

case.  Id., citing to In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 743 (3d Cir. 1994)

In the matter *sub judice*, Dr. Silverman has conveniently chosen to ignore testimony from

his own client, independently corroborated by medical records of another one or more of

Plaintiff's treating physicians and objective results of blood tests that all contradict a basic

assumption of his opinion- that Plaintiff's abrupt cessation of Klonopin occurred during his

weekend stay at the prison as a result of deprivation by prison officials.  In fact, Plaintiff

independently stopped taking the Klonopin several days before checking into the prison, a fact to

which he admitted to his neurologist Dr. Gzesh, as recited in his July 25, 2000 letter *addressed to*

*Dr. Silverman* (Exhibit A).

This fact is further supported by the results of the blood tests performed on plaintiff

immediately after the fall at the Crozer Chester Medical Center, which show no trace of

Klonopin or any benzodiazapenes in his system, a condition inconsistent with its abrupt cessation

the day previous (his first full day in prison that weekend, during which he alleged he was denied

his Klonopin).  See, May 27, 2003 report of Dr. James F. Menapace, pages 3-5, attached hereto

as Exhibit B[2] and the June 6, 2003 report of  Dr. Marc Sageman, pages 23-24, attached hereto as

Exhibit C.  None of the three reports authored by Dr. Silverman subsequent to the May 28, 2000

incident address this fact, which is fundamentally inconsistent with his conclusions in those

reports on the cause of Plaintiff's fall. (Exhibits D-F).

Expert testimony not accompanied by sufficient factual foundation cannot be

submitted to the jury for consideration as it is inadmissible under F.R.E. 702.  Boucher v. United

---

[2] Dr. Menapace conveniently attaches to his report a Quest Diagnostics drug detection standard noting that Chronic use of benzodiazapenes are detectable for 4-6 weeks after the last dose.  Dr. Silverman had Plaintiff on regular Klonopin from at least the beginning of his treatment of him in August, 1996, almost 4 years prior to the incident, per  social security administration records.

353328-1

States Suzuki Motor Corp., 73 F.3d 18, 21-22 (2d Cir. 1996). Federal courts have not hesitated to exclude an expert where his testimony is not supported by sufficient evidence. *See e.g.* Concord Boat Corp v. Brunswick Corp, 207 F.3d 1039, 1056 (8th Cir. 2000) (Exclusion warranted under Daubert/Khumho standard where expert had not considered all relevant facts in relevant market when performing market share analysis*.)  Also see* Boucher*, supra* (approving exclusion of testimony based on conjecture and faulty assumptions).

> *2.  Dr. Silverman's testimony fails to meaningfully  address alternative theories of causation relative to Plaintiff's fall at Prison*

Indeed, Dr. Silverman's report completely fails to address any alternative causes for the fall, most obviously alcohol withdrawal.  This, he is required by Daubert to do.  Campbell v. Chiles, 2000 U.S. Dist. Lexis 6872 (N.D. Tex., May 18, 2000), Viterbo v. Dow Chemical Co., 826 F.2d 420 (5th Cir. 1987).

Dr. Silverman has authored three reports since the incident, on February 20, 2001, January 21, 2003, and February 2, 2004. (Exhibits D-F.)  Two of the three (2/21/01 and 2/2/04) contain no discussion or even allusion to an alternative cause or his alcoholism.  (Exhibits E, F)  In his 1/21/03 report to Plaintiff's counsel, Dr. Silverman mentions, as a preface to his conclusion that he is taking as "a given" that his patient was not drinking during the weeks of his incarceration: "***Given that*** Mr. Jackson was not intoxicated at the time ***nor was he drinking on a regular*** *[sic]* it is my belief that the seizure was more likely due to abrupt cessation of the Klonopin and lack of insulin" (Exhibit D, p2).  However, Plaintiff's own sworn testimony given in March 2003 directly contradicts this[3], as the Plaintiff did as well in a videotaped two and a half hour interview given to doctor Marc Sageman, M.D. during his evaluation of Plaintiff on June 4, 2003 in the presence of his attorney.  See, 6/6/03 Report of Dr. Sageman, p5, attached hereto as (Exhibit C).

---

[3] See, March 12, 2003 Deposition of Plaintiff, pages 44-45, Exhibit G.

353328-1

Dr. Silverman's report of 2/2/04 does not take the obvious opportunity to address these admissions which occurred subsequent to the 1/21/03 report, but nevertheless reaffirms without explanation his opinion that "the seizure was caused by the failure of the Prison to give this man his psychiatric medications and/or his insulin."

3.   *Dr. Silverman's expert opinion on causation is significantly based upon unreliable data, e.g. inaccurate and inconsistent statements of his patient to him made regarding the degree and active nature of his alcoholism, despite his documented awareness of and prior commentary upon Plaintiff's unreliability as a historian, especially in regards to his drinking.*

Indeed, Dr. Silverman's willingness to believe that his patient has been "completely sober in regards to alcohol over the past several years" as recited on page 2 of his 1/21/03 report is inconsistent with numerous observations he made of plaintiff documented in his own records. For instance, just two sentences after committing the "completely sober" assertion to print, he acknowledges that "I am aware of 1 alcohol binge that has occurred since the closed head injury."  As well, in the 10/16/96 Transcription of Telerecorded Message from Dr. Silverman presented to the Pennsylvania Bureau of Disability Determination, he notes that "Mr. Jackson also admitted to although minimized an extensive history of alcohol abuse".  He further notes that Plaintiff "was an inconsistent historian and at times it was difficult to accurately gauge the truthfulness of what he was telling me"  (Exhibit H).

In his report of  1/21/03, Dr. Silverman, in buttressing the above quote regarding his "completely sober" patient bluntly states that Plaintiff "never appeared in my office intoxicated".  Yet, in his own office notes of 1/28/00, Dr. Silverman described his patient as mildly intoxicated, and notes that he admits to "a 32 oz" beer that day. (exhibit I) Moreover, his office notes describe other alcohol binges or significant drinking in 3/99 (Exhibit J)[4], 11/99 (Exhibit K  )[5], and 10/00

---

[4] "drinking binge"
[5] "Pt had drinking binge ->DUI"

353328-1

(exhibit L)[6].   Its even clear that Dr. Silverman did not believe Plaintiff's denials of drinking during this period:  **On March 22, 2000, his notes document a conference with another of Plaintiff's treating physicians, Dr. Ebba: "I spoke with Dr. Ebba about patient-we agreed that suspicions about excessive alcohol use justified.  Pt denies ETOH"**  (Exhibit M, emphasis supplied.).  He makes no attempt whatsoever to reconcile **<u>any</u>** of these observations with his stated "belief that he has been completely sober in regards to alcohol over the past several years".

Dr. Silverman also ignores prison records documenting alcohol withdrawal on the weekend of May 6, 2000, a weekend in which the same records also document that he received his Klonopin. See, prison medication records, exhibit N,[7] and excerpted transcript of deposition of Miriam A. Byrd, pages 73-74 (Exhibit O interpreting prison progress record page 28, attached as Exhibit P)[8]

Also ignored is the sworn testimony of prison guard Sean Gardner given on January 14, 2004 (over two weeks prior to his 2/2/04 report) that Plaintiff appeared for his prison sentence "slobbering, falling down" drunk every weekend, except the weekend the incident happened. (Exhibit Q, pages 10-12).   How drunk was he?  "You got a guy that's really falling down drunk. …there's times he peed his pants and he was pretty messy, pretty nasty.  He reeked of alcohol. … He was drunk and there was times he would say 'I had a few drinks'…  He was obnoxious, just dirty, reeked of alcohol, didn't want to like, conform .."  (Exhibit Q, pages 74-75).

> 4      *Dr. Silverman himself makes blatant misstatements of fact regarding his own treatment of the plaintiff.*

---

[6] "s/p alcohol relapse"
[7] Showing that Plaintiff was dispensed both Librium (for treatment of alcohol withdrawal) and Klonopin on May 6, 2000)
[8] Page 73, lines 20-24, page 74, lines 1-6, quoting page 28**: "feeling he has an alcoholic problem.  Last drink was Thursday daytime."**  Responding to the question from counsel 'Does it indicate anywhere there why Mr. Jackson was shaking?  The reason was?"  "Gastroenteritis **and drinking**". (Emphasis supplied.)

353328-1

In a product liability action in which the plaintiff operator asserted that a forklift manufactured by defendant was defective and unreasonably dangerous and that he suffered injuries, the defendant manufacturer moved to strike the operator's witness on Daubert/Kumho grounds.  Pearson v. Young, 2002 U.S. Dist. Lexis 26263 (W.D. Okla., February 5,  2002).   The expert filed an affidavit indicating that, although challenges to his testimony had been provided in other cases, he had always been allowed to testify. Id.  The manufacturer provided evidence that this statement was untrue. Id.  Although the Court excluded the expert's proffered expert opinion testimony on conventional Daubert/Kumho grounds, the court also found and concluded, *while making no finding that the expert's untrue statement was knowingly made,* that the untrue statement provided an additional basis for exclusion under Daubert, as it directly implicated his reliability. Id.  The court discussed the requirement of "intellectual rigor" required under the Daubert standard, and applied it to in court testimony, Rule 26 requirements and 'the other facets of the expert's litigation engagement'.  Id., citing to Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L. Ed. 2d 238 (1999).  It then concluded that "even the most indulgent assessment of intellectual rigor presupposes that the witness will have taken care to avoid misrepresentations to the court as to matters of objective, concrete fact."  Id. at 13.

In the matter at bar, Dr. Silverman has made at least two patently untrue statements:   The first, discussed above, was that the Patient had never appeared before him intoxicated, when his own office notes document otherwise. (Exhibit M) Secondly, in two of his three post-incident reports prepared specifically for this litigation (as evidenced by their being addressed to his patient's attorney), Dr. Silverman asserts, in identical language that "I first met Mr. Jackson in August of 1998 when he was referred to me by his internist, Celcus Ebba, M.D."  (Exhibits D and E).   However, as noted above, Dr. Silverman offered transcribed, recorded testimony in connection with Mr. Jackson's disability application in October, 1996, nearly two years previous,

in which he stated that he began treating plaintiff on August 19, <u>1996</u>. (Exhibit H).   Perhaps this was a mistake, repeated twice in reports to counsel and compounded in his response to a subpoena[9], but the unreliability is inherent in the fact that the misstatements were made, and does not turn on whether they were made intentionally or knowingly.  <u>Pearson v. Young</u>, *supra*.

> 5    *Dr. Silverman's conclusions regarding the causation of the alleged cognitive deficits suffered by the Plaintiff subsequent to the incident are blatantly led by Plaintiff's counsel and further ignore the existence of identical complaints made by the plaintiff in his disability application, a process in which the doctor participated.*

In addition to opining on the cause of the 5/28/00 incident at the prison, Dr. Silverman also opines on the causation of the Plaintiff's claimed cognitive problems subsequent to the incident.  In both cases, Dr. Silverman explicitly responds to blatantly leading questions submitted to him by his patient's attorney:

> Now in regards to your questions: …. 2) Do you agree that the injuries (subdural hematoma with subarachnoid hemorrhage) for which you have been treating him since May 29, 2000 were caused by the deprivation of physician prescribed medications (e.g. insulin, Klonopin, etc.) while Mr. Jackson was incarcerated in Delaware County Prison? From review of records from his medical hospitalization I believe at Crozer-Chester Medical Center immediately following the event and Mr. Jackson [sic] recollection, it appears to me that he had a seizure and the seizure led to the closed head injury.  It is my understanding that Mr. Jackson was not given his psychiatric medications or his insulin. Given that Mr. Jackson was not intoxicated at the time nor was he drinking on a regular [sic] it is my belief that the seizure was more likely due to abrupt cessation of the Klonopin and lack of insulin… 8) Do you believe that Mr. Jackson has sustained any permanent impairment to the usefulness of his brain with respect to memory loss (or other parts of his body injuries due to the May 28, 2000 accident, if so please indicate the nature, extent of such permanent impairment and as a consequence with respect to Mr. Jackson's healthcare requirements and activities of daily living?  I stated previously I believe that Mr. Jackson who when I first me him in spite of his depression, anxiety, chronic pain and intermittent alcohol use was intelligent, articulate  and animated.  There has been a marked change in his personality and also a marked change in his attention, his ability to initiate and complete tasks and his memory.  There's also been some ataxia although I have not formally addressed its extent.  Since the injury occurred Mr. Jackson has been largely reclusive to his home and has been markedly dependent on his common-

---

[9]  His 3/28/03 response to Defendant Delaware County's subpoena for his "entire medical billing file including but not limited to any and all records, correspondence to and from the consulting and/or treating physicians, files, memoranda, handwritten notes, history and physical reports, medication and/prescription records … relating to any examination, consultation, diagnosis or treatment to" Plaintiff "up to and including the present" produced records going back only to 8/98.  Yet his billing records show treatment and prescriptions dating back to 8/19/96.

353328-1

law wife.  Activities that Mr. Jackson had been involved in when I first met him in spite of his chronic pain and depression, which included artistic,[sic] endeavors and use of the computer and the internet have largely been abandoned by him since the injury occurred. (Exhibit D).

Seldom does one see counsel's involvement in the preparation of witness testimony so blatantly set forth. Of course, it could be argued that there was no prejudice to the defense by the blatant leading since Dr. Silverman somehow failed to tie any of the symptomatology recited directly to the injury with any certainty, medical or otherwise, at least in the above quoted 1/21/03 report to counsel.  (Exhibit D).

In addition to receiving a map to the desired medical conclusions, Dr. Silverman was also fortunate enough to be led to legal conclusions as well.  In his February 2, 2004 report addressed to counsel he notes:    "You asked me to address the following questions:  1. Did the defendant in this case exhibit a policy of deliberate indifference to the serious medical and psychological needs of plaintiff, Arthur Jackson?  My opinion is affirmative…3. Was the deliberate indifference of defendants a substantial factor in causing this injury to plaintiff Jackson? Again my opinion is affirmative."  (Exhibit F).

The blatant and unapologetic involvement of counsel in shaping if not forming Dr. Silverman's opinions in all three of his post incident reports is, at a minimum a further indicia of their bias and unreliability.

In reaching his conclusions, such as they are, regarding the relationship of Plaintiff's claimed cognitive deficits to the incident, Dr. Silverman also chooses to ignore the fact that the Plaintiff claimed those same deficits over 4 years previous in the context of a disability application to Pennsylvania's Bureau of Disability Determination, a process in which Dr. Silverman himself participated.

In connection with that proceeding, on 9/22/96 specifically (less than a month prior to Dr. Silverman's 10/16/96 transcribed testimony, and during his treatment with him), Arthur Jackson

completed a "daily activities questionnaire" in his own handwriting and signed it.  (Exhibit R).

In response to the questionnaire, Mr. Jackson variously reported in support of his disability claim

that he needed reminding to change his clothes daily, and to bathe, that he cannot do his own

shopping, and relies on his neighbors to do it, cannot take public transportation because he will

get lost due to a lack of concentration, avoids appearing in public due to panic attacks, cannot

complete projects or activities such as reading a book or puzzle, because he forgets where he was

in the project or looses interest.  He further states that he cannot get out of bed on his own, and

cannot go to appointments unless someone puts them on the calendar for him, cannot make

decisions on his own, *cannot remember if he has taken his medication*, has to be reminded to

change his clothes and to take showers, and cannot clean or cook (besides microwave) because

he cannot stay focused.  (Exhibit R)

Assuming for the moment that Plaintiff was truthful in his application for disability

benefits in 1996, then Dr. Silverman, who was aware of and participated in that evaluation, chose

to ignore the existence of the obvious cognitive deficits described by Mr. Jackson therein in

reaching his conclusion that those same deficits exhibited subsequent to the May 28, 2000

incident arose from that incident.  No where in any of his three reports to Plaintiff's counsel did

he address or even mention the disability application, or plaintiff's claims of cognitive limitations

therein.  Exhibits (D-F).

As noted previously, The United States Supreme Court has set out the criteria district

courts are to follow in assessing challenged expert testimony offered under F.R.E. 702.

"Proposed testimony must be supported by appropriate validation, i.e. 'good grounds', based on

what is known … The requirement that an expert's testimony pertained to 'scientific knowledge'

establishes a standard of evidentiary reliability." <u>Greer v. Bunge Corp.</u>, 71 F.Supp. 2d 592 (S.D.

Miss. 1999), citing to and quoting from  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590, 113 S.Ct. 2786, 2795, 125 L. Ed. 2d 469  (U.S. 1993).

The proponent of an expert testimony, while not required to prove that the expert opinions are correct, must prove by a preponderance of the evidence that his or her testimony is reliable. Id., citing to Padillas v. Stork-Gamco, Inc. 186 F.3d 412, 418 (3d Cir. 1999) and Paoli, *supra*.  The expert will be held to the intellectual rigor of his field, and must have 'good grounds' for his opinion.  Id., citing to Kumho, and Paoli, *supra*.  Nothing requires a court to accept an opinion tied to existing data only through an expert's say so.

B.  Dr. Daniel Gzesh, MD's proffered testimony as set forth in his report of February 4, 2003 that the May 28, 2000 fall at the prison was a result of the deprivation of "clonzapam"[10] and that the plaintiff's current cognitive deficits are the direct result of that fall is unreliable under the Daubert standard and should be excluded by F.R.E. 702 for the following reasons:

1. *Dr. Gzesh's February 4 2003 report completely fails to address the possibility of alternate causes of Plaintiff's May 28, 2000 fall, including most obviously the possibility of acute alcohol withdrawal.*

Unlike his colleague Dr. Silverman, Dr. Gzesh fails to make even a token attempt to dismiss the possibility that acute alcohol withdrawal may have been the cause of Plaintiff's fall in the prison on May 28, 2000.  (Exhibit S).  Nowhere in his report is there any mention whatsoever of his drinking, or even of the possibility that there might have been an alternative cause. (Exhibit S).

As noted previously, the courts' are not required to accept Dr. Gzesh's opinion just because he says it's so.  Edmonds v. Illinois C.G.R.R., 910 F.2d 1284 (5th Cir. 1990).  Daubert requires an examination of the methodology used by Dr. Gzesh to arrive at this expert opinion,

---

[10] A generic name for Klonopin

and requires its exclusion under F.R.E. 702 if that methodology is indeterminable.  <u>Greer v.</u>

<u>Bunge Corp,</u> supra (Trial court has duty under Daubert to screen expert testimony for both

relevance and reliability, and that duty requires court to determine reasoning and methodology

underlying expert's opinion.)

As also previously noted with regard to Dr. Silverman's proposed testimony, while

Daubert does not require the expert to rule out alternative causes completely, it does require

consideration of the issue by the expert, as well as consideration of the evidence in the case

which supports the other possible causes.  <u>Viterbo v. Dow Chemical Co.</u>, *supra.*

> *4. Dr. Gzesh's February 4, 2003 report ignores the results of blood work done at Crozer-Chester Medical Center immediately following the fall which fail to show any trace of benzodiazapenes in Plaintiff's system, despite Plaintiff's chronic use (since at least 1996), and despite the fact that chronically used benzodiazapenes should remain in the blood for 5-6 weeks after discontinuation.  It also ignores the plaintiff's admission to him, contained in a July 25, 2000 letter he authored to Dr. Silverman that the plaintiff unilaterally discontinued his Klonopin at least several days before the weekend admission in which he claims that he was deprived of it by prison officials.  These facts taken together are fundamentally inconsistent with his stated expert opinion that the fall was due to the deprivation of clonzapam*

Like Dr. Silverman, Dr. Gzesh completely ignores the blood test results which are

fundamentally inconsistent with his expert opinion that the May 28, 2000 fall was called by a

deprivation of clonzapam.  As set forth in more detail earlier in the brief in the discussion of Dr.

Silverman's failings in this area, clonzapam, a benzodiazapene should have been detectable in his

blood stream for 5-6 weeks after cessation in light of Plaintiff's chronic use since at least 1996,

and its failure to appear in even trace amounts in the blood work performed at the hospital after

his fall is fundamentally inconsistent with Dr. Gzesh's conclusions. (Exhibits B (pp. 3-5 and C

(pp 23-24)).

Also like Dr. Silverman, Dr. Gzesh ignores Plaintiff's admission made directly to him,

that he unilaterally stopped taking his Klonopin at least several days before the hospital

admission in which he claims he was deprived of it by prison officials.  (Exhibit A).

353328-1

Technically, Dr. Gzesh doesn't actually say that he was deprived of the Klonopin/clonzopam by the prison, but if he isn't saying that, i.e. if the deprivation to which he refers was self administered by the Plaintiff as was admitted to him, then his opinion fails on relevance as well, as it is no longer evidence that Defendants are liable for his fall.  (Exhibit S).

> 3   *Dr. Gzesh's stated opinion regarding the cause of plaintiff's current cognitive deficits*
> *completely fails to consider the fact that Plaintiff made substantially similar*
> *complaints of cognitive deficits to the Social Security Administration in 1996, nearly*
> *four years prior to the fall at the prison on May 28, 2000. Report*

Dr. Gzesh's February 4, 2003 report also opines that Plaintiff's cognitive deficits, including specifically "the inability to remember to perform activities of daily living, such as taking his insulin" are a direct result of the May 28, 2000 fall.  (Exhibit S).

However, Dr. Gzesh is apparently unaware, or has chosen to ignore that Plaintiff made nearly identical complaints nearly four years previous in his 1996 application to the Social Security Administration for disability benefits.  As described more particularly by Plaintiff himself in Exhibit R, in 1996 plaintiff claimed that he was permanently disabled because he could not remember to take his medication, could not take public transportation because he would forget where he was and get lost, could not cook beyond microwaving because of lack of concentration, could not remember to keep appointments unless some one reminded him, could not get out of bed or go shopping without assistance, as well as many other similar complaints. (Exhibit R).

CONCLUSION

The Court's function as a gatekeeper for the submission of scientific evidence to the jury requires its evaluation of the reliability of that evidence, or in particular of an expert's testimony under the standards enunciated by the United States Supreme Court in <u>Daubert</u>, <u>Kumho</u> and their

353328-1

progeny.  Unreliable evidence, such as testimony based upon an insufficient factual foundation is inadmissible under F.R.E. 702 and cannot be submitted to the jury for consideration.

Dr. Silverman's report is unreliable for five separate reasons:   First, he ignores all evidence contradictory to or inconsistent with his opinions, including objective evidence such as blood tests which fail to show the presence of benzodiazapenes in his blood stream on the day of the incident, and sworn testimony from his own patient that he was actively drinking throughout the period of his admissions to the prison each  consecutive weekend, admissions of his patient to another treating physician recited in that Physician's letter addressed to him (Dr. Silverman) that he had unilaterally discontinued the Klonopin several days prior to the weekend prison admission during which the incident occurred (as opposed to being suddenly deprived of it by the prison that weekend as alleged and assumed by Dr. Silverman), and fails to affirmatively set out any objective evidence to support his own theory of causation.  He also ignores prison infirmary records that show that the plaintiff was in alcohol withdrawal two weeks prior, while taking his Klonopin in prison.

Second, he fails to give any meaningful consideration to the possibility that the May 28, 2000 incident was a result of his patient's withdrawal from alcohol, as opposed to Klonopin and/or insulin, dismissing any such suggestion upon his inaccurate assumption that Plaintiff was not regularly drinking during this period (ignoring sworn testimony from Plaintiff himself as well as a security guard that he was not only drinking, but doing so heavily.)

Third, he bases his causation opinion heavily upon his subjective "belief" that his patient has been "completely sober for the past several years" per the unreliable history of his patient, who repeatedly denies his alcoholism to his psychiatrist (Dr. Silverman) despite testimony that he was regularly "falling down drunk" upon reporting to the prison every weekend (other than the weekend of the incident), and despite his own progress notes that document his own

observations of Plaintiff's binge drinking during this period (including the episode which resulted in the DUI conviction for which he was serving weekends in prison).

Fourth, he makes several blatant misstatements of fact in reports which he knows are to be used in this litigation (because they are addressed to Plaintiff's counsel), including that his client has never appeared before him intoxicated (contradicted by his own notes) and that he began treating him in August 1998 (contradicted by an report, obtained by virtue of a subpoena to the Social Security Administration, dated 10/16/96 from Dr. Silverman describing his treatment of plaintiff for the previous six weeks.)  Such misstatements are direct evidence of his unreliability and are additional Daubert grounds for exclusion.

Finally, his conclusions are themselves explicitly shaped, if not initially formed, by specific leading questions submitted to him by plaintiff's counsel, which questions he explicitly recites verbatim in each of  his three reports addressed to counsel before providing answers which are offered as his expert testimony on causation.  This seldom seen direct involvement of counsel in preparing his testimony is itself highly suggestive of bias and unreliability for obvious reasons.

Dr. Gzesh's testimony, as indicated by his February 4, 2003 report is similarly unreliable for at least three separate reasons:

His opinion on the cause of Plaintiff's fall fails to even mention the possibility of alternate causes, much less explore or rule out the most obvious one: acute withdrawal from alcohol.

His opinion that the cause was deprivation of clonzapam "which he had been receiving on a chronic basis" ignores the objective facts that benzodiazapenes such as clonzopam should be detectable in the blood for 5-6 weeks following cessation, and were not even present in trace amounts in the blood work done on plaintiff at the hospital immediately following the fall.

353328-1

He also ignores the Plaintiff's own admission to him, acknowledged in his own letter to Dr. Silverman that he had unilaterally stopped taking his Klonopin (clonzopam) several days before he alleges that he was deprived of it by prison officials.

His opinion that the May 28, 2000 fall resulted in Plaintiff's current cognitive deficits "including the inability to remember to perform activities of daily living such as taking his insulin" ignores the fact that Plaintiff made nearly identical claims to the Social Security Administration four years previously (including specifically that he could not remember to take his medications) in connection with his application for social security disability benefits.

Expert opinions which ignore the facts of the case, including objective evidence and admissions against interest with which they are fundamentally inconsistent are unreliable under the Daubert standard and inadmissible under F.R.E. 702 for that reason.

Both Dr. Silverman's and Dr. Gzesh's testimonies should be excluded from the jury's consideration as inherently unreliable and inadmissible under the standards of Daubert and F.R.E. 702.

WHEREFORE, moving Defendants Wackenhut Corrections Corporation, the Wackenhut Corporation, James Janecka, Deborah Perretta, Margaret Carillo, M.D., Dr. Frederick, Dr. Holland Hull, Meriam Byrd , Meriam Byrd and Carol Snell respectfully request this Honorable

353328-1

Court grant Moving Defendant's Motion to Exclude the Proffered Testimony of Lee M.

Silverman, M.D. and Daniel J. Gzesh, M.D. Pursuant to F.R.E. 702 as unreliable.


Respectively submitted,

**KELLY, McLAUGHLIN, FOSTER, BRACAGLIA,
DALY, TRABUCCO & WHITE, LLP**


By:/s/ David F. White_____
DAVID F. WHITE, ESQUIRE
Attorney I.D. No. 55738
TIMOTHY H. HARTIGAN,  ESQUIRE
Attorney I.D. No. 66231
Kelly, McLaughlin, Foster, Bracaglia
Daly, Trabucco & White, LLP
620 W. Germantown Pike, Suite 350
Plymouth Meeting, PA  19462
Attorneys for Defendants,
Wackenhut Corrections Corporation,
The Wackenhut Corporation
and James Janecka, Deborah Perretta,
Margaret Carrillo, M.D., Dr. Frederick,
Dr. Holland Hull, Meriam Byrd, and Carol Snell

Dated:  March 19, 2004

353328-1

ARTHUR JACKSON, III                         :        CIVIL ACTION

    vs.                                    :
                                           :

DELAWARE COUNTY; WACKENHUT      :
CORRECTIONS CORPORATION C/O      :
PRENTICE HALL CORP.; WACKENHUT :
CORPORATION; DELAWARE COUNTY :
BOARD OF PRISON INSPECTORS;        :
CHARLES SEXTON, CHAIRMAN OF       :
DELAWARE COUNTY BOARD OF           :
PRISON INSPECTORS; GEORGE HILL,   :
SUPERINTENDENT OF DELAWARE        :
COUNTY PRISON (GEORGE W. HILL      :        NO. 02-3230
CORRECTIONAL FACILITY); JAMES      :
JANECKA, WARDEN OF DELAWARE       :
COUNTY PRISON; DEBORAH               :
PERRETTA, HEALTH SERVICES           :
ADMINISTRATOR OF DELAWARE         :
COUNTY PRISON; MARGARET            :
CARRILLO, M.D., DELAWARE            :
COUNTY PRISON; DR. FREDERICK,      :
DELAWARE COUNTY PRISON; DR.        :
HOLLAND HULL, DELAWARE             :
COUNTY PRISON; MERIAN BYRD,        :
NURSE, DELAWARE COUNTY             :
PRISON; CAROL SNELL, NURSE,         :
DELAWARE COUNTY PRISON              :

## CERTIFICATE OF SERVICE

    I, Timothy J. Hartigan, do hereby certify that a true and correct copy of the Motion in Limine of Defendant Wackenhut

Corrections Corporation and the Wackenhut Corporation to Exclude the Proffered Testimony of Lee M. Silverman, M.D. and

Daniel J. Gzesh, M.D. Under F.R.E. 702 as Unreliable has been served by U.S. Mail, First Class, postage prepaid, to the

following at the addresses and on the date listed below:

| Derrick Howard<br>John Rollins, Esquire<br>HOWARD ROLLINS & JONES<br>1319 South Broad Street<br>Philadelphia, PA 19147 | Kathleen E. Mahoney, Esquire<br>Robert M. DiOrio, Esquire<br>Front and Plum Streets<br>P.O. Box 1789<br>Media, PA 19063 |
|---|---|
| William C. Reil, Esquire<br>42 S. 15th Street<br>210 Robinson Bldg.<br>Philadelphia, PA 19102 | |

                                    /s/ Timothy J. Hartigan
                                  Timothy J. Hartigan

<u>March 18, 2004</u>

353328-1

## <u>AFFIDAVIT</u>

I, Timothy J. Hartigan, Esquire, swear and affirm that all portions of deposition transcripts, infirmary records, hospital records, prison records and expert reports attached as exhibits to this summary judgment motion are true and correct copies of these documents and that these have been produced and exchanged between moving counsel and non-moving counsel throughout the discovery process.

<u>/s/Timothy J. Hartigan</u>
Timothy J. Hartigan

<u>March 19 2004</u>
Date

353328-1