EXHIBIT C

# MARC SAGEMAN, M.D., PH.D.
Clinical and Forensic Psychiatry

✉ *mailing address:*
Society Hill Towers, Apt. 15A
200 Locust Street
Philadelphia, PA 19106

🖂 *clinical office:*
The Rittenhouse, Suite 405
210 W. Rittenhouse Square
Philadelphia, Pennsylvania

telephone: (215) 627-1553
facsimile:  (215) 627-3464
e-mail: sageman@post.harvard.edu

Mr. Robert DiOrio, Esquire
DiOrio & Sereni, LLP
Front & Plum Streets
P.O. Box 1789
Media, Pennsylvania 19063

June 6, 2003

RE: **Arthur Jackson, III v. Wackenhut, et al**
**U.S.D.C., Eastern District of Pennsylvania, Civil Action No. 02-3230**

Dear Mr. DiOrio,

As you requested, I examined Mr. Arthur Jackson, III at my office at the Rittenhouse on June 4, 2003 from 14:00 to 16:30 hours. Mr. Jackson was told the purpose of the examination. He understood that the examination was in a legal context and that there was no patient/physician confidentiality involved. He was further told that a report would be sent to you based on the examination. He acknowledged this and cooperated. His attorney, Mr. Scott Jeffries, was present throughout the evaluation and videotaped it in its entirety.

The following records were reviewed:

- Copy of the Complaint
- Copy of Defendant's Answer with Affirmative Defenses
- Beckett Apothecary purchase records, 3/4/96 to 3/12/02
- The Medicine Shoppe purchase records, 1/1/98 to 3/12/02
- Wackenhut Corrections Corporation medical records, 1/1/98 to 12/31/02
- Lee Silverman, M.D.'s office notes 8/3/98 to 3/19/03, and letters, 2/20/01 and 1/21/03
- Celsus Ebba, M.D.'s medical records, 11/10/99 to 2/4/03
- Wackenhut Corrections Corporation medical records, 2/26/00 to 5/28/00
- Incident Report from C/O DiCave, 5/28/00
- Inmate Interview Sheets, 5/28/00 (four)
- Crozer Chester Medical Center medical records, 5/28/00 to 6/3/00
- Crozer Chester Medical Center medical records, 6/3/00 to 6/4/00

- Crozer Chester Medical Center partial records, 6/4/00 to 6/7/00
- Robert O'Reilly, M.D.'s letter, 6/26/00
- Incident Report from C/O Gardner, 10/13/00
- Dan Gzech, M.D.'s letters, 7/25/00, 11/14/00, 12/19/00, 2/8/01, 3/7/02, 6/25/02, 12/17/02 and 2/4/03
- EEG report, 11/28/00
- Carol Armstrong, Ph.D.'s report, 1/29/03
- Verzilli & Verzilli and Consultants, Inc.'s report, 2/19/03
- Betsy Bates, BSN's report, 2/20/03
- Deposition transcripts of Mr. Arthur Jackson, III, 2/20/03 and 3/12/03
- Deposition transcript of Ms. Camilla McFadden, 3/12/03

## NATURE OF THE PROBLEM:

I was asked to perform an independent medical examination of Mr. Arthur Jackson in connection to the above-referred litigation.

## SUBJECT'S NARRATIVE ABOUT THE SITUATION:

The following account has been generated from Mr. Arthur Jackson's narrative of the events.

Mr. Jackson was born on 1/6/53, in West Chester, Pennsylvania. His father worked in a fruit orchard and his mother was a housewife. He is the fourth of five children. He is no longer close to any of his siblings. He denied any family history of mental illness. He remembered he had an operation as a baby for a "tight band" around his stomach and did not remember his mother saying anything about his developmental milestones. Mr. Jackson said he grew up dirt poor, but nothing stood out in his memory as a significant event in his childhood. He graduated from high school in 1970 and was a B, average student. He said he was a popular child. He dated, smoked pot and drank some alcohol. He was politically aware but not politically active.

Mr. Jackson worked for Rothwell Office Equipment as a salesman from 1969 to 1985. He became a field engineer and a sales representative. He was terminated because his driver's license was revoked when he refused to pay a ticket for driving too slowly in Washington, D.C. In terms of his social life, he dated in the 1970's and got married for

2

four years in the 1980's. He was divorced in 1987. He has a child, Chanel, age nineteen, from this marriage. He has another child, Brian, eighteen, "out of marriage." He was not close to his children. In terms of medical problems at the time, he had a left knee injury (torn cartilage) and left thumb dislocation from sparring in Tae Kwan Do. He developed cluster headaches, which he eventually treated with chamomile tea. He denied any substance abuse and said he was a social drinker on weekends. He denied any mental problems in the 1970's and 1980's and said he "worked on the solutions."

In 1987, he worked at Snappy Car Rental as a driver, dispatcher and manager till 1989. He then worked at Stoltzfus RV and Marine as a sales representative, selling accessories and parts for boats. He was laid off in 1991 after the passage of the luxury tax. In 1991, he took off from work again, relaxed and enjoyed himself. He said that he later became aware that he paid taxes for 1992, but could not remember what he did. Socially, after his divorce, he just "hung out" and had a serious relationship from 1987 to 1991. He collected unemployment for one and a half years and traveled locally. He was upset that he lost the Stoltzfus job because he had really enjoyed it.

Medically, Mr. Jackson suffered from pancreatitis around 1989 or 1990. He said this was due to his excessive drinking and said his main drink was a screwdriver. He developed high blood pressure, which was first discovered in 1993. His blood pressure was "off the chart." He was treated with Procardia. In 8/94, he developed a stroke. He said that a doctor mentioned it was a TIA. He was admitted to a hospital for two weeks. His left arm was paralyzed and curled up. He had physical therapy in the hospital and did his own rehabilitation upon release.

On 1/5/96, Mr. Jackson developed pancreatitis again as a result of alcohol abuse. He was "hanging out with the boys pretty good." During the hospitalization, he developed an iatrogenic osteomyelitis. One day, he realized that he could not move his lower extremities. He stayed at the hospital for four and a half months and was treated with intravenous antibiotics. He was discharged and gave himself intravenous antibiotics for two months. Mr. Jackson said that as a result of this horrible experience, he could not do anything and developed depression "really bad" around May or June 1996. He also had pain in his back radiating to his testicles. He started seeing Dr. Silverman around 6/96 and Dr. Gzech around that time. His sleep was affected: he had racing thoughts and

could not shut down for the night. His weight stayed the same and he denied any problem with concentration at the time. He was determined to "beat this out." He was put on Effexor, Klonopin and later Trazadone. He had thoughts of suicide but denied any suicide attempts. He remembered that once he went to Fitzgerald Mercy Crisis Center and was admitted to the psychiatric ward for about five days because he was angry and upset about the osteomyelitis. He said he was still drinking. In 1999, just after he had been diagnosed with diabetes, he went on disability because of his back problem and depression.

Mr. Jackson said that around that time, he lived with his now common-law wife, Camilla and her two children, Josh and Mandy. He said he was first arrested in the late 1990's for a DUI. He later corrected himself saying it was for receiving stolen property. He was incarcerated in 1998 for months and said this was the occasion of his only suicide attempt. He said that the prison authorities would not give him his medication or it took too long to get it. He tried to hang himself from the tier with his bed sheets. The second arrest was in late 1999 for DUI. He was incarcerated the third week of February 2000, right after St Valentine's Day. He was sentenced to 15 weekends. He would go to jail from 6 PM Friday to 6 PM on Sunday. He was on Effexor 300 or 200 mg daily, Klonopin 1 mg five times daily, Trazadone 200 mg at bedtime and Insulin. In terms of arrangements to take his medications, he said "you were admitted and you were dispensed the medications." However, he did not receive his medications the first weekend and asked where his Klonopin was. He was also on insulin twice daily. He got no diabetic meals and no psychiatric medication. On the second weekend, he received just the insulin. The Klonopin was out of the picture. He said he told Dr. Silverman about this, right in that period. He said that Dr. Silverman explained to him Klonopin withdrawal and what the consequence of the withdrawal would be. He said he was not getting insulin until later. He received no Trazadone at all and was told he could not receive it in the evening because no nurse could be escorted at the time by correctional officers. He said that every weekend, he was complaining about shaking and diarrhea. He was taken to the prison infirmary three times. He then asked a nurse, "Birdie", if he could bring his own medication. It was agreed that he did so. He said he brought enough to cover his complete stay there.

Mr. Jackson said that, the first weekend he brought his medications, he kept them on him. He said the other inmate found out that he had Klonopin and threatened him to get high. He took the medications back home when he left. The second weekend, he brought enough medications to last him until the end of his sentence. He said he gave them to the correctional officer and did not know what happened to them because he never saw them again. He said he recalled getting insulin in the morning and afternoon, but he did not recall receiving his psychiatric medications after that second weekend. He said he might have received them, but he did not recall at the evaluation. He said he was still drinking at the time, but one could not come drunk to jail because time could be added to the sentence. The last thing he recalled the last weekend was getting lunch around 10-11 AM on Sunday morning. He recalled that it was high in sodium nitrate and was concerned about getting his insulin shot that afternoon. He repeated that he did not remember getting his medications that last weekend or the weekend before. He just remembered that it was a problem getting his medications.

In terms of his life before the incident of 5/28/00, he said he would get up around 5 or 5:30 AM and watch the Civilization Channel, read National Geographic and walk the dog. He was living with his common law wife, who was also disabled because of manic-depressive illness. He said he would work on clocks. He collected clocks and timepieces and liked to repair them to make them work. He used to be a mechanic. He liked reading, non-fiction, mostly National Geographic. He liked to watch movies, cook meals and go out on short day trips in the car in Pennsylvania. He liked to visit neighbors, see his sister and nieces. He liked to visit with people, talk politics and make jokes. He liked to keep up with car styles. He liked to cook meals, mostly "male" meals with steak. He liked to watch a movie in the evening and go to bed around 12 or 12:30 AM. He said he only slept about five hours.

The first thing he remembered after the accident was being taught how to walk. He wanted to get out of there. He described life afterwards as "not too well." He did not read and did not watch movies. When he read a Tom Clancy book, he read two pages and did not know what he had read. Before, he could read two books at a time. He did not like to socialize because he got angry. He said he never got angry before, except for the one time he was hospitalized. The anger was new. He had been a pleasant guy

5

before. He said the anger was still there. He said that people had the audacity to tell him that nothing was wrong with him. He could not remember to call people he used to socialize with and became a hermit. He said that cooking was out of the question. One time, he walked away from the stove and things caught fire. He realized what had happened when the alarm went off. He did not take the dog out anymore for fear of dropping the leash. He had an American Bull Terrier and there were strict laws about handling them. He no longer took day trips. He would not go to places that were not ingrained in his life. Once, he went to Delaware and could not find his way back. It was just another thing that spooked him. He still had his clocks but no patience. He did not repair them anymore. When he watched movies, after the first half hour, he did not remember the plot anymore.

Mr. Jackson said that he was on insulin three times daily; Trazadone 300 mg at bedtime; Effexor 200 mg in the morning, 200 mg in the afternoon and 200 mg after dinner; Klonopin 1 mg in the morning and 2 mg at bedtime. He said he no longer took medications for the pain. He just coped with it. He stopped drinking two years ago. He said that with the diabetes, it was not going to work out too well. It was time to stop. He went to Valley Forge rehabilitation for ten days and he has been sober ever since. In terms of other medical complaints, he said that sometimes when he looked at a picture, it was difficult for him to distinguish what it was. This symptom was not consistent. He denied any new psychiatric complaint since the incident.

In terms of review of mental symptoms, he denied any auditory or visual hallucination or delusion. He denied any manic symptoms. His sleep lasted four hours and was interrupted. His appetite had not changed. He was on a controlled diet and it was sufficient. His concentration was poor. He said that he did not have much energy. He depended on his wife to dispense medications for him. This scared and bothered him, especially Insulin. He said once his glucose level was 561, and he could not incur any more medical bills. He would treat himself slowly.

Mr. Jackson said he was still depressed. He could not depend on himself anymore. He could not recall things that he should. He was not dependable anymore. Even when he washed clothes, he left it in the washing machine. This was why he did not go where he had not gone before. He saw his sister less frequently. But he knew the

way to Wal-Mart because it was only a left turn from the house. He denied having any panic attacks, excessive worries, obsession, compulsions, phobias or reliving any traumatic experience. He smoked three cigarettes daily for about seven years. He stopped drinking two years ago. He drank a half-cup of coffee in the morning and denied drinking any other caffeinated drinks.

Mr. Jackson said he tried to start a business "On Top" with his common law wife in the spring and summer of 2001 to try to supplement their incomes. His wife is a great baker and the business was selling cinnamon buns and pound cakes. He said he was the sales person and went around to several individuals. At its height, they sold six dozen buns and six pound cakes in a three day period. The business faded after three months because he could not retain product knowledge.

I asked him about any other episodes of loss of consciousness. He could not recall any. I asked him about any other instances of seizures. He could not recall any. He said he went to Dr. Silverman and asked him about prior seizures. Dr. Silverman said, "What seizures?" He said he had a car accident in 1997, when he was riding in the back and the car hit a pole. He said he injured his knee but not his head. In 1999, he rear-ended another car. This was how he got a DUI, which landed him in jail. He said his BAC was .28. This was just before he was diagnosed with diabetes.

**MEDICAL HISTORY FROM REVIEWED DOCUMENTS:**

To the extent that the medical history impacts on my opinion, the following is a brief summary of the medical records reviewed.

The oldest records reviewed are from pharmacies, which revealed prescriptions from Dr. Silverman dating back to 8/19/96. His billing records indicate that he saw Mr. Jackson from 8/19/96 for major depression and alcohol abuse. The same billing records indicate he was hospitalized for major depression and alcohol abuse from 9/7/96 to at least 9/9/96. Dr. Silverman continued to see Mr. Jackson on a monthly basis.

On 1/20/98, Mr. Jackson was incarcerated at the Delaware County Prison. On admission, he gave a history of hepatitis, gastritis, arthritis, hypertension, a CVA in 1995, pancreatitis in 1996, osteomyelitis treated in 1996, a MVA with head trauma and seizure

in 1997 and a psychiatric history with three suicide attempts and psychiatric hospitalization in 1997. He denied alcoholism and admitted only to drinking beer once in a while. He was on Effexor 300 mg daily, Klonopin 5 mg daily, Trazadone 200 mg at bedtime, Procardia, Percocet and Prevacid. On 1/20/98, he stated that he was always suicidal but was just too scared to go through with it. The physician's note reported that he had hypertension since 1995 with a stroke resulting in residual numbness but no weakness of the left arm. On 1/23/98, he came to the hospital ward after trying to hang himself. He was crying, stating, "I'm sorry, I didn't mean to do it. I just need my medicine." He would not give his name and had poor eye contact. He became more cooperative on the ward and the next day stated he was hearing voices.

On 1/26/98, a psychiatrist noted that he was depressed with suicidal thoughts. He was overwhelmed with feelings of unworthiness, inability to contribute, considerable physical pain associated with osteomyelitis and other problems. He had five prior suicide attempts. His charges consisted of violation of parole and retail theft. He said he had not taken his medications for two days and suddenly, while driving developed racing thoughts. He went into a Kmart and stole trinkets and was arrested. He had no idea why he did that but said that not taking his medications may have contributed to his behavior. He had problems with anger out of frustration about not working. He lived with his fiancée, who was manic-depressive. He was not eating and hoped this would kill him. On 1/28/98, he was transferred to B ward.

On 1/29/98, the psychiatrist noted that Mr. Jackson was treating with Dr. Silverman for depression for about a year. On 1/30/98, he had a positive tuberculin test with a known active exposure. He was given INH 900 mg twice weekly with vitamin B6 for six months. On 2/12/98, the psychiatrist noted that suicidal ruminations were still present and he added Navane to his regimen. Mr. Jackson complained of back pain radiating to his testicles. By report, an MRI on 1/8/98 showed anterior osteophytes with disc space narrowing at L5-S1. On 4/9/98, the psychiatrist noted that Mr. Jackson still believed he was being followed and had some suicide thoughts. There was a history of seizure disorder and he claimed that a neurologist stopped Dilantin the previous year. On 4/16/98, Dr. Carrillo reviewed the seizure history. He reported that Mr. Jackson said he had head trauma from a car accident ten months prior and had one seizure. He was put

on Dilantin for two weeks and then taken off by his doctors. He had no recurrent symptoms since. He now complained of episodes of rage, wanting to break something or hurt someone or himself. It happened when the pain got past a certain point. Dr. Carrillo's impression was post-traumatic seizure without recurrence, off medication. On 5/20/98, he said he had problems with anger management and requested group therapy, which was scheduled to start on 5/22/98. He was discharged on 6/6/98.

The notes provided by Dr. Silverman started on 8/13/98. His patient was "mad at the world" and about to lose his house. His handwriting was difficult to read, but it seemed that Mr. Jackson was losing weight and had poor sleep. He was on Effexor 300 mg daily, Klonopin 5 mg daily and Trazadone 200 at bedtime. On 9/3/98, Dr. Silverman reported that his patient was not following up with appointments to other physicians. He raised the Effexor to 600 mg daily. On 10/23/98, Dr. Silverman reported that his patient appeared more depressed and had mild stammering. He was supposed to see Dr. Boyer. He denied any alcohol intake and minimized problems at home. He had problems with his neighbor. His sleep was variable. On 11/27/98, Dr. Silverman reported that his patient missed the appointment with Dr. Boyer because his brother died of alcohol. He appeared to be handling the tragedy well and insisted he was sober. On 3/2/99, Mr. Jackson told Dr. Silverman that he was afraid of seeing Dr. Boyer. On 4/30/99, he said he did not want to see Dr. Boyer, whom he blamed for his last drinking binge. He said he was now sober for the past month. He stayed reclusive at home, restrained by his pain. On 5/26/99, Dr. Silverman repeated that his patient's activities were very limited. On 6/24/99, Dr. Silverman reported that his patient rarely went out and had stopped driving. He had not had any alcohol for the past four months but was very isolated. On 7/22/99, Dr. Silverman again reported that his patient rarely went out. He was depressed and anxious. On 9/22/99, Mr. Jackson was still depressed and anxious, reported being in pain, had death in the family, and his 16-year-old daughter was pregnant. On 11/4/99, Mr. Jackson reported he had a drinking binge, which lead to a DUI for which he faced prison. He was distraught and complained of insomnia. He denied any alcohol ingestion for the past five weeks. On 11/10/99, Mr. Jackson consulted with Dr. Ebba for bronchitis with bronchospasm. On 11/22/99, Dr. Ebba noted that his patient complained of unbearable low back pain. He was also diabetic and put on insulin. Other diagnoses

included hypertension, osteomyelitis, stroke in 1994 and left upper extremity hemiparesis. On 12/6/99, Dr. Ebba reported that the morning blood glucose was well controlled on the insulin regimen. Mr. Jackson was also on Effexor 300 mg twice daily, Klonopin 5 mg daily and Trazadone 200 mg at bedtime. On the same day, Dr. Silverman noted that his patient, who mostly stayed at home, had just been diagnosed with diabetes and was on insulin.

On 1/22/00, Dr. Silverman changed the diagnosis to depression and alcoholism. He had spoken with Dr. Ebba and they agreed that their suspicion about their patient's excessive use of alcohol was justified. Mr. Jackson denied using any alcohol for the past two months and said he was attending AA meetings. He was spending his weekends in prison and complained about back pain. Dr. Silverman stressed the need for sobriety. Mr. Jackson agreed. Dr. Silverman wrote that he would not continue to prescribe Klonopin if he relapsed significantly. On 1/28/00, Mr. Jackson came to his appointment very tearful and despondent. He admitted that he drank "a 32 oz" beer earlier that day. His pregnant 16-year-old daughter had given birth to a baby. He was mildly intoxicated with alcohol. On 2/23/00, Dr. Silverman reported that his patient was doing better.

On 2/26/00, Mr. Jackson was admitted for his first weekend in prison. He denied any mental health history including hospitalization for an emotional or nervous problem or even receiving counseling or outpatient treatment for such problems. He denied any use of beer or alcohol. He denied any suicidality, head injury or seizure. On the first weekend, he was given Trazadone 200 mg at bedtime and Librium 50mg three times daily and 100 mg at bedtime. He also followed an insulin regimen twice daily. He provided a script by Dr. Silverman for Trazadone 200 mg at bedtime, Effexor 200 mg three times daily and Klonopin 5 mg daily. On 2/29/00, Mr. Jackson called Dr. Ebba for Vicodin. Dr. Ebba refused to prescribe some over the telephone and urged his patient to come in the next day. He was to go to the ER if he was in severe pain. There was no record of any visit the next few months.

During the second prison weekend, on 3/2/00, a physician note reported that a conversation took place with Dr. Silverman and the following regimen was decided: Effexor 200 mg three times daily, Klonopin 1 mg in the morning and noon and 2 mg at bedtime, and Trazadone 200 mg at bedtime. The inmate was to bring his own medication

for the weekends. That day, the doctor's orders were changed: insulin twice daily and Effexor 600 mg daily, Klonopin 4 mg daily and Trazadone 200 mg at bedtime. The doctor's order noted that the inmate was to use his own medications that he would bring each weekend. Throughout the month of March 2000, Mr. Jackson received Trazadone 200 mg at bedtime, Effexor three or two times a day, Klonopin once daily but not in the evening. In April, he was given his evening insulin on 4/2/00 but no other medication during the first weekend. During the next four weekends, he was given his evening Trazadone and Klonopin, the Effexor three times daily and Klonopin once or twice daily. A note that the inmate was to use his own medication was on the 4/00 medication sheet.

On 4/19/00, Dr. Silverman reported that Mr. Jackson was doing well but stayed mostly at home. On 5/6/00, the prison health facility reported that Mr. Jackson was sick during his diabetic accucheck, which was 129. He was gagging and vomiting, with chills and diarrhea for about twenty-four hours. The impression was gastroenteritis and the insulin was held for the evening. He was given Maalox and Kaopectate. He had been given his Effexor and Klonopin in the morning and at noon that day. Later that day, he was still shaking. The staff felt that he had an alcohol problem and his last drink was on 5/4/00 in the daytime. He was given Librium 50 mg at 5 PM. He was given Trazadone 200 mg and Klonopin 2 mg that evening.

On 5/22/00, Mr. Jackson denied drinking any alcohol to Dr. Silverman. He seemed to be doing well. The previous weekend, he had been given his psychiatric medication in prison. On the weekend of 5/27-28/00, Mr. Jackson's fasting blood sugars were 227 and 228 respectively. He was given his morning insulin. However, there is no record of dispensing Trazadone, Klonopin or Effexor that weekend. From the incident report on 5/28/00, at around 1800, Mr. Jackson fell to the ground as he was leaving the prison, striking his head on the floor. There was some seizure activity. Four inmate interviews reported that he made a quick noise, stiffened up, clinched his fist, his arms began to shake and he fell directly backward and his head struck the floor. He began to shake on the floor and blood came out of his ear. The officers present tried to help him by putting a towel under his head, which had struck the ground.

Mr. Jackson was admitted to the intensive care unit at Crozer Chester Medical Center on 5/28/00. The Riddle Hospital workup showed a basilar skull fracture, subdural

11

hematomy and right frontal contusion.  There was a history of seizure in the ER.  On admission, the blood glucose was 461 mg/dl.  A urine toxicology screen failed to detect any benzodiazepine.  A Head CT scan showed a curvilinear density in the parenchyma of the right frontal lobe most likely representing a parenchymal hemorrhage, subarachnoid blood in the sulci of the frontal lobe and the Sylvian fissure and low density left temporal love probably representing a contusion, perhaps a contre coup type of injury.  Mr. Jackson was started on Dilantin.  The CT scan the next day showed an apparent increase in subarachnoid hemorrhage along the tentorium over the right parietal convexity.  The physical medicine and rehabilitation noted that there had been a right CVA with left hemiparesis in 1994.  The neurology consult on 5/29/00 reported that there had been two episodes of hypoglycemia in the past with warning (sweating, lightheadedness) but no warning symptoms this time.  Speech and language seemed intact.  An EEG on 5/30/00 was normal.  A second neurology consult on 5/30/00 reported that there were two previous episodes of loss of consciousness.  At the time of the last one in 11/99, the patient was driving and rear-ended another car.  Prior to that, he was a passenger in a car listening to music and passed out.  He stated that his mother's uncle had similar spells.  On exam, there was a mild residual left hemiparesis from the previous stroke including mild facial droop.  On 5/31/00, the patient complained of headache, dizziness and decreased short-term memory but the exam was nonfocal.  On 6/2/00, his dizziness resolved and neurosurgery signed off on the patient

On 6/3/00, Mr. Jackson was transferred to CCMC rehab, where he underwent a formal cognitive evaluation by speech/language pathology on 6/4/00.  Although he was cooperative, he appeared drowsy and mildly lethargic, probably due to medication effect.  He demonstrated mild memory deficits on immediate recall but did fine on short term and remote memory, as well as hospital safety awareness and functional problem solving.  The impression was mild memory deficits, slow processing with increasing complex and lengthy procedures, decreased concentration and attention and awareness of deficits.  The patient demonstrated cognitive abilities supporting independent living and one to three speech therapy visits were recommended for improvement of memory.  The same day, Mr. Jackson was transferred back to the hospital portion of CCMC for management of his low sodium (121).

On admission, Mr. Jackson admitted drinking 16 eight-ounce glasses of fluid daily in order to "flush out" his system. On exam, he had a mild left hemiparesis. He was fluid restricted and discharged on 6/7/00 on insulin, Dilantin 300 mg every 8 hours; Antivert 12.5 mg three times daily; Pepcid 20 mg twice daily; Procardia XL 90 mg daily and Magnesium Oxide 400 mg twice daily.

On 6/19/00, Mr. Jackson complained of decreased memory to Dr. Silverman. He said that he had not been given his medication in prison and had loss of consciousness resulting in a closed head injury. Dr. Silverman resumed Effexor 600 mg daily (he had been on 300 mg daily in the hospital), Klonopin 5 mg daily and Trazadone 200 mg at bedtime. On 6/22/00, Dr. Ebba noted that his patient had been hospitalized for head trauma, hyponatremia and poorly controlled diabetes. There was a denial of tobacco, alcohol or illicit drug use. The patient was on Pepcid 20 mg daily, Dilantin 30 mg every eight hours, Procardia XL 90 mg at bedtime, insulin, folic acid and the psychiatric medications. On 6/26/00, Dr. O'Reilly evaluated Mr. Jackson for his hearing and dizziness. His impression was post-traumatic benign positional vertigo; traumatic brain injury and probable cerebellar degeneration due to alcohol abuse, resulting in disequilibrium. On 7/6/00, Mr. Jackson's blood sugars were still elevated, but he was not compliant with his diet. On 7/18/00, Dr. Silverman noted stammering speech and the fact that his patient had been arrested in the mall the day before because of a confrontation with police officers.

On 7/25/00, Dr. Gzesh evaluated his patient, whom he had seen several years prior for an epidural spinal cord compression with paraparesis. He reported that Mr. Jackson reported that witnesses said he had simply dropped over and there was no convulsion at the scene. He was discharged on Dilantin but elected not to take it. He complained of memory loss, speech dysfunction, headache, dysequilibrium and depression. On exam, he was labile, going from exuberance to tearfulness. Dr. Gzesh saw no evidence of epileptic disorder. He also reported that his patient had suddenly stopped his Clonazepam several days prior to his fall, which had occurred while he was in prison. He inquired whether this might have been responsible. Dr. Gzesh stated that this was a possibility. On 8/27/00, Dr. Silverman noted that his patient complained that his memory was shot but noted that he was relatively stable. On 9/18/00, he reported that

13

his patient complained that he had no short-term memory but told him that he had retained a lawyer for his injury. On 10/10/00, Dr. Silverman reported that Mr. Jackson had a two-and-a-half-week drinking binge. After he stopped, he started experiencing vertigo. The impression was alcohol relapse.

Later that day, Mr. Jackson was admitted to Fitzgerald Mercy Hospital with a two-day history of recurrent vomiting and crampy abdominal pain. He underwent an endoscopic examination the next day, which revealed moderate gastritis, probably due to alcohol use, and candida esophagitis. The discharge diagnoses were pancreatitis, alcoholism, hypertension, insulin dependent diabetes mellitus, elevated liver function enzymes and history of cholecystectomy. On 11/13/00, Mr. Jackson was still complaining of vertigo to Dr. Silverman. On 11/14/00, Dr. Gzesh reported that Mr. Jackson continued to complain of memory loss, depression and gait dysfunction. On 11/28/00, he performed an EEG on his patient, which was mildly abnormal because of the presence of slowing in the left frontal region, consistent with an underlying structural disorder. There were no epileptiform features. On 12/13/00, Dr. Silverman noted the complaints of forgetfulness, affective instability, speech stammering, memory defect. Dr. Gzesh on 12/19/00 did not recommend anticonvulsants.

On 1/22/01, Dr. Silverman noted that his patient had missed Effexor and passed out perhaps from a seizure but did not have a head injury. He was back to baseline. On 2/8/01, Dr. Gzesh reported that Mr. Jackson continued to complain of memory loss and symptoms of depression, "although to my eye, he appears brighter and more focused." He complained that his wife needed to accompany him constantly." On 2/20/01, Dr. Silverman wrote a letter to his patient's attorney. He stated he first met Mr. Jackson in 8/98 for depression, anxiety and other psychological repercussions from chronic pain that he was experiencing. His patient also had a history of binge alcohol abuse, liver disease and chronic pain. However, he always had a very clear sensorium and no cognitive problem whatsoever. He suffered a closed head injury perhaps as the result of a seizure that he suffered when he was forced to abruptly stop the prescribed medications. Mr. Jackson knew that there was significant discontinuation syndrome associated with some of the medications, most specifically Klonopin. "Unfortunately, he was not allowed to take this medication." Dr. Silverman opined that his patient suffered chronic cognitive

14

deficits from his closed head injury: abnormalities in his memory, inability to recall and carry out tasks, emotional lability, ataxia and stammering speech. Prior to the injury, he had a completely clear sensorium and undamaged cognition. On 4/6/01, Mr. Jackson acknowledged there was some improvement in terms of his stammering speech, but still complained of pain and insomnia. Dr. Silverman increased Trazadone to 300 mg at bedtime. On 6/14/01, Dr. Silverman noted that Mr. Jackson had been treated as an inpatient for alcohol and diabetic ketoacidosis at Fitzgerald Mercy and then at Valley Forge Rehab and had been discharged on 6/10/01. On 7/25/01, Dr. Ebba noted that Mr. Jackson had been in an alcohol rehabilitation program and had been sober for two months.

Dr. Silverman continued to see his patient on a monthly basis. He noted the stammering speech and on 8/23/01 noted that the reports of memory defect were much greater than the objective evidence. On 9/19/01, he reported that the cognitive symptoms were less prominent that day. On 10/15/01, Dr. Silverman reported word finding difficulties, complaints of anxiety and problems with the wife and sometimes difficulty driving at night. There was increased anxiety. The Klonopin was increased. On 12/11/01, there were complaints of getting lost, memory and word finding problems. On 3/7/02, Dr. Gzesh reported that his patient continued to complain of cognitive impairment. On multiple occasions he had forgotten to take his insulin. His wife was now reminding him on a regular basis. He constantly wrote down reminders for himself. On 4/9/02, Dr. Silverman noted that the memory was inconsistent. Mr. Jackson was driving without incident. On 5/2/02, Dr. Ebba reported complaints of memory loss, forgetfulness, poor diabetic control, weight gain and poor diet control. On 6/25/02, Dr. Gzesh reported no appreciable subjective changes. The physical examination revealed Mr. Jackson to be bright and alert, with less confusion and hesitation than in the past. He appeared slightly blue, but not really depressed. There was no evidence of delirium or psychosis. On 8/5/02, Mr. Jackson complained of intermittent bad headaches. Dr. Ebba advised him to contract Dr. Gzesh. On 12/17/02, Dr. Gzesh reported that Mr. Jackson complained of cognitive impairment and had trouble remembering to take both his insulin and his Clonazepam. His wife was helping as much as she could, but she also had cognitive problems as well. He was on 6 mg of Clonazepam daily.

In a 1/21/03 letter to the attorney, Dr. Silverman repeated he first met Mr. Jackson in 8/98 when his internist referred him. He reported his patient never appeared intoxicated in his office. He went on to state that it was his belief that his patient had been completely sober in regards to alcohol over the past several years, but later stated that he was aware of one alcohol binge that had occurred since the closed head injury, leading to hospitalization at Mercy Fitzgerald Hospital in 5/01. He further stated that around the time of the closed head injury in 5/00, his patient was not drinking on a regular basis. He opined that the seizure leading to that injury was more than likely due to abrupt cessation of the Klonopin and lack of insulin.

On 2/4/03, Dr. Gzech wrote a letter to attorney Rollins, opining that his patient suffered from the neurological sequelae of a severe head injury, a subdural hemotoma, which was due to a seizure caused by deprivation of clonazepam, which he had taken chronically. Because of the injury, his patient has suffered significant cognitive and emotional impairment, including the inability to remember to perform activities of daily living, such as taking insulin.

At his 2/20/03 deposition, Mr. Jackson testified that he had not worked since 1991 when he was laid off from a sales job. He briefly tried to start a business from his home in 2001, but failed (5-6). He had been incarcerated three times: twice for receiving stolen property and once for driving under the influence of alcohol (9). He remembered that he started treating with Dr. Silverman after the blizzard of 1996. He was in pain, which made him depressed. He was put on Effexor, Trazadone and Klonopin (39-48). He said he would bring Klonopin to prison for the weekend, but other prisoners would harass him for them, offering him up to $20 for a pill. He said he brought Klonopins in, gave them to the guards, who lost them. Then, he stated that they thought he had been released and threw them in the trash. So the next weekend, he was not going to bring them in anymore. They were too expensive to lose (51-55). Even though he did not bring them in, he verbally told the medical department that he needed them. During his weekend incarcerations, he would take his five o'clock dose of Klonopin on Friday, come to the prison at 6PM and leave Sundays at 6PM (55-56). He denied ever suffering a head injury prior to the 5/28/00 incident (65). He testified that prior to the incident, he used to take his dogs out, shoot pool with a league, go to Philadelphia, to the museums, go to state

parks (71). He went on disability in 1998 for his osteomyelitis and still received
payments (74-5). He did not recall whether he ever passed out or blacked out before the
incident (79). He testified that since the incident, he has had problems with anger
management, but not before the incident (93).

At his second deposition on 3/12/03, Mr. Jackson testified that before the 5/28/00
incident, he was going out shopping, to the movies, to parks, walking, being out in the
fresh air, driving to different locations, reading books, cooking, spend time with
neighbors and taking them places. After the incident, he no longer had any social life
(19-20). He also had problems with his anger since the incident (20). He recalled that he
had a small stroke in 8/94, for which he was hospitalized for two weeks at Chester
County Hospital. He had a motor vehicle accident in 1997, in which he injured his knee
but not his head. He went to Bryn Mawr Hospital (27-28). He could not recall ever
having a head injury or a seizure before the 5/28/00 incident (33-38). The last time he
drank was in 2/01 (39). He went to Valley Forge Medical Center for rehabilitation for
about ten days (41). He admitted to drinking during 2000, when he was serving his
sentence, testifying that he would drink around 3 PM on Fridays before he would go to
prison (44-45). He later testified that he had been on Dilantin only once for two weeks
because of the motor vehicle accident (46-47). When this contradiction to his earlier
statement was pointed out, he said he would guess and then said he did not know (47-48).
Again, when asked about any head injury included in Dr. Armstrong's report, he testified
he did not recall (59-63). He also did not recall ever having thoughts of suicide prior to
1/98 in prison (67).

On the same day, Ms. McFadden, his common law wife testified that before the
incident, Mr. Jackson was active, cooking her a full breakfast, wash the cars every two or
three days and fix things around the house (8-9). She also testified that there was a big
change in his personality, for how he got very angry at her, bringing her to tears (17).
However, in her eight years of living together with him, she could not recall her husband
appearing to be drunk. "Arty's just Arty." (19)

## MENTAL STATUS EXAMINATION:

Mr. Jackson came with his attorney Mr. Jeffries. I invited them in my office. Mr. Jackson sat on a chair facing me and Mr. Jeffries set up a videocamera to record the evaluation. Mr. Jackson is an African American male looking his chronological age of 50 years. He was about five feet nine inches and weighed about 260 pounds. He was balding, casually dressed and wore a large gold Jewish star around his neck. He made good eye contact and displayed no unusual psychomotor movement.

Mr. Jeffries interrupted the evaluation twice. Once he tried to ask me the scope of my evaluation and I told him that it depended on the story provided by Mr. Jackson and the documents reviewed. In the middle of the evaluation, Mr. Jeffries interrupted again and told me that my questions had been covered in the deposition and this was not a deposition. I told him he was not to interfere with the evaluation and, if he persisted in doing so, I would invite him to leave my office. I called the office of Mr. DiOrio, who had retained me, and complained about the interference. I handed the phone to him to talk to an associate there, and while he was on the phone I told him that I had decided that he was to leave my office. He finished the conversation, and said he would not interfere anymore. I said that if that was the case, he could stay and continue to film the proceedings. Throughout that time, he kept referring to a bound monograph, which I suspected might have been a copy of Mr. Jackson's deposition.

Mr. Jackson's mood was euthymic and affect was full range. His speech was fluent. I did not detect any signs of stuttering or stammering. His stream of consciousness was goal directed, relevant and coherent. His thought content was responsive to the topic of the evaluation and the questions asked. His sensorium was grossly intact. He was oriented to time, space, person and situation. His attention did not waver throughout the two-and-a-half-hour evaluation. His long-term and short-term memories were grossly intact. He repeated himself a few times for what I took to be emphasis rather than forgetting. At the end of the evaluation, he remembered details that he had told me earlier. His vocabulary and fund of information were greater than might have been expected from his educational background. He abstracted easily during the course of the interview. His judgment and insight were fair.

## PHYSICAL EXAMINATION:

Not performed due to the nature of the interview.

## OPINION:

The following opinion is keyed to the American Psychiatric Association's
Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text revision
(DSM IV-TR), which has become the accepted standard of reference in the profession.
This reference is the work of committees of experts based on extensive field trials and
their consensual analysis of historical data.

RELIABILITY:

In a forensic setting, the first issue to address is the reliability of the litigant as an
informant on his or her condition. While validity or the truthfulness of information is
firmly within the province of the fact finder, the nature of a forensic examination requires
the evaluator to comment on the reliability of the litigant's information. This assessment
is critical in a psychiatric evaluation, where so much information comes from self-
reports. And it is often on the basis of this self-reported data, either directly from the
information gathered during the interview or indirectly through a review of documents
based on self-reports, that an opinion is reached.

Is Mr. Jackson a reliable informant about past events and on his own psychiatric
condition?

There were some major discrepancies between Mr. Jackson's narrative to me and
the medical records reviewed. He denied any head injuries to me and at his deposition.
Yet, Dr. Armstrong report clearly stated twice that he suffered a motor vehicle accident
with head injury in 1997 (pages 1 and 6 of her report). The prison admission form on
1/20/98 reported that he was in a car accident with head trauma and seizure in 5/97. Dr.
Carillo's consult on 4/16/98 also reported head trauma from that accident. Likewise, Mr.
Jackson denied any seizure prior to the incident under litigation both to me and at

19

deposition. Yet, the same prison admission form reported a seizure in 1997. Dr. Carillo also separately reported a seizure as a consequence of the above accident and for which Mr. Jackson was put on Dilantin. Again, in terms of unexpected loss of consciousness, Mr. Jackson denied any other episode of loss of consciousness to me. Yet, the neurology consult at Crozer Chester Medical Center on 5/30/00 documented two previous episodes of loss of consciousness: the 1997 car accident, and the 1999 car accident, leading to Mr. Jackson's eventual incarceration. Dr. Silverman reported on 1/22/01 that Mr. Jackson had recently passed out. And again, in terms of his anger, Mr. Jackson stated that he never had problems with anger before the incident under litigation and repeated this to me (with the exception of his 1996 psychiatric hospital admission). Yet, the first prison records clearly demonstrate that he complained of episodes of rage to Dr. Carillo. He even requested group therapy for anger management at the time. Dr. Armstrong also noted the problems with anger in her review of the first prison records. In terms of suicide attempts, Mr. Jackson told me that he had made only the one in prison. Yet, the first prison records refer to at least three or four that predated his first incarceration.

Mr. Jackson's inconsistencies with respect to his smoking are not particularly relevant but are indicative of his general lack of consistency. More relevant to this litigation, the medical records are replete with Mr. Jackson's minimizing his drinking until he sobered up in 2001. His account of his drinking to Dr. Armstrong contrasts with his account to me or to other clinicians (Dr. Silverman, the two prison records). Supporting Dr. Armstrong's account are the multiple complications from alcohol (chronic pancreatitis, gastritis, arrests, hypertension) dating back to 1989. Of greater relevance still, Mr. Jackson's accounts of the events of his second incarceration with respect to his medications are not consistent. I shall address that in the next section.

Therefore, my opinion within a reasonable degree of medical certainty is that Mr. Jackson is not a reliable informant about his past medical condition.

What is more surprising in this case is the letter of his treating psychiatrist, Dr. Silverman. First, let me state that, in psychiatry, the practice of "wearing two hats" – being both a fact and expert witness – is frowned upon. The American Academy of Psychiatry and Law, the official branch of the American Psychiatric Association representing the subspecialty of forensic psychiatry, clearly discourages treating

psychiatrists from being retained as expert witnesses for their patients. The process involves a conflict of interest and may adversely affect the therapeutic relationship. The temptation of becoming an advocate for one's patient may also be too difficult to resist. This seems to be the case here. Dr. Silverman is not even a reliable fact witness for his patient. Just to limit myself to his 1/21/03 letter to attorney Rollins, he stated: "Specifically, I first meet (sic) Mr. Jackson in August 1998 when his internist Celsus Ebba referred him to me." He made the same statement two years earlier in a letter to the attorney. Indeed, in response to subpoenas, he produced records dating back only to 8/3/98. Yet, his billing records show that his initial evaluation dated back to 8/19/96 and he saw Mr. Jackson weekly afterwards. The records of Beckett Apothecary show that Dr. Silverman's first prescription also dated back to 8/19/96. The 1/20/98 prison records indicate that Mr. Jackson was already treating with Dr. Silverman for about a year. And Mr. Jackson himself testified at deposition and told me that he saw Dr. Silverman since 1996. In the same paragraph of his letter, Dr. Silverman stated that his patient "never appeared intoxicated in my office." Yet, in his 1/28/00 note, Dr. Silverman described his patient as mildly intoxicated with alcohol.

Later in the same letter, Dr. Silverman stated: "it is my belief that he has been completely sober in regards to alcohol over the past several years." This statement is refuted by his own notes that document alcohol binges or significant drinking in 3/99, 11/99, 1/00, 10/00 and 5/01. Further down the same paragraph, Dr. Silverman only acknowledged the last incident. Of course, at his deposition and to me, Mr. Jackson admitted that he was drinking throughout that time until he quit in 5/01. This is supported by the second set of prison records, which document alcohol withdrawal during the weekend of May 6, 2000, during a weekend he was receiving his Klonopin and the hospitalization for consequences of drinking in October 2000. Further in the letter, Dr. Silverman stated that at the time of his second incarceration, Mr. Jackson was not intoxicated nor was he drinking on a regular basis. This is not consistent with his own notes, showing he was intoxicated on 1/28/00. Dr. Silverman did not seem to be aware that Mr. Jackson admitted to drinking at the time of his incarceration at his deposition, to me and to the prison staff. The fact that he was drinking at the time is supported by the evidence cited above.

21

This lack of consistency of the major fact witnesses (Mr. Jackson and Dr. Silverman) makes the task of reconstruction of the past more challenging. It also affects the opinions of the experts, who rely partly on Mr. Jackson's self report. Dr. Armstrong also relied on her conversation with Dr. Silverman, who suffers from the same lack of reliability.

DIAGNOSIS:

What does Mr. Jackson suffer from? My opinion with a reasonable degree of medical certainty is that Mr. Jackson suffers from Major Depressive Disorder, Recurrent, Moderate in severity but presently in remission; and Alcohol Dependence, in Sustained Full Remission (according to Mr. Jackson's self-report). Neither condition was linked to Mr. Jackson's incarceration in the spring of 2000. As an aside, Mr. Jackson is receiving an excessive amount of medication, which is very dangerous in his case. Mr. Jackson has been receiving 600 mg of Effexor daily. The *maximum* adult dose of Effexor is 375 mg daily. At this dose, Effexor is associated with clinically significant effects, namely high blood pressure and insomnia. Mr. Jackson is receiving almost twice the maximum adult dose! He is suffering from hypertension, which has already resulted in a stroke. He is at great risk of developing another one if it is continued at such a high dose. Furthermore, his dose vastly in excess of the maximum recommended dose probably results in insomnia, which he reported started around the initiation of Effexor. To counter this side effect, Dr. Silverman prescribed Trazadone and a high dose of Klonopin. Both are very strong sedatives and affect memory. Mr. Jackson's cognitive complaints may well be a result of the large amount of Klonopin he receives. I would strongly and urgently recommend lowering the dose of Effexor to the recommended clinical range before Mr. Jackson suffers another stroke. He may also then dispense with Klonopin and Trazadone altogether.

On 5/28/00, Mr. Jackson suffered a sudden loss of consciousness with probable seizure, resulting in parenchymal hemorrhage in the right frontal love, subarachnoid hemorrhage and left temporal lobe contusion. What contributed to this loss of consciousness? Drs. Silverman, Gzech and Armstrong blamed the abrupt discontinuation of Klonopin, which they blamed on the Delaware County Prison preventing him from

taking his medication. Yet, it appears that none reviewed the second (and most relevant) prison records.

To reconstruct what might have happened, one cannot just rely on self-report but one must take into account the totality of the evidence. Mr. Jackson was drinking at the time of his incarceration, as he reported at his deposition, to me, and documented in the prison records. He went into alcohol withdrawal on the weekend of May 6, 2000 at a time when he was receiving Klonopin according to the prison records. The cardex from the prison records show that he was receiving Klonopin sporadically on weekends. The only weekend in May when he did not receive Klonopin was the weekend of May 26 to 28, 2000. These records contradict his narrative to me that he gave his medications to a correctional officer during the "second" weekend and never saw his medications again. The prison records are also very clear in several places that Mr. Jackson was to bring his own medications every single weekend. Furthermore, contrary to his narrative the records show only one episode of withdrawal and not three as he claimed, and this was clearly related to alcohol withdrawal because he was getting Klonopin that weekend while in prison.

Of greater significance is Mr. Jackson's report to Dr. Gzech on 7/25/00 that he had suddenly stopped his Klonopin several days prior to his fall. This is consistent with his prior behavior of non-compliance with medications. He claimed to have suddenly stopped his medications in 1/98, resulting in "racing thoughts" and stealing for which he was arrested. It is consistent with the fact that no Klonopin seemed to have been dispensed the weekend of 5/27/00 and this was the only weekend he did not receive any of his psychiatric medications according to the prison cardex. It is also consistent with the objective evidence: his toxicology screen on 5/28/00 failed to detect any benzodiazepine, of which Klonopin is one. Because of its long half life, greater than 20 hours, and the very high dose Mr. Jackson was taking, traces of Klonopin should have been *easily* detected in the drug screen, had Mr. Jackson still been taken Klonopin on 5/26/00, two days before his loss of consciousness. The fact that none was detected is far more consistent with an abrupt stopping of Klonopin *days prior to his return to prison* on 5/26/00. With the high dose of Klonopin Mr. Jackson was taking, withdrawal symptoms

would have taken days before appearing. A far more likely scenario is withdrawal from alcohol, which takes 12 to 48 hours to develop after the last drink ("rum fits").

Therefore, my opinion within a reasonable degree of medical certainty is that the lack of Klonopin for two days would not have resulted in seizures because of the high dosage Mr. Jackson was taking and the long half-life of Klonopin. Mr. Jackson had stopped Klonopin on his own days before he returned to prison on 5/26/00, as he almost contemporaneously stated to Dr. Gzech. This is strongly supported by the toxicology result. Furthermore, alcohol withdrawal would have compounded this picture and by itself could have caused a seizure within 12 to 48 hours of discontinuing alcohol. Then there is the mystery of the other episodes of loss of consciousness documented in the records, whose etiology is still not clear because of the lack of the relevant medical records. It is possible that Mr. Jackson may suffer from a seizure disorder that predated his incarceration, since an episode predated it. He was indeed put on anti-seizure medication at the time.

In terms of damages that Mr. Jackson might have suffered from the closed head injury he sustained, it is difficult to gauge. He is definitely overmedicated and this affects his performance on neuro-psychological examination. The extent of damages from his previous stroke and his previous head injury need to be better gauged. This would require the relevant contemporaneous records. Any opinion at this point would be premature without examining this evidence. As I demonstrated earlier, Dr. Silverman's statement is not reliable in terms of his patient. Certainly, Mr. Jackson does not suffer from dementia as Dr. Silverman claims in his letter, without stretching the word beyond any reasonable meaning. Furthermore, I found no evidence of "stammering speech with mild expressive aphasia" as Dr. Silverman again claimed in the same letter. The videotape of my evaluation with him will easily demonstrate that there was no such stammering or any expressive aphasia.

In terms of prognosis, Mr. Jackson will do much better once his medications are reduced from their current mildly toxic levels. Once he is on a normal regimen of medication for his depression, he can be better assessed. Certainly, he was grossly intact during my evaluation. He had made the courageous step to give up drinking, which has greatly improved his cognitive abilities and the quality of his life. He no longer seems to

24

take any medication for his pain. As long as he stays off the alcohol and decreases his sedating medications, his cognitive abilities will continue to improve.


## PSYCHIATRIC DIAGNOSIS:

(According to the DSM IV-TR)


Axis I: Clinical Disorders

- Alcohol Dependence, in Sustained Full Remission
- Major Depressive Disorder, Recurrent, Moderate
- Possible Cognitive Disorder, NOS


Axis II: Personality Disorders

- Deferred


Axis III: General Medical Conditions

- Status Post Pancreatitis, 1989, 1996, 2000
- Status Post Gastritis, 2000
- Hypertension
- Status Post Cerebro-vascular Disease with left hemiparesis, 8/94
- Status Post Motor Vehicle Accident, with head trauma and seizure, 5/97
- Status Post Motor Vehicle Accident, with loss of consciousness, 11/99
- Insulin Dependent Diabetes Mellitus
- Status Post Loss of Consciousness with probable Seizure, resulting in parenchymal hemorrhage in the right frontal love, subarachnoid hemorrhage and left temporal lobe contusion, 5/28/00
- Status Post self induced Hyponatremia


## CONCLUSION:

In conclusion, my opinion with a reasonable degree of medical certainty is that Mr. Jackson suffers from major depressive disorder and alcohol abuse, in remission. He suffered from a loss of consciousness resulting in a closed head injury. The two-day hiatus of taking Klonopin because of its very high dosage and long half-life could not, by itself, have resulted in a seizure. Only a longer stoppage of this medication could, by itself, have caused a seizure. The evidence points to such a stoppage prior to his return to

prison in combination with withdrawal from alcohol as contributing factors of a probable seizure. He is still greatly overmedicated and needs to decrease his dosage of medication. Only then will the extent of possible damage from the closed head injury be accurately gauged.

Should further information become available, I would be happy to review it and provide an addendum if needed.


Sincerely yours,

Marc S. Sageman, M.D., Ph.D.