EXHIBIT D

February 20, 2001

John L. Rollins
Attorney At Law
1134 Rodman Street
#5A
Philadelphia, PA  19147

RE:   Arthur Jackson

Dear Mr. Rollins,

 I am sending you this letter in regards to my patient Arthur Jackson.  Please also find copies of notes and records that you requested.

 I first met Mr. Jackson in August of 1998 when he was referred to me by his internist, Celsus Ebba, M.D.  I initially treated him for depression, anxiety and other psychological repercussions from the chronic pain that he was experiencing.  Mr. Jackson also had a history of binge alcohol abuse, which he was initially largely sober from within frequent binges and then over the past several years, sober. He has a history of liver disease and chronic pain, which was both in his back, and also into his testicle.  However, in spite of this, Mr. Jackson was always punctual and had a very clear sensorium and no cognitive problems whatsoever.  He always struck me as being articulate and quite spontaneous in regard to his inter-actions with me.

 Unfortunately, Mr. Jackson suffered a closed head injury while in prison.  This may have been the result of a seizure that he suffered when he was forced to abruptly stop the medications that I had prescribed him.  Mr. Jackson knew that there was a significant discontinuation syndrome associated with some of the medications, most specifically Klonopin.  Unfortunately, he was not allowed to take this medication.

 He was hospitalized and I've reviewed the records and I also correspond on a regular basis with his neurologist, Dan Gzesh, M.D.

Based on my review of the records and my ongoing work with Mr. Jackson, there is no question in my mind whatsoever that he suffered at this point chronic cognitive deficits from this closed head injury. More specifically, he has abnormalities in his memory, ability to recall and carryout tasks; he also has some emotional lability. In addition, there are other neurologic symptoms such as ataxia and stammering speech. These symptoms are all consistent with the type of closed head injury that Mr. Jackson suffered.

In summary, Mr. Jackson is a gentleman that I've been treating for over two years who while he does have a pre-morbid history of depression, anxiety and binge alcohol use, had a completely clear sensorium and undamaged cognition. He suffered an acute closed head injury and has had subsequent to that significant and persistent cognitive neurologic problems which are not due to either his supreme morbid psychiatric condition or the medications used to treat it.

I hope that this letter and the accompanying information are helpful to you in your effort to help Mr. Jackson recover from his unfortunate accident.

Sincerely,

Lee D. Silverman, M>D.
Board Certified Psychiatrist
Mercy Psychiatry Associates
1503 Lansdowne Avenue
Suite 3005
Darby, PA   19023
(610) 237-4122

LDS/jb

Enclosure

EXHIBIT E



# Mercy
### Fitzgerald Hospital

January 21, 2003

RE: Arthur Jackson

Attn: John L. Rollins

Dear Mr. Rollins,

I am writing you again in respect to my patient Arthur Jackson III. I've included copies of the previous letter that I wrote you and also some other office documents that you may or may not already have in your possession. I will briefly summarize my work with him and then address your questions in the order that you have asked them.

Specifically, I first meet Mr. Jackson in August 1998 when his internist Celsus Ebba referred him to me. I initially treated him for depression, anxiety and other psychological repercussions from the chronic pain that he was experiencing. In addition, he had a history of binge alcohol abuse. At first he had periods of sobriety with infrequent binges and then largely long periods of sobriety with very infrequent binges. My understanding is that he had a history of liver disease probably related to his alcohol use and chronic pain. In spite of this he had a good response to the medication that I used to treat him for his anxiety and depression. He was always punctual had a very clear sensorium and no cognitive problems whatsoever. He never appeared intoxicated in my office. He was very articulate, intelligent and spontaneous in regards to his interactions with me.

After the closed head injury that occurred in prison there is a significant change in regards to Mr. Jackson's personality, cognition, and speech. There is no question in my mind whatsoever that this change was due to the closed head injury sustained in prison. In addition, since there has been a period now of several years since the injury occurred and the large majority of these symptoms have persisted without significant improvement, it is my belief that they are now chronic and permanent.

Specific symptoms include decreased attention, problems with memory, stammering speech with a mild expressive aphasia and most worrisome, difficulty attending to and completing tasks. This has a very significant effect on his ability to monitor his own blood sugar and give himself injections of insulin. He also has described some mild ataxia and some emotional liability.

In part due to the fact that he lives with a woman who helps him, he has been largely compliant with his medication since this incident occurred. It is my belief that he has been completely sober in regards to alcohol over the past several years. Please know that a neurologist colleague of mine Doctor Dan Gzesh has seen Mr. Jackson and he is also followed by an internist Doctor Celsus Ebba. I am aware of 1 alcohol binge that has occurred since the closed head injury that lead to a hospitalization at Mercy Fitzgerald Hospital in May 2001. He had come in delirious due both to the use of alcohol on his now significant brain injury and also inattention to his blood sugar.

His current medications are Klonopin .5 mg bid and 2 mg HS, Effexor XR 150 qid and Trazadone 300 mg at HS. I last saw him on 1-10-03.

Now in regards to your questions: 1) What is the present diagnosis of Mr. Jackson's injuries? In regards to his injuries my diagnosis would be post-concussive syndrome due to a closed head injury. Another appropriate diagnosis would be dementia due to close head injury. Status post-subdural hematoma and subarachnoid hemorrhage. 2) Do you agree that the injuries (subdural hematoma with subarachnoid hemorrhage) for which you have been treating him since May 29, 2000 were caused by the deprivation of physician prescribed medications (e.g. insulin, Klonopin, etc.) while Mr. Jackson was incarcerated in Delaware County Prison? From review of records from his medical hospitalization I believe at Crozer-Chester Medical Center, immediately following the event and Mr. Jackson recollection, it appears to me that he had a seizure and the seizure lead to the closed head injury. It is my understanding that Mr. Jackson was not given his psychiatric medications or his insulin. Given that Mr. Jackson was not intoxicated at the time nor was he drinking on a regular it is my belief that the <u>seizure was more than likely due to abrupt cessation of the Klonopin and lack of insulin</u>. I do remember faxing Mr. Jackson's psychiatric medication records to the nurse or physician in the prison so they would have had an updated record of the medications that I was prescribing for him. Please note that would not have included the insulin. 3) What is the prognosis with respect to the injuries and complaints of Mr. Jackson? As stated previously, it is my belief that his injuries are now fixed and chronic. His prognosis for further recovery is quite poor. 4) With respect to such prognosis do you anticipate the need for further medical or surgical treatment? If so please indicate the nature, extent and approximate cost of such future treatment to the best of your knowledge at this time. I am not able to specifically answer this question as it is written, however it is reasonable to assume that Mr. Jackson will need some type of supervision be it informal such as that provided by his common-law wife or formal such as that provided by a nurses' aide to help him dose his insulin, measure his blood sugar and make sure he's taking his medication correctly. In addition, he will need regular visits with a psychologist and a neurologist. 5) Have you placed any limitations either on work or leisure activities of Mr. Jackson? If so, what are these limitations? I have not specifically addressed these issues with Mr. Jackson in the time that I've been working with him. Although, it appears to me that given the nature of his disability when superimposed on his diabetes, chronic pain and pre-existent depression and anxiety that he would

more than likely meet the criteria for chronic and permanent disability as per the federal government in regards to Social Security Disability. 6) Do you anticipate that any of Mr. Jackson's injuries may be permanent, if so please indicate which injuries may be permanent? As stated previously, I believe that the cognitive deficits that are unquestionably the result of the closed head injury, are at this point permanent and chronic.
7) Do you believe that Mr. Jackson is capable of self-sufficient living/living alone, if not please elaborate? As stated previously, Mr. Jackson has not shown himself to be able in a sustained manner to monitor his own blood sugars and administer his own insulin dosing. This could be life threatening acutely if he does not have somebody helping him. It is my understanding that his common-law wife is currently helping him with this. If there were a point in time, which she was no longer willing or able to do this, he would probably require some kind of home nursing. 8) Do you believe that Mr. Jackson has sustained any permanent impairment to the usefulness of his brain with respect to memory loss (or other parts of his body injuries due to the May 28, 2000 accident, if so please indicate the nature, extent of such permanent impairment and as a consequence with respect to Mr. Jackson's healthcare requirements and activities of daily living? I stated previously I believe that Mr. Jackson who when I first met him in spite of his depression, anxiety, chronic pain and intermittent alcohol use was intelligent, articulate and animated. There has been a marked change in his personality and also a marked change in his attention, his ability to initiate and complete tasks and his memory. There's also been some ataxia although I have not formally addressed its extent. Since the injury occurred Mr. Jackson has been largely reclusive to his home and has been markedly dependent on his common-law wife. Activities that Mr. Jackson had been involved in when I first met him in spite of his chronic pain and depression, which included artistic, endeavors and use of the computer and the Internet have largely been abandoned by him since the injury occurred.
9) Please address any other concerns you deem relevant to Mr. Jackson's injury sustained on May 28, 2000. I feel I have adequately addressed my concerns via your previous questions. If other information or records are necessary please contact me and I'll provide them to the best of my ability.

Sincerely,

*[signature]*

Lee D. Silverman, M.D.
Board Certified Psychiatrist
Mercy Psychiatry Associates
1503 Lansdowne Avenue
Suite 3005
Darby, PA 19023
(610) 237-4122

LDS/jb

EXHIBIT F



**Mercy**
Fitzgerald
Hospital

February 2, 2004

RE: Arthur Jackson

Attn: John L. Rollins

Dear Mr. Rollins:

At your request, I reviewed the records of Arthur Jackson III regarding the injury which he suffered at Delaware County Prison on 05/28/00. On that date, Mr. Jackson fell and injured his head while he was in the process of being discharged from the Prison. I reviewed depositions of Prison medical personnel, security personnel, and administrative staff. You also supplied me with the exhibits to these depositions, incident reports, Prison security and medical policies, and medical records for Arthur Jackson. I am incorporating my report to Mr. Rollins of 01/21/03. I note that I have been providing psychiatric treatment to Arthur Jackson for several years, and specifically I treated him for quite sometime prior to the incident, shortly after the incident, and for the years following the incident.

Arthur Jackson, age 51, was an inmate in Delaware County Prison doing 15 consecutive weekends for driving under the influence of alcohol. Mr. Jackson was housed in a separate DUI building with no medical staff stationed in that building. He fell on the concrete floor at the Prison and severely injured his head as result of being deprived by the Prison of necessary medication. Review of their records, clearly indicates that on prior weekends they were aware of

his medical psychiatric illnesses, had corresponded with me, and documented the medications and doses that were prescribed to him, and had at times appropriately given him his medications. Documentation also reveals that at other times, for reason that are not clear to me, there was substitution of some medications for others; some were given and some were omitted. I see no rational pattern for why this was done. Specifically their records indicate direct knowledge of his history of major depression, insulin dependant diabetes mellitus, and possibly alcoholism. Records also revealed that they had noted symptoms including nausea, vomiting, other gastrointestinal symptoms including diarrhea, elevated temperature, elevated heart rate, and fluctuations of blood sugar. They did note a possible diagnosis of gastroenteritis and possible correlation with alcohol discontinuation syndrome. The physicians and nurses also know that benzodiazapines, when taken on the regular basis, if abruptly stopped, can cause a similar life threatening discontinuation syndrome that is undistinguishable from that alcohol withdrawal. In addition, the medication specifically prescribed includes Klonopin, the most potent of the benzodiazapines, at a relatively high dose, Effexor, which is an antidepressant with a very short half life and a rapid discontinuation syndrome, if abruptly stopped, and Trazodone, which is used for insomnia, and if abruptly stopped, could result in sleep deprivation which could lower the seizure treshold, and, of course, insulin. After he fell, plaintiff was transferred to the Crozier Medical Center, where he was diagnosed with a subarachnoid hemorrhage, a possible basilar skull fracture and seizure. He received hospitalization for ten days.

According to the incident report of the Prison, Mr. Jackson was on his way out of the DUI building at the Prison, when he gave a loud yell and fell to the floor, striking his head on the concrete. This happened in front of Prison personnel. Mr. Jackson suffered a seizure and was rushed by ambulance to the hospital. Medical records indicated that Mr. Jackson suffered a

closed head injury. The seizure was caused by the failure of the Prison to give this man his psychiatric medications and/or his insulin.

You asked me to address the following questions:

1. Did the defendant in this case exhibit a policy of deliberate indifference to the serious medical and psychological needs of plaintiff, Arthur Jackson? My opinion is affirmative. Deposition testimony of a nurse involved in administering medication to Mr. Jackson and other inmates in the DUI program characterized Prison policy as a "nightmare." Prison personnel were unfamiliar with the implementation of Prison policies dealing with the administration of prescription medication to weekend inmates. Medication was lost and not returned to inmates on their departure. Record keeping as to medications was grossly inadequate, and there is no record that Mr. Jackson received any of his medications on the weekend that he was injured. The Prison failed to follow its own policies and to train staff about the prescription policy for weekend inmates.

2. Did Arthur Jackson suffer serious and permanent injury as a result of his fall at the Delaware County Prison? I addressed this issue in my report of 01/21/03. I concluded that Mr. Jackson suffered a post-concussive syndrome due to the trauma suffered in his fall at the Prison. I further concluded that his injuries are serious, fixed and chronic. I stated that his prognosis for recovery is quite poor. My review of further records supports this conclusion. Please also recall that I had treated him for quite sometime prior to the incident, and saw him shortly after the incident, and for years following the incident. Therefore, I have direct first hand experience and knowledge of Mr. Jackson prior to the event, acutely after the event, and chronically after the event.

3. Was the deliberate indifference of defendants a substantial factor in causing this injury to plaintiff Jackson? Again, my opinion is affirmative. I sent Mr. Jackson's psychiatric medication records to the nurse or physician at the Prison. This is documented at least once in their records and I clearly recalled several other occasions when I was compelled to refax information and/or speak to people on the phone. In addition, I clearly remember times when Mr. Jackson or his common-law wife called my office telling me that the Prison had not returned his medications to him, and I had to either phone the prescription or supply samples to replace that which was not returned to him. Despite that, Arthur Jackson was not given his proper medication. Deposition testimony indicated that the nurse assigned to the weekend inmates did not have access to their medical records. In my opinion, Mr. Jackson suffered a seizure which could have been avoided if the Prison had implemented its own policies on medication for weekend inmates and trained its staff in these policies. This was a systemic problem throughout the Prison system, which the Prison knew about, but failed to correct. Prison personnel testified that they were unfamiliar with the Prison's written policy for weekender prescription medications, and that they had received no training in this area.

All opinions, which I have expressed in this report and in the report incorporated herein, are true to a reasonable degree of medical and psychiatric certainty.

Sincerely,

Lee D. Silverman, M.D.
Board Certified Psychiatrist
Mercy Psychiatry Associates
1503 Lansdowne Avenue
Suite 3005
Darby, PA 19023
(610) 237-4122

EXHIBIT G

<u>VOLUME II</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

ARTHUR JACKSON, III        : CIVIL ACTION - LAW
                           :
                           :
vs.                        :
                           :
DELAWARE COUNTY, ET AL     : NO. 02-3230

- - -

Media, Pennsylvania

Wednesday, March 12, 2003

- - -

Continued deposition of ARTHUR JACKSON, III, taken pursuant to notice at the law offices of DiOrio & Sereni, L.L.P., Front and Plum Streets, Media, Pennsylvania, on the above date, beginning at approximately 9:38 a.m., before Marguerite Contino, a Professional Court Reporter and a Notary Public of the Commonwealth of Pennsylvania.

- - -

KAUFMAN COURT REPORTING
Court Reporting & Video Services
18 Foster Avenue
Havertown, Pennsylvania  19083
(610) 446-9694

Arthur Jackson, III

1   A.   No.

2   Q.   Were you drinking -- I mean consuming
3   alcohol -- during the period when you were serving
4   your weekend sentences?

5   A.   That was 2000. Yes, I was still. Yes, I
6   was.

7   Q.   And that would have been beer?

8   A.   Yes.

9   Q.   Did you ever drink -- and this is a
10  serious question. Did you ever drink when you
11  were serving your weekend sentences while you were
12  in the jail?

13  A.   While I was in the jail?

14  Q.   Yes.

15  A.   During the weekend sentence?

16  Q.   Yes.

17  A.   Elaborate.

18  Q.   Did you ever have a drink when you were in
19  jail?

20  A.   No.

21  Q.   Did you drink before or after you would
22  show up for your weekend sentence or leave your
23  weekend sentence?

24  A.   Before, you know, 3 o'clock in the

Arthur Jackson, III

1  afternoon. You have to be there by 6:00. You
2  can't come in intoxicated because if you are
3  intoxicated, you are sent up to the main building
4  to serve out your weekend or possibly your full 30
5  days.
6      Q.  Did that ever happen to you where you got
7  sent up to the main jail?
8      A.  I was sent up to the main jail once.
9      Q.  And why was that, because you were
10 intoxicated?
11     A.  No, because I got in an argument with
12 Gardner, CO Gardner. The previous weekend he had
13 confiscated my Walkman, but other inmates were
14 bringing theirs in. And he just, I guess, decided
15 that today was my day to mess with me. He took
16 it. He said I would get it back on discharge on
17 Sunday at 6:00.
18     The following weekend I came back.
19 Other inmates were bringing their Walkman in. I
20 asked Gardner if I could have mine back. He says,
21 "No."
22     I says, "Why not?"
23     "I can't find it."
24     "Well, where did you put it?" And

*records*