**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ARTHUR JACKSON III | : | UNITED STATES DISTRICT |
| | : | COURT FOR THE EASTERN |
| vs. | : | DISTRICT OF PENNSYLVANIA |
| | : | |
| DELAWARE COUNTY PRISON, ET AL | : | CIVIL ACTION NO. 02-CV-3230 |
| | : | |
| | : | JURY TRIAL DEMANDED |

## PLAINTIFF'S PRE-TRIAL MEMORANDUM

## 1. NATURE OF THE ACTION

This lawsuit arises out of the fall by Arthur Jackson, then age 47, at the Delaware County Prison on May 28, 2000. After the fall, plaintiff was transported by ambulance to Crozier Medical Center (Hospital) to be treated for his injuries. Jackson was given no medication on the weekend that he was injured due to a policy by defendants toward the medical needs of weekend prisoners, which was characterized as a "nightmare" by a Prison nurse involved in trying to administer this policy. In fact, plaintiff never correctly received the medication prescribed and/ or approved by Dr. Victoria Gessner, the chief Prison physician, on any weekend that plaintiff was incarcerated over a period of 14 weeks. Jackson suffered permanent neurological damage and loss of memory and cognitive function as a result of striking his head on the concrete floor at the Prison. Jackson's injuries were caused as a result of failure to receive his prescription medications.

On May 26, 2002, plaintiff commenced the instant action against Delaware County, Wackenhut Corrections Corporation and several of their employees and administrative personnel. Plaintiff's claims assert that defendants violated the Civil

Rights of plaintiff under 42 U.S.C.A. § 1983.  There are pendent claims for negligence and emotional distress.

The written policy of the Prison entitled "Weekender Program" was as follows: **"Weekender's taking prescription medication shall have their doctor fax a copy of the prescription to the Medical Division of the George W. Hill Correctional Facility, and if approved, the medications will be dispensed through the Medical Department**."  The de facto policy of defendants was to willfully disregard the serious medical needs of "weekenders" like the plaintiff with respect to their required medications, since the Prison had actual knowledge that their written policy was unworkable in practice.  The dichotomy between Prison policy and practice is underscored in the testimony of Prison Superintendent George W. Hill, who stated that weekend prisoners were to be treated like any other inmates and that Prison was responsible for their medical needs.  On the other hand, Nurse Byrd testified that she believed the written Prison policy on prescription medications, "**was not for weekenders**," but for "**real inmates**."

The Prison violated its written policy with respect to Mr. Jackson and ignored the written and verbal orders of his physician, who not only faxed the prescription to the Prison, but also spoke to Dr. Gessner, the Prison physician.  Defendants failed to train the correctional officers and medical staff who were in charge of the weekend inmates with respect to the Prison written policy.  Lieutenant McCullough, who was the on-site supervisor for the weekender correctional officers, testified at his deposition that he and his staff were unfamiliar with the written policy on prescription medication. Indeed, there was testimony that Prison personnel had never seen the written policy.

Weekend prisoners were treated differently than other prisoners with respect to prescription medications, and there was insufficient staff to care for their medical needs. Nurse Byrd, who testified that the policy of having weekend inmates bringing their own medications was a "nightmare" in practice, stated that it was "common knowledge" at staff meetings and with the nurses involved, that the Prison policy here was a "difficult situation". This sentiment was corroborated by Correctional Officer Sean Gardner, who stated at page 33 of his deposition: "They would give their medicine up on Friday when we would take it up there, but they wouldn't get their medication until they were leaving on Sunday. **Some of them never got it**." (emphasis supplied)

## 2. STATEMENT OF FACTS

On or about February 14, 2000, plaintiff was sentenced to thirty (30) days to twenty-three (23) months to be served on fifteen (15) consecutive weekends at the Delaware County Prison (currently known as "George W. Hill Correctional Facility) by the Delaware County Court of Common Pleas on the charge of Driving While Under the Influence of Alcohol. Plaintiff was diabetic who required insulin three (3) times per day via injection. Prior to his incarceration, plaintiff's personal physician diagnosed plaintiff with Hypertension, Osteomylitis, diabetes, depression, anxiety, and other psychological repercussions from the chronic pain that he was experiencing, which was both in his back, and also into his testicle.

Plaintiff required physician-prescribed-medications on a daily basis, including insulin, benzodiazepenes and antidepressants. Defendants deprived plaintiff of his medications while he was incarcerated. Plaintiff complained to defendants that he was having problems such as sweating, shaking, inability to focus his eyes, not being able to

walk straight, and constant vomiting. Despite this notice and warning from plaintiff's doctor, defendants continued to deny plaintiff's medications.

Prison medical personnel told plaintiff that his medications cost too much money for defendants to provide. Defendants also stated plaintiff would not receive his medications because they were narcotics, and Prison policy prevented defendants from giving the medication to plaintiff. Nurse Snell recommended to plaintiff that he bring his own medications with him for his weekend incarcerations, but when he did, defendants told him the medications were lost or that they had been thrown away. Mr. Jackson was forced to get additional prescription medication from his doctor to replace his medications, which the Prison lost.

Plaintiff informed the defendants that medications prescribed for his various ailments had significant discontinuation syndrome associated with life-threatening complications, including sudden blackouts and seizures. Defendants were on notice as to Mr. Jackson's serious medical condition as a result of a prior incarceration. Defendants knew that plaintiff's medical problems would be triggered if they abruptly stopped allowing plaintiff to take his medications. Defendants further acknowledge that individuals receiving the same medications as plaintiff might sustain injuries as a result of sudden loss of consciousness syndrome. Despite defendants' forewarning about plaintiff's medical condition since his 1998 incarceration, and the medications he required, defendants recklessly deprived plaintiff of his medications over a period of 14 weeks, which manifested deliberate indifference to plaintiff's health, safety and life.

Prior to his initial incarceration, plaintiff various ailments were medically regulated and controlled. However, while plaintiff was incarcerated in the Delaware

County Prison on May 28, 2000, he sustained head injuries and trauma after losing consciousness and violently striking his head on a concrete floor. Soon thereafter, plaintiff was transported to Crozier Medical Center and was hospitalized there for ten (10) days. Physicians at Crozier Medical Center diagnosed plaintiff's injuries as subdural hematoma with subarachnoid hemorrhage resulting from the sudden lose of consciousness.

As a direct and proximate result of violently striking his head on the concrete, plaintiff has experienced serious permanent psychological and physical injuries including the permanent and continuing lose of memory. More specifically, he now has abnormalities in his memory, including inability to recall and carryout daily tasks that previously presented no difficulty. In addition, plaintiff now experiences other neurologic symptoms such as ataxia and stammering speech.

## 3. <u>MONETARY DAMAGES CLAIMED</u>

Among the damages which plaintiff's suffered were pain and suffering, severe cognitive loss, and loss of earning capacity. On the issue of attorney fees, it should be mentioned that four plaintiff's attorneys have devoted substantial amount of time to this case, which has proved to be quite protracted.

Plaintiff has submitted expert reports from the following: Betsy Bates, RN, BSN, Life Care Planner, Andrew G. Verzilli, Ph.D., Economist, Carol Armstrong, Ph.D., Neuropsychological Evaluation of plaintiff, Dan Gzesh, M.D., Neurologist, and Lee Silverman, M.D., Psychiatrist. Expert reports noted that as a result of the fall, Mr. Jackson has a clear loss of memory, speech dysfunction, headache, vertigo, loss of equilibrium, and depression, all resulted from the May 28, 2000 injuries at the Prison.

Dr. Lee Silverman, a psychiatrist treating the plaintiff, stated in his report of January 21, 2003 that " After the closed head injury that occurred in Prison there is a significant change in regards to Mr. Jackson's personality, cognition, and speech." The doctor stated that an appropriate diagnosis would be dementia due to closed head injury. He wrote that Mr. Jackson's prognosis is quite poor that he will require future medical supervision.

Dr. Gzesh notes in his medical records and report that the neurological prognosis of Mr. Jackson is poor. Additionally, Dr. Gzesh notes that "it is likely that he has obtained maximum neurologic improvement and further improvement in unlikely." Dr. Gzesh also points out that because of the injury, plaintiff has suffered significant cognitive and emotional impairment. When one considers that these conditions have persisted since the incident, it is likely that a sympathetic jury will concur with Dr. Gzesh's opinion that the injuries are permanent and a direct result of fall on May 28, 2000, and plaintiff is incapable of self-sufficient living.

Carol Armstrong, Ph.D., conducted a neuropsychological evaluation of Mr. Jackson, and concluded "… the fall at that time clearly caused significant brain injury resulting in disabling neuropsychological dysfunction at this time." Plaintiff expert Bates concluded that Mr. Jackson's future life expectancy care would be over $3 million. Dr. Verzilli stated that the loss of earning capacity would be almost $500,000. Mr. Jackson has a life expectancy of approximately 23 years and the projected total monetary damages, including medical costs and future treatment, would be in excess of $4 million, as delineated in plaintiff's previous settlement memorandum.

**4. WITNESSES**

(a)    Arthur Jackson, III (Plaintiff)

(b)     Camilla McFadden (Plaintiff's common law wife)

(c)     Betsy Bates, RN, BSN (Life Care Planner)

(d)     Andrew G. Verzilli, Ph.D. (Economist)

(e)     Carol Armstrong, Ph.D. (Neuropsychological Evaluation)

(f)     Dan Gzesh, M.D. (Neurologist)

(g)     Lee Silverman, M.D. (Psychiatrist)

(h)     Miriam A. Byrd (Nurse)

(i)     Sean Gardner (Correctional Officer)

(j)     Victoria Gessner, M.D. (Prison Doctor)

(k)     Ernest W. Gratz, Jr. (Correctional Officer)

(l)     George W. Hill (Superintendent of Prison)

(m)     James A. Janecka (Former Prison Warden)

(n)     Lt. McCullough (Correctional Officer)

(o)     Deborah Perretta (Medical Administrator)

(p)     Lorraine Robertson (Medical Administrator)

(q)     Charles P. Sexton (Chairman of Delaware County Board of Prison

Inspectors)

(r)     Mark Smida (Record Custodian)

(s)     Carol Ann Snell (Nurse)

(t)     Robert Burgwald (Record Custodian)

(u)     Cellmates of plaintiff: George Simpson, Charles Kellar, Carroll Adams

(v)     Inmates identified in discovery

All witnesses identified in discovery.

5. **EXHIBITS**

     (a)    Discovery and self-executing discovery exchanged by parties and introduced in depositions

     (b)    Wackhenhut Policy Manuals

     (c)    Medical records of Arthur Jackson

     (d)    Expert reports of Betsy Bates, Dr. Verzilli, Carol Armstrong, Dr. Gzesh, and Dr. Silverman

     (e)    Incident reports regarding Arthur Jackson and statement of correctional officers and inmates submitted in discovery

     (f)    Contract between Wackhenhut and the Board of Prison Inspectors

     (g)    Wackhenhut manual and memoranda identified in discovery

     Plaintiff reserves the right to supplement this list in a timely manner as per the Court Rules and the discretion of the Court.

6. <u>**LENGTH OF TRIAL**</u>

     Trial is estimated to take ten days depending upon the number of defense witnesses and length of jury selection.

7. <u>**APPLICABLE LAW**</u>

     Delaware County, a government body, is liable for plaintiff injuries under Section 1983, as set forth in plaintiff's complaint, because defendants' employees or agents executed a governmental policy that directly resulted in the deprivation of plaintiff's civil rights. <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 98 S. Ct. 2018 (1978). If a city official causes a deprivation of life or liberty upon another because he was following a city policy reflecting the policymakers' deliberate indifference to

constitutional rights, then the city is directly liable under Section 1983 for causing a violation of plaintiff's fourteenth amendment rights.  <u>Fagan v. City of Vineland</u>, 1993 WL 290386 at *17 (3d Cir. August 5, 1993.)  Liability may be based on actions of an official with final policy-making authority, which is then attributed to the municipality, and even a <u>single action</u> by the policy maker may be enough to trigger municipal liability. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 106 S. Ct. 1292 (1986).

It is alleged in the instant case that defendants had actual knowledge that plaintiff suffered from serious medical conditions and that he continuously required physician prescribed medications to treat these conditions.  Defendants also had actual knowledge that if plaintiff did not receive his prescribe medications and medical treatment he would be subject to significant discontinuation syndrome resulting in, <u>inter alia</u>, blackouts, seizures and/or death.  Defendants not only recklessly disregarded plaintiff's condition, but also through their acts, omissions, policies, customs, and lack of training, caused plaintiff to sustain severe permanent brain injury.

It is not required to find that individual defendants violated the rights of plaintiff to find that the government bodies and corporate entities named in plaintiff's complaint had a policy whose implementations violated those civil rights.  <u>Pembaur</u>, <u>supra</u>; <u>Tennessee v. Guiner</u>, S. Ct. 1694 (1985); <u>Simmons v. City of Philadelphia</u>, 947 F. 2d 1042 (3rd Cir. 1991).  In his excellent analysis at p. 28–45 of <u>Simmons v. Philadelphia</u>, <u>supra</u>, Judge Becker rejects the City's argument that an employee must have primary liability for a constitutional violation.  He states at page 3 of his opinion: "<u>City of Canton,</u> similarly to <u>Monell</u>, therefore appears to require that a plaintiff, in order to meet the deliberate indifference standard for directly subjecting a municipality to Section 1983

liability, must present scienter-like evidence of indifference on the part of a particular or particular policy makers."   The Supreme Court in both <u>Pembaur</u> and <u>Tennessee v. Guiner</u>, <u>supra</u>, considered civil rights liability of the municipality alone, where all individual defendants had been dismissed.

In order to state a valid claim under Section 1983, plaintiff must allege the following: (1) that the conduct complained of was committed by a person acting under the color of state law; and (2) the conduct deprived plaintiff of rights, privileges or immunities secured by the United States Constitution.   <u>Coates v. Jeffes</u>, 822 F. Supp. 1189 (E.D. Pa. 1993) citing <u>Parratt v. Taylor</u> 451 U.S. 527, 535 101 S. Ct. 1908, 1912, 68 L. Ed.2d 420 (1980).  In order to state a valid claim pursuant to an Eighth Amendment violation, plaintiff's medical needs must be serious.   <u>Monmouth County Correction Institution Inmates v. Lanzaro</u>, 834 F.2d 326 (3rd Cir. 1987).

In <u>Estelle v. Gamble</u>, 429 U.S. 97 the United States Supreme stated in its holding that:

> "We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" <u>Gregg v. Georgia</u>, <u>supra</u>, at 173 (joint opinion), prescribed by the Eighth Amendment.  This is true whether the indifference is manifested by Prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  **Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause under Section 1983**."  (Emphasis supplied)

**Thus, Courts have found deliberate indifference where prison officials know of a prisoner's need for medical treatment, but intentionally refuse to provide it.** <u>Rouse v. Plaintier</u>, 182 F.3d 192 (3rd Cir. 1999) (prisoner denied insulin for diabetes melitus).

Similarly, prison officials have been held liable where they delay necessary medical treatment based on a non-medical reason or prevent a prisoner from receiving needed or recommended medical treatment.  See Durmer, 991 F.2d at 68 (citing Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347-47 (3d Cir. 1897).  Further, the Courts have found deliberate indifference to exist where prison officials persist in a particular course of treatment, "in the face of resultant pain and risk of permanent injury."  Napoleon, 897 F.2d at 109-11 (holding that allegations of several instances of flawed medical treatment state a claim under the Eighth Amendment.)

To state a valid State-Created Danger claim under Kneipp v. Tedder, 95 F.3d 1199 (3rd Cir. 1996), it must be shown that: (1) the harm ultimately caused to plaintiff was foreseeable and fairly direct; (2) moving defendants, as state actors, acted in willful disregard for plaintiff's safety; (3) there existed some relationship between the state and plaintiff; and (4) the state actor used its authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.  In Kneipp, Philadelphia police officers stopped an inebriated Samantha Kneipp and her husband while they were walking home from a bar.  The police officers indicted that Ms. Kneipp could go home and that the officers would care for Ms. Kneipp, who was visibly drunk, but instead left her to walk home alone.  Consequently, Ms. Kneipp fell down an embankment, suffered hypothermia and sustained permanent brain damage.  The Court held Ms. Kneipp under these facts made out a prima facie case of violation of her constitutional rights under the "State-Created Danger Theory."  In the case, sub judice, plaintiff was similarly harmed by the State Created Danger that deprived him of medications vital for his health, safety, and life.

The case law is consistent with the conclusion in the expert report of Lee Silverman, M.D., a psychiatrist, who wrote in his expert report of February 2, 2004, that defendants in this case exhibited a policy of deliberate indifference to the serious medical and psychological needs of plaintiff, Arthur Jackson.  Dr. Silverman wrote:

> "Deposition testimony of a nurse involved in administering medication to Mr. Jackson and other inmates in the DUI program characterized Prison policy as a 'nightmare'.  Prison personnel were unfamiliar with the implementation of Prison policies dealing with the administration of prescription medication to weekend inmates.  Medication was lost and not returned to inmates on their departure.  Record keeping as to medications was grossly inadequate, and there is no record that Mr. Jackson received any of his medications on the weekend that he was injured.  The Prison failed to follow its own policies and to train staff about the prescription policy for weekend inmates."

Accordingly, in view of the relevant case law cited herein, plaintiff asserts that the named defendants are culpable with respect to the allegations in the Complaint, and they have liability for their actions, which were a substantial factor in causing harm to the plaintiff.

Respectfully submitted,

_____
William C. Reil, Esquire
Attorney for plaintiff
For: John Rollins, Esquire
and Derrick Howard, Esquire