**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ARTHUR JACKSON, III | : | CIVIL ACTION NO. 02-3230 |
| | : | |
| vs. | : | JURY TRIAL DEMANDED |
| | : | |
| DELAWARE COUNTY PRISON, ET AL | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S ANSWER**
**TO MOTION FOR SUMMARY JUDGMENT BY ALL DEFENDANTS**

Plaintiff, Arthur Jackson, III ("Plaintiff" or "Mr. Jackson") respectfully submits, by and through his undersigned counsel, this Memorandum of Law in Support of Plaintiff's Answer to Motion for Summary Judgment by All Defendants.

**I.    PRELIMINARY STATEMENT**

This lawsuit arises as a result of injuries Mr. Jackson, then age 47, sustained while incarcerated at the Delaware County Prison (the "Prison") on May 28, 2000. Defendants were aware for some time that their policies for administering medication to weekend inmates was a ***"nightmare,"*** as characterized by one of the Prison nurses who was responsible for administering those policies. (Miriam Byrd, R.N. deposition at 43, Exhibit "B") Despite this forewarning, defendants' deliberately disregarded the serious, life-threatening consequences of not providing Mr. Jackson with the medications prescribed to him by the Prison's Medical Director, Dr. Victoria Gessner.[1]

Sean Gardner, former Delaware County Prison Corrections Officer, filed an Incident Report with defendants regarding plaintiff's injuries, stating the following:

---

[1] According to defendants' policy Number 101, Responsible Health Authority, "All clinical judgments rest with a single, designated, licensed, responsible physician." The addendum to that policy identifies Dr. Gessner as the "responsible physician."

On the above date [May 28, 2000] and time the above named imate [sic][Arthur Jackson] was being discharged from his court order weekend sentence.  When I c/o Gardner called Arthur, Jackson #001232 name outloud I/M Jackson responded with a loud yelp and fell to the floor, and appeared to be having a seizure [sic] [seizure], I c/o **Gardner called a 'man down' to Master Controll [sic] [Control], and proceeded to put a towel under I/M Jacksons [sic] [Jackson's] head because he was hiting [sic] [hitting] his head on the concrete floor at this time I was trying to talk I/M Jackson out of his seizur [sic] [seizure].** (emphasis supplied)  See Exhibit "N."

Defendants' failure to give Mr. Jackson his medications was not an isolated event, limited to the weekend of May 28, 2000.  Mr. Jackson did not receive his medications correctly on a daily basis during the fourteen consecutive weekends he was incarcerated from February to May 2000.  (See e.g., Deborah Perretta deposition at 70, 92-93, 105-106, Exhibit "R"; and Exhibit "O") [2]

Defendants' deliberate indifference to Mr. Jackson's serious medical needs is more egregious in the case, sub judice, because defendants witnessed the consequences of withholding his medications in 1998.  At that time, plaintiff was incarcerated as an inmate in the Prison's general population.  As a result of not receiving his medications from the Prison, Mr. Jackson attempted to hang himself from a stairway railing, but survived.  (Jackson deposition at 59-62, Exhibit "K") As set forth more fully, infra, defendants' motion for summary judgment must be denied because there are numerous genuine issues of material fact that must be resolved by the trier of fact.  Samplings of just a few of defendants' admissions alone demonstrate that entry of summary judgment is totally inappropriate in the instant matter:

---

[2] According to defendants' policy number 307, Medication Administration Training: "WCC policy requires that the right medications are administered at the right time in the right dose by the right method to the right person, in keeping with all applicable laws and regulations."  Exhibit "O" is plaintiff's graphical chart compiling Ms. Perretta's

(1)    While Mr. Jackson was still in defendants' custody on May 28, 2000, he sustained a subdural hematoma with subarachnoid hemorrhage resulting from the sudden loss of consciousness in the Prison;[3]

(2)    The weekend Mr. Jackson sustained his injuries defendants' medical staff failed to provide plaintiff with Klonopin, one of the medications he was prescribed by his private and Prison physicians;[4]

(3)    Defendants were aware that deprivation of Klonopin to an individual could subject him or her to the serious health consequences associated with the sudden loss of conscious syndrome;[5]

(4)    Defendants prescribed Klonopin, Insulin, Trazadone, and Effexor as medications for Mr. Jackson while incarcerated in the Prison on weekends;[6]

(5)    Indeed, defendants maintained a supply of Klonopin that cold have been administered to plaintiff even if he did not bring it with him for his weekend incarcerations.[7]

(6)    Defendants administered Klonopin to Mr. Jackson despite the fact the Prison's Medical Director believed that the dosage plaintiff could have negative consequences, ***perhaps death.***"

(7)    However, individuals incarcerated only on weekends at the Prison did not receive the same level of medical care that was apparently reserved for "real inmates."[8]

---

testimony as defendant Wackenhut's corporate representative concerning the administration of plaintiff's prescribed medications from February to May 2000.

[3] See Defendants' Motion for Summary Judgment

[4] See Exhibit "R."

[5] See Exhibit "L."

[6] See Exhibit "I."

[7] Defendants' policy on Use of Controlled Substances Number 405.5 indicates "WCC health facilities will maintain a minimum stock of controlled substances necessary for the sound practice of medicine and dentistry in a correctional environment. Any time these controlled substances are no longer needed at a facility, the stock must be immediately removed from the facility." Nurse Carol Ann Snell confirmed the availability of the Prison's supply of Klonopin while plaintiff incarcerated at her deposition. (Snell deposition at 40-41, Exhibit "L")

[8] See Exhibit "I" and "B."

(8)     Defendants' medical and correctional staff recognized plaintiff was in medical distress, but intentionally disregarded his symptoms and related Prison policies that directly addressed the proper response to protect plaintiff from serious medical consequences;[9]

(9)     As a result of defendants' overt, discriminatory denial of medical care, repeated lapses in continuity of treatment in light of defendants' written policies, and defendants' deliberate indifference to several indications that plaintiff was in dire need of medical care, plaintiff was subjected to a "nightmarish" situation through which he sustained permanent, debilitating brain injuries.

(10)    At all times relevant hereto, defendants acted under color of state law.[10]

Accordingly, plaintiff respectfully requests that this Court deny defendants' motion for summary judgment and set a date for the adjudication of this matter.

## II.     STATEMENT OF RELEVANT FACTS

On or about February 14, 2000, plaintiff was sentenced to thirty (30) days to twenty-three (23) months to be served on fifteen (15) consecutive weekends at the Prison (currently known as "George W. Hill Correctional Facility) by the Delaware County Court of Common Pleas on the charge of Driving While Under the Influence of Alcohol. (See plaintiff's complaint, Exhibit "P") Plaintiff was a diabetic who required insulin three (3) times per day via injection. Prior to his incarceration, plaintiff's personal physician diagnosed plaintiff with hypertension, osteomylitis, diabetes, depression, anxiety, and other psychological repercussions from the chronic pain that he was experiencing, which was both in his back, and also in his testicle. Plaintiff required physician-prescribed medications on a daily basis, including Insulin, Klonopin, a benzodiazepine, and

---

[9] See Argument Section, infra, concerning the fact that Defendants Disregarded Their Knowledge of Plaintiff's Serious Medical Needs.

[10] See defendants' answer to plaintiff's complaint paragraph 56.

-4-

antidepressants, Effexor and Trazadone.    As a result of receiving the foregoing medications, plaintiff's various ailments were medically regulated and controlled prior to his incarceration.  (See Lee D. Silverman, M.D. medical report of February 20, 2001, Exhibit "G")

When plaintiff was scheduled to begin serving his prison sentence in 2000, the written policy of the Prison concerning individuals incarcerated only on weekends in the "Weekender Program" was as follows: "***Weekender's taking prescription medication shall have their doctor fax a copy of the prescription to the Medical Division of the George W. Hill Correctional Facility, and if approved, the medications will be dispensed through the Medical Department.***"  (See Exhibit "A")  Plaintiff's physician, Lee D. Silverman, M.D., faxed and re-faxed his prescription to the Prison medical personnel in compliance with the Prison policy.  (Dr. Silverman expert report of 2/204, Exhibit "G")  When plaintiff reported at the Prison on February 26, 2000, he informed Nurse Miriam Byrd that, inter alia, he had been incarcerated at the Prison before, of the medications he was prescribed by Dr. Silverman, and indicated to her that plaintiff had his medications with him. (Byrd deposition Exhibit "B", attached Receiving Screen and Health History)

During her deposition, Dr. Gessner confirmed that she spoke with Dr. Silverman about plaintiff's medical condition and related care.  She recalled personally noting on Mr. Jackson's medical administration records on March 2, 2000, that she had a conversation with Dr. Silverman about Mr. Jackson's prescription medication and what amounts of Klonopin, Effexor and Trazadone he was prescribed. (Dr. Gessner deposition

at 17, Exhibit "I") Dr. Gessner prescribed the following medications for administration to plaintiff: Insulin, Trazadone, Effexor, and Klonopin.[11]

Dr. Gessner further testified with regard to medication prescribed to inmates, that she concurred the Prison's policy Number 508 on Written and Verbal Clinician's Orders which made the Prison's medical staff the final authority on the medications prescribed to inmates. (Gessner deposition at p. 18, Exhibit "I")  Deborah Perretta, defendant Wackenhut's 30(b)(6) corporate representative and Health Services Administrator, confirmed that the medical decisions of the prison medical staff superseded those of an inmate's private physician.  (Perretta deposition at p. 58, Exhibit "R")[12]  Nevertheless, Dr. Gessner testified that she "deferred" to prescribing medications to plaintiff based on Dr. Silverman's conversation with her, despite the fact she "obviously was reluctant to administer or prescribe Klonopin to Mr. Jackson."  (Gessner deposition at p. 56 and 106, Exhibit "I")  Dr. Gessner further testified that "Mr. Jackson's excessive dose of Klonopin would actually be detrimental in someone who admits to drinking, taking that much Klonopin would have a variable and unpredictable effect on him to include uptundation [sic] [obtundation] and **perhaps death.**"  (Gessner deposition at p. 106, Exhibit "I") (Emphasis supplied) Thus, Dr. Gessner's admitted she violated Prison policy by abdicating her authority in this regard and took the unacceptable risk that another

---

[11] Defendants have suggested that the prescription Dr. Silverman faxed to the Prison was invalid because it was dated 1999.  Irrespective of the date on the prescription defendants received, Dr. Gessner personally confirmed Mr. Jackson was receiving the specified medications from Dr. Silverman.  Indeed, Dr. Gessner noted in Mr. Jackson's medical records that he should continue to receive those medications.

[12] Nurse Byrd characterized the chain of command more succinctly when she testified that "The buck stopped with Dr. Gessner."  (Byrd deposition at p. 53-54, exhibit "B")

physician's medical opinion that Dr. Gessner disagreed with could result in the death of an inmate.

Instead of voicing belated concern that the dosage of Klonopin suggested by Dr. Silverman could kill plaintiff, and deferring to a stranger's medical opinion. Dr. Gessner could have and should have followed the written Prison protocol to independently confirm that plaintiff should continue receiving Klonopin, a federally regulated, controlled substance. Defendants' policy on Use of Controlled Substances Number 405.5 provided:

> All inmates who are prescribed controlled substances for longer than five consecutive days must have their medical conditions reviewed by the prescribing practitioner. All practitioners who believe that an inmate must be continued on a controlled substance beyond a five day period may renew the original order one time, and only after a clinical evaluation. For controlled substance orders greater than 10 days, the prescribing practitioner will submit a clinical summary and justification for continuing the medication beyond the five day period to the WCC corporate medical director for review and discussion. A copy will be forwarded to the WCC director of health services for review.

Dr. Gessner's testimony concerning her reservations about the medical decisions defendants were making on plaintiff's behalf was belied by her actions. In addition, Nurse Byrd testified that Klonopin was dispensed to inmates who were "alcoholics" although it was counter-indicated. According to Nurse Byrd, "Klonopin, is a funny drug . . . Klonopin is indicated. But that would not affect whether you gave it or not. You understand what I'm saying? If everything was in place, [Mr. Jackson] would get it." (Byrd deposition at p. 66-67, Exhibit "B") (emphasis supplied) Further, defendants' policy Number 703, concerning Intoxication and Withdrawal specifically states "Alcohol Detoxification. Detoxification in alcohol–dependent inmates does not involve

administering decreasing doses of alcohol; it involves administering, decreasing doses of drugs that are cross-tolerant to it (i.e. benzodiazepines)."

Moreover, the Prison's written policy, Health Record Format and Contents No. 801, required defendants coordinate the medical treatment of anyone incarcerated at the Prison on more than one occasion: "When an inmate is reincarcerated, the prior record, if one exists, *will be reactived in a timely manner*. The inmate will have one medical record that contains a record of all health services that are rendered." (emphasis supplied) Nevertheless, Dr. Gessner testified the medical staff and she ignored this policy with regard to plaintiff, solely because he was a weekend inmate:

> Q  [By Plaintiff's Counsel]:  As of 2000, do you know if you should have had access to his medical records from when he was incarcerated in 1998?
>
> A  [By Dr. Gessner]:  I don't know.
>
> Q:  You don't know if you should have?
>
> * * *
>
> A:  *Records for a weekender are not pursued in the same way as records for a regular inmate*, because the situation occurs where we have the least control over the medical care of the inmate, but the most liability.  So, old records are much less important in a weekender than in somebody under our care fully.

(Gessner deposition at 80, Exhibit "I") (emphasis supplied).  Nurse Byrd candidly elaborated on this incomprehensible lapse of Prison policy:

> Q:  [By Plaintiff's Counsel]:  Would part of your job have been to review his prior medical records, if any at the prison, when he was here in 2000?
>
> A:  [By Nurse Byrd]:  Ideally it would be.  He was a weekender.
>
> * * *

Q:    When you say ideally it would have been, but he was a weekender, you mean if he was a full-time, you would have been able to do that?

A:    I would have pulled his old chart; yes, sir.

Q:    But as a weekender, you wouldn't have done that?

A:    No, sir.

Q:    Why not?

A:    ***You want an honest answer.***

Q:    Yes, please.

A:    ***I don't have the time for weekenders to pull their old charts.*** . . .

(Byrd deposition at p. 76-78, Exhibit "B")

Despite defendants' numerous policies to the contrary, in practice, the Medical Department did not properly dispense prescription medications to "weekenders", for non-medical reasons including Mr. Jackson. Nurse Byrd, who was aware of the haphazard medical treatment provided to inmates, informed plaintiff that he had to bring his own medications. (Jackson deposition at 51-53, Exhibit "K") Defendants' de facto policy was to willfully disregard the serious medical needs of "weekenders" like the plaintiff with respect to their required medications, since the Prison had actual knowledge that their written policy was unworkable in practice.

The dichotomy between Prison policy and practice is underscored in the testimony of Prison Superintendent Hill, who stated that weekend prisoners were to be treated like any other inmates and that the Prison was responsible for their medical needs.

(Superintendent Hill, deposition at 17-18, 42-43 Exhibit "E")[13]  Conversely, Nurse Byrd

testified that she believed the written Prison policy on prescription medications, "*was not*

*for weekenders*," but for "*real inmates*." (Byrd deposition at 78-79, Exhibit "B")

 Weekend prisoners were treated differently than other prisoners with respect to

prescription medications, and there was insufficient staff to care for their medical needs.

Nurse Byrd, who testified that the policy of having weekend inmates bring in their own

medications was a "nightmare" in practice, stated that it was "*common knowledge*" at

staff meetings and with the nurses involved, that the Prison policy was a "*difficult*

*situation*", which was discussed by the nurses "at every staff meeting."  (Byrd deposition

at 44, 62-63, Exhibit "B")  This sentiment was corroborated by former Correctional

Officer Sean Gardner, who stated at page 33 of his deposition: "*They would give their*

*medicine up on Friday when we would take it up there, but they wouldn't get their*

*medication until they were leaving on Sunday.  Some of them never got it*." (emphasis

supplied) (Gardner deposition at 33, Exhibit "C")

 Plaintiff informed the defendants that medications prescribed for his various

ailments had significant discontinuation syndrome associated with life-threatening

complications, including sudden blackouts and seizures.  Defendants were on notice as to

Mr. Jackson's serious medical condition as a result of his prior incarceration in 1998. The

Prison had his prior medical records, but they were never reviewed by the physicians or

off-site nurses assigned to the DUI building, since there were often 100 or more inmates

---

[13] The National Commission on Correctional Health Care, Accreditation Report on the Health Care Services At George W. Hill Correctional Facility, February 25, 2000, indicates on page 1 "While the national contractor is responsible for the daily functional services at the jail, **the superintendent has contract oversight authority and retain rule making and adjudicative powers at the institution**."

in that building. Defendants knew that plaintiff's medical problems would be triggered if they abruptly stopped allowing plaintiff to take his medications. (Snell deposition at 40-41, Exhibit "L") Defendants further acknowledged that individuals receiving benzodiazepines like plaintiff could sustain injuries as a result of the sudden loss of consciousness syndrome.

According to plaintiff, when he reported for incarceration in February 2000 he was also informed that he would receive a diabetic diet. (Jackson deposition at p. 101, Exhibit "K") However, the breakfast he received from the defendants consisted of doughnuts, and other sweets for lunch. (Jackson deposition at p. 76 and 103, Exhibit "K") In fact, according to the records produced by defendants, plaintiff's diabetic diet was not authorized to begin until April 3, 2000 and only to last until May 3, 2000. (Byrd deposition Exhibit "B", attached Diet Order Form) On the weekend of May 28, 2000, plaintiff received a high sodium nitrate lunch consisting of processed meat. (Jackson deposition at p. 76-77, Exhibit "K")[14]

Sean Gardner, a former correctional officer employed by defendants, testified that plaintiff arrived at the Prison apparently intoxicated on more than one occasion. Although plaintiff disputes this allegation, even if true, the Prison was obviously aware that individuals in the "DUI Building" might have alcohol use or abuse issues.

Furthermore, irrespective of whether or not plaintiff reported to the Prison intoxicated, defendants had an affirmative duty imposed upon them by Federal law, the Administrative Code of the Pennsylvania Department of Corrections, and the Delaware

---

[14] Defendants were unable to produce documentation to refute Mr. Jackson's recollection of the numerous non-diabetic meals he was served.

County Courts to comprehensively address the issue. Contrary to Prison policy, plaintiff was not placed in the detoxification program the Prison was obligated to have in place. That policy specifically stated "All inmates found to be demonstrating the signs and symptoms of drug / alcohol withdrawal will be seen by the physician and his treatment plan will be followed. An inmate will be hospitalized only on the order of a physician and with administrative notification. Inmates experiencing severe, life-threatening intoxification (overdose) or withdrawal will be immediately transferred to an acute care facility. . ." Although plaintiff's medication administration records suggest he received Librium on two occasions when he allegedly appeared at the Prison intoxicated, there are no records indicating that the defendants followed the necessary policy to address plaintiff's alleged intoxication. The Weekender Program policy specifically provided that weekenders who reported to the Prison intoxicated were to be held in and subjected to a multi-leveled process that involved several individuals working for defendants, substantial documentation, notification to the sentencing judge, and possibly, a change in the inmate's sentence. None of these steps were taken to either help plaintiff with his alleged alcohol problems or as a disciplinary measure to dissuade other inmates incarcerated in the "DUI Building" from breaches of important Prison protocols. Finally, defendants are unable to verify when or if plaintiff reported to the Prison intoxicated, because defendants intentionally destroyed plaintiff's weekly urine tests that could have been used to substantiate his sobriety and/or his use of benzodiazepines from February to May 2000. (Burgwald deposition at 20-23, Exhibit "V")

Despite defendants' forewarning about plaintiff's medical condition since his 1998 incarceration, and the medications he required, defendants acted intentionally

and/or recklessly by depriving plaintiff of his necessary prescription medications over a period of 14 weeks, which manifested deliberate indifference to plaintiff's health, safety and life.  Prison medical personnel told plaintiff that his medications cost too much money for defendants to provide. (Jackson deposition at 51, Exhibit "K") Defendants also stated plaintiff would not receive his Klonopin because they were narcotics, and the Prison could not afford it, despite the fact that the Prison had the drug for non-weekenders.  (Jackson deposition at 51, Exhibit "K")

Nurse Byrd recommended to plaintiff that he bring his own medications with him for his weekend incarcerations, although that requirement was neither part of the Weekenders Program nor any other written Prison policy.  (Byrd deposition at p. 61, Exhibit "B") When plaintiff did bring his medications to the Prison and provided them to the Prison staff, defendants told him the medications were lost or that they had been thrown away. Mr. Jackson was forced to get additional prescription medication from his doctor to replace his medications, which the Prison had lost, at his own expense. (Jackson deposition at 51, Exhibit "K")

Mr. Jackson could not even rely upon the Prison grievance procedure because the Prison's correctional officers would simply destroy the grievance forms received from inmates without submitting them to the medical staff for processing.  (Smida deposition at 60-61, 78-80, Exhibit "T") This systematic denial of due process continued even after plaintiff's incident, as the Prison personnel continued to destroy, misplace or lose grievances filed by inmates for years. (Burgwald deposition at 62-67, Exhibit "U")

Defendants' acting Health Services Administrator during plaintiff's incarceration, Laureen Robertson, testified at her deposition that the Prison retained medications to

provide to inmates in the event they did not bring them with them to the jail.  (Robertson deposition at p. 34, Exhibit "V") More specifically, Prison Nurse Carol Ann Snell, who was also responsible for providing nursing care to plaintiff, testified that if plaintiff appeared on the weekend without his Klonopin she would not give it to him, even though the medication was available at the Prison:

> Q:    [By Defendants' Counsel]:  Nurse Snell, what if Mr. Jackson would appear on the weekend on a Friday without his medications, say he didn't bring his Klonopin, what would be done?
>
> A:    [Nurse Snell] Well, unless the nurse got approval from the medical director at that time or the physician on call, which is usually the medical director on the weekend, to give from *our own count our own narcotic count* - -
>
> Q:    Do you keep Klonopin in stock?
>
> A:    We keep some, not usually any quantity.  Maybe for emergency situations, we keep a card perhaps the card is like thirty pills.

(Snell deposition at p. 36-37, Exhibit "L")

The Prison violated its written policy with respect to Mr. Jackson and disregarded the written and verbal orders of his psychiatrist, Dr. Silverman, who not only faxed the plaintiff's prescription to the Prison, but also spoke to Dr. Gessner, the Prison physician, as previously indicated. Defendants failed to train the correctional officers and medical staff who were in charge of the weekend inmates with respect to the Prison's written policy concerning, inter alia, the Weekender Program, the grievance process, assisting or dealing with intoxicated inmates, or equal treatment of inmates irrespective of their status as "regular inmates" or mere "weekenders".

Lieutenant McCullough, who was the on-site supervisor for the weekender correctional officers, testified at his deposition that he and his staff were unfamiliar with

the written policy on prescription medication. (Lieutenant McCullough deposition 43-44, Exhibit "D")  Indeed, there was testimony that Prison personnel had never seen the written policy.   Even the acting Health Services Administrator during plaintiff's incarceration, Laureen Robertson, and one of his treating nurses, Carol Ann Snell, indicated that they had never seen the Weekenders Program policy prior to their respective depositions on January 14, 2004, and December 17, 2003.   (Robertson deposition at p. 33, Exhibit "V"; Snell deposition at p. 12-13, Exhibit "L")

Plaintiff complained to defendants that he was having problems such as sweating, shaking, inability to focus his eyes, not being able to walk straight and constant vomiting. (Jackson deposition at 54, Exhibit "K")  Despite warnings from plaintiff's doctor, defendants continued to deny plaintiff his medications.  As a direct and proximate result of defendants' deliberate indifference to plaintiff's serious medical needs, plaintiff sustained head injuries and trauma at the Prison after losing consciousness and violently striking his head on a concrete floor in the DUI Building.  (See Defendants' Incident Reports, Exhibit "N")  Soon thereafter, plaintiff was transported to Crozer-Chester Medical Center and was hospitalized there for ten (10) days.  Physicians at Crozer-Chester Medical Center diagnosed plaintiff's injuries as subdural hematoma with subarachnoid hemorrhage resulting from the sudden loss of consciousness.

Defendants' written policy that had immediate effect whenever an inmate was involved in specified "serious incidents" was not even followed by defendants after plaintiff was transported to the hospital for emergency treatment.[15]  The Serious Incident

---

[15] Defendants' define a serious incident according to their policy titled Serious Incident Reporting No. 7.1.3 as follows:  "Serious Incidents and Situations—refers to those operations and / or medical occurrences which might result in scrutiny or potential

Report Policy Number 116 indicated "In the event of a serious health incident, the Health Services Administrator will inform the Health Services Director by telephone immediately or as soon as time permits. A serious incident report will be completed and forwarded to the Health Services Director and Corporate Legal department as soon as time permits, but no later than 2 hours."[16] Defendants never explained during discovery why a serious incident report was never generated concerning plaintiff's injuries, which would have launched an investigation. Defendants also have not explained why an incident report written by Correctional Officer Gratz was never produced to plaintiff. They also never answered why an incident report written by former correctional officer, Sean Gardner, was dated four days after plaintiff's counsel, John L. Rollins, Esq. wrote the Prison in October 2000, not May 28, 2000, the day plaintiff sustained his injuries, although Gardner was confident he provided one that day.

Jackson suffered permanent neurological damage, loss of memory and cognitive functions as a result of striking his head on the concrete floor at the Prison. Jackson's injuries were proximately caused as a result of failure to receive his prescription medications and unregulated lapses in relevant Prison medical policies. (Dr. Silverman's expert report of 2/2/04, Exhibit "G"; Dr. Gzesh expert report, Exhibit "Q") More specifically, plaintiff now has abnormalities in his memory, and inability to recall and carryout daily tasks that previously presented no difficulty. In addition, plaintiff now experiences other neurologic symptoms such as ataxia and stammering speech.

---

liability of facility operations. . . . The Facility Administrator or designee is responsible for immediately reporting Category I Incidents . . ."
[16] Pursuant to Prison policy Number 404, Hospital And Specialized Ambulatory Care, defendants were obligated to pay for plaintiff's medical expenses associated with his injuries. To date, defendants have failed to comply with this policy.

On May 26, 2002, plaintiff commenced the instant action against Delaware County, Wackenhut Corrections Corporation and several of their employees and administrative personnel. Plaintiff's claims assert that defendants violated the Civil Rights of plaintiff under 42 U.S.C.A. § 1983. There are pendent claims for negligence and emotional distress.

## III.   ARGUMENT

### A.   Genuine Issues of Material Fact Still Exist In The Instant Case.

In order to prevail on a motion for summary judgment, defendants must show, taking facts and inferences in the light most favorable to plaintiff, that no reasonable fact finder could find for the plaintiff on an issue which is a case determinative. Thomas v. Transamerica Accidental Life Insurance Company, 761 F. Supp. (D.Or. 1991). Summary judgment is inappropriate when credibility is at issue or different ultimate inferences can be reached. FRCP 56 (c). In addition to the evidence cited in Rule 56 (c), a court may take into account any material that would be admissible or usable at trial. Wright and Miller, Federal Practice and Procedure Section 2721 at 40 (2d. Ed. 1983). In evaluating a summary judgment motion, the record will be viewed in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505 (1986). Summary judgment is appropriate only if there is no genuine issue of material fact such that a reasonable fact finder could find for the non-moving party, Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986).

In the instant matter, most of defendants' arguments actually amount to the proffer of counter-evidence on disputed factual issues. The Court must distinguish defendants' belief that they have evidence to convince a jury to decide an issue in their

favor, from the tenet that no reasonable jury can fail to view the issue in any other manner than that suggested by defendants. The mere fact that defendants have admitted to not providing proper medical treatment to plaintiff on the weekend of his sudden loss of consciousness is sufficient to raise a genuine issue of material fact as to that misfeasance being the cause of plaintiff's injuries.

**B.      Delaware County Liability For Plaintiff's Injuries.**

Delaware County, a government body, is liable for plaintiff's injuries under Section 1983, as set forth in plaintiff's complaint, because defendants' employees or agents executed a governmental policy that directly resulted in the deprivation of plaintiff's civil rights. Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018 (1978). If a city official causes a deprivation of life or liberty upon another because he was following a city policy reflecting the policymakers' deliberate indifference to constitutional rights, then the city is directly liable under Section 1983 for causing a violation of plaintiff's fourteenth amendment rights. Fagan v. City of Vineland, 22 F.3d at 17 (3d Cir. 1993) Liability may be based on actions of an official with final policy-making authority, which is then attributed to the municipality, and even a single action by the policy maker may be enough to trigger municipal liability. Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S. Ct. 1292 (1986).

It is alleged in the instant case that defendants had actual knowledge that plaintiff suffered from serious medical conditions and that he continuously required physician prescribed medications to treat the same. Defendants also had actual knowledge that if plaintiff did not receive his prescription medications and medical treatment, and he would be subject to significant discontinuation syndrome resulting in, inter alia, disorientation,

blackouts, seizures and/or death. Defendants not only ignored plaintiff's condition, but through their acts, omissions, policies, customs, and lack of training, caused plaintiff to sustain physician-diagnosed, severe permanent brain injury.

It is not required to find that individual defendants violated the rights of plaintiff to find that the government bodies and corporate entities named in plaintiff's complaint had a policy whose implementation violated those civil rights. Pembaur, supra; Tennessee v. Guiner, S. Ct. 1694 (1985); Simmons v. City of Philadelphia, 947 F. 2d 1042 (3rd Cir. 1991). In his excellent analysis at p. 28–45 of Simmons v. Philadelphia, supra, Judge Becker rejects the City's argument that an employee must have primary liability for a constitutional violation. He states at page 3 of his opinion: "City of Canton, similarly to Monell, therefore appears to require that a plaintiff, in order to meet the deliberate indifference standard for directly subjecting a municipality to Section 1983 liability, must present scienter-like evidence of indifference on the part of a particular or particular policy makers." The Supreme Court in both Pembaur and Tennessee v. Guiner, supra, considered civil rights liability of the municipality alone, where all individual defendants had been dismissed.

In order to state a valid claim under Section 1983, plaintiff must allege the following: (1) that the conduct complained of was committed by a person acting under the color of state law; and (2) the conduct deprived plaintiff of rights, privileges or immunities secured by the United States Constitution. Coates v. Jeffers, 822 F. Supp. 1189 (E.D. Pa. 1993) citing Parratt v. Taylor 451 U.S. 527, 535 101 S. Ct. 1908, 1912, 68 L. Ed.2d 420 (1980). In order to state a valid claim pursuant to the Eighth Amendment

violation, plaintiff's medical needs must be serious.   Monmouth County Correction Institution Inmates v. Lanzaro, 834 F.2d 326 (3rd Cir. 1987).

In Estelle v. Gamble, 429 U.S. 97 the United States Supreme Court stated in its holding that:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" Gregg v. Georgia, supra, at 173 (joint opinion), prescribed by the Eighth Amendment.  This is true whether the indifference is manifested by Prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  ***Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause under Section 1983***.

(emphasis supplied) **Thus, Courts have found deliberate indifference where prison officials knew of a prisoner's need for medical treatment, but intentionally refused to provide it.**  Rouse v. Plaintier, 182 F.3d 192 (3rd Cir. 1999) (prisoner denied insulin for diabetes melitus).

Similarly, prison officials have been held liable where they delay necessary medical treatment based on a non-medical reason or prevent a prisoner from receiving needed or recommended medical treatment.   See Durmer, 991 F.2d at 68 (citing Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347-47 (3d Cir. 1897).  Further, the Courts have found deliberate indifference to exist where prison officials persist in a particular course of treatment, "in the face of resultant pain and risk of permanent injury."  Napoleon, 897 F.2d at 109-11 (holding that allegations of several instances of flawed medical treatment state a claim under the Eighth Amendment).

To state a valid State-Created Danger claim under Kneipp v. Tedder, 95 F.3d 1199 (3rd Cir. 1996), it must be shown that: (1) the harm ultimately caused to plaintiff

was foreseeable and fairly direct; (2) moving defendants, as state actors, acted in willful disregard for plaintiff's safety; (3) there existed some relationship between the state and plaintiff; and (4) the state actor used its authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.  In <u>Kneipp</u>, Philadelphia police officers stopped an inebriated Samantha Kneipp and her husband while they were walking home from a bar.  The police officers indicted that Mr. Kneipp could go home and that the officers would care for Ms. Kneipp, who was visibly drunk, but instead left her to walk home alone.  Consequently, Ms. Kneipp fell down an embankment, suffered hypothermia and sustained permanent brain damage.  The Court held Ms. Kneipp under these facts made out a prima facie case of violation of her constitutional rights under the "State-Created Danger Theory."  In the case, <u>sub judice</u>, plaintiff was similarly harmed by the State Created Danger that deprived him of medications vital for his health, safety, and life.

The case law is consistent with the conclusion of Lee Silverman, M.D., a psychiatrist, who wrote in his expert report of February 2, 2004, that defendants in this case exhibited a policy of deliberate indifference to the serious medical and psychological needs of plaintiff, Arthur Jackson.  Dr. Silverman stated:

> Deposition testimony of a nurse involved in administering medication to Mr. Jackson and other inmates in the DUI program characterized Prison policy as a 'nightmare'.  Prison personnel were unfamiliar with the implementation of Prison policies dealing with the administration of prescription medication to weekend inmates.  Medication was lost and not returned to inmates on their departure.  Record keeping as to medications was grossly inadequate, and there is no record that Mr. Jackson received any of his medications on the weekend that he was injured.  The Prison failed to follow its own policies and to train staff about the prescription policy for weekend inmates.

Wackenhut is a private corporation that administers prisons throughout the United States. Defendant Delaware County Board of Prison Inspectors is the entity that administers the Prison for Delaware County, now named George W. Hill Correctional Facility. The Board, according to statute and by contract with Wackenhut, is the ultimate authority, which has care, custody and control of the Prison. Superintendent Hill (after which Delaware County Prison is now named) is an employee of the Board. Mr. Hill and the Board have final policy-making authority, and the warden of the prison, a Wackenhut employee, is responsible to Superintendent Hill and Chairman of the Board, Charles Sexton. A true and correct copy of the contract between Delaware County and Wackenhut is attached and incorporated as Exhibit "J".

Charles Sexton, the Chairman of the Delaware County Prison Board, testified at his deposition that the Superintendent's Office answers to the Prison Board, and that the sole function of the Superintendent's Office is to monitor the Wackenhut contract and to see if there are any complaints. (Sexton deposition at 10, Exhibit "F") The contract had been in effect between Wackenhut and the Prison Board since 1995. (See contract, Exhibit "J") On page 11 of his deposition, Mr. Sexton alleged that Wackenhut makes policy for the Prison, while acknowledging that Wackenhut was ultimately answerable to the Prison Board. Sexton acknowledged at page 16 of his deposition that he was generally familiar with the "weekender" program at the Prison, but did not review written documents from Wackenhut about how the "weekender" program works. (See Sexton deposition at 16, Exhibit "F").

**C.    Defendants Disregarded Their Knowledge
Of Plaintiff's Serious Medical Needs.**

There is little dispute that Prison staff had actual knowledge that Arthur Jackson

had serious medical problems and required prescription medications. Mr. Jackson not only informed the Prison about his prescription needs, but also attempted to bring in his medication on several occasions, after his physician personally notified the Prison doctor concerning his prescriptions.

Plaintiff was incarcerated at the Prison in 1998, and had an extensive contact with the Prison's medical staff during that time. The written policy of the Prison entitled "Weekenders Program" was as follows: "Weekender's taking prescription medication shall have their doctor fax a copy of the prescription to the Medical Division of the George W. Hill Correctional Facility, and if approved, the medications will be dispensed through the Medical Department." Defendants' medical records for plaintiff indicate his medical needs were discussed by defendants' chief physician and plaintiff's private physician, Lee D. Silverman, M.D.

Prison Nurse, Miriam Byrd, who was involved in dispensing and administering medication to Weekenders when Mr. Jackson was at the Prison, testified at her deposition that the system for prescribing medication in place in 2000 when Mr. Jackson was an inmate at a minimum, "needed improvement". (Byrd deposition at 43-44, Exhibit "B") On page 62 of her deposition, Nurse Byrd testified that it was "common knowledge" at staff meetings that the policies for prescription medications need to be changed. (Byrd deposition, Exhibit "B") On page 43 of her deposition, defense counsel, Dennis Herbert, how the Prison system is different from 2000 and why it was changed asked her, and she said "it was a nightmare". She said that the weekenders are not "real inmates" and the Wackenhut written prescription policy was not for the weekenders. (Byrd deposition, Exhibit "B")

Prison Nurse, Carol Ann Snell, testified at her deposition that emergency provision of Klonopin would be given to "in-house" inmates, but not Weekenders:

> Q:    [By Defendants' Counsel]: What would you consider an emergency?
>
> A:    [Nurse Snell]:  If we have somebody in-house who is having a major panic attack, claustrophobic, having problems breathing.
>
> Q:    You said in-house, is that opposed to a weekender?
>
> A:    As a weekender, yes.
>
> Q:    Why wouldn't you have it for weekenders?
>
> A:    Because weekender people are not - - they're still under the care of their own physician.  Five days a week they're receiving whatever follow up they need to supposedly from their own doctor.

(Snell deposition at p. 37-38, Exhibit "L")  Thus, Nurse simply assumed that weekenders received medical treatment during the week that they may have needed during incarcerations at the Prison on weekends.  Nurse Snell's blatant disregard for plaintiff's serious medical needs is even more troubling when considering her obvious knowledge of the debilitating effects he was experiencing as he was deprived of his Klonopin:

> Q:    [By Defendants' Counsel]:  When you said that Librium is used to bring somebody down from Benzodiazepine, what do you mean by that?
>
> A:    [By Nurse Snell]:  You don't want somebody who has been on Benzodiazepine long term to come off of those completely without coming down in gradual steps.  When you're saying coming down, I mean without coming away from that medication in gradual steps.
>
> Q:    If they've been on Benzodiazepine for a long period of time and they just go cold turkey, if you will, if they stop, what happens?
>
> A:    Well, over a period of time, because Benzodiazepine could stay in your system for a considerable amount of time.  So over a period of time, the eventuality is if they do not receive that medication, at

some point.  When I say some point, I'm talking like anywhere between a week to two-week interval, they are going to have problems.  They're going to shake.  They're going to have detox symptoms.

Q:    They're going to have withdraw symptoms?

A:    Yes, they are.

(Snell deposition at p. 40-41, Exhibit "L")

George W. Hill, the Superintendent of the Prison, stated that he agreed with the general statement that Weekenders are supposed to be treated like any other inmates (Hill deposition at 18-19, Exhibit "E").  On page 20 of his deposition, he acknowledged that there is no medical facility in the building, which houses "weekenders".  On page 35 of his deposition, Hill acknowledged that Wackenhut has to provide medical services under the contract with Delaware County. On page 42 of his deposition, Hill acknowledges that the Prison has the responsibility to give appropriate medical attention to inmates.

Lieutenant McCullough stated in his deposition on page 23-24 that if an inmate had alcohol in his breath, a urinalysis would have been done, he would have been written up, and he would have been held in the jail to serve out his sentence. McCullough said that he does not remember about having any training with respect to the Prison policy for "weekenders".  He does not remember discussing the "weekender" policy for prescriptions with any shift commander. He never recalled having discussions with any Correctional Officer about implementing the policy. (McCullough deposition at 43, Exhibit "D")

**D.    Defendants' Lapses In Medical Care To**
**Plaintiff Resulted In A Policy of Deliberate Indifference.**

Two major United States Supreme Court decisions dealing with deliberate indifference are Estelle v. Gamble, which has already been cited, and Brennan v. Farmer, 511 U.S. 825 (1994).   Brennan v. Farmer stated that there has to be a subjective awareness on the part of Prison Officials for the serious medical needs of plaintiff. Prison personnel had actual knowledge of Mr. Jackson's need for prescription medication.

Mr. Jackson testified that he told Prison personnel about his needs and brought prescription medication with him on several occasions.   Furthermore, Mr. Jackson's psychiatrist, Dr. Silverman, not only faxed the prescription to the Prison, but also had conversations with the Prison medical personnel about plaintiff's prescription medication. Medical staff at the Prison were aware of the problem of getting a prescription medication to "weekenders," as indicated in the testimony of Nurse Byrd, that not only was the problem a "nightmare," but that it was also common knowledge among medical staff that the inmates were not getting their medications.   This was also known by Correctional staff, and corroborated by the testimony of Correctional Officer Sean Gardner, who stated in his deposition that inmates would bring their medications on Friday and would not get them back until Sunday, and some of them never got it.

As set forth, supra, defendants ignored several of their own policies concerning the proper manner in which to address the medical needs of "weekenders," who were jailed in the DUI Building.   Defendants further undermined the continuity of care afforded to "weekenders" by creating unwritten policies that limited their medical treatments.   Namely, the Prison did not have a written policy requiring weekend inmates

bring medications with them during their incarcerations. Nevertheless, as a means of lowering costs and improving profit margins, defendants forced inmates like plaintiff into the untenable position of having in their jail area controlled substances that inmates covet.

     **E.**     **Defendants' Actions Were A Proximate Cause of Plaintiff's Injuries.**

Defendants have tried to dispute whether Mr. Jackson's failure to get his Insulin, Klonopin, Effexor and related prescription medications on the weekend of May 28, 2000 was related to his fall and his injuries. It is noted that defendants have no record that indicates that Mr. Jackson received any of the prescription medications on the weekend that he was injured, other than two doses of Insulin at 4 a.m. on May 27 and 28, 2000. (Byrd deposition at 35-38, Exhibit "B"; See also Exhibit "O") He was prescribed Insulin three times daily.

A report by Dr. Ebba, Mr. Jackson's personal physician, is attached and incorporated as Exhibit "H". Dr. Ebba stated in his report that "To a degree of medical certainty elevated blood sugar as a result of noncompliance with Insulin dosages could lead to a change of mental status and even more so if other medications, such as anti-seizure medications and anti-psychotic medications were withheld. The lack of medications could cause syncope, seizure, falls and even sudden death from cardiopulmonary event." Dr. Gzesh wrote in his report of February 4, 2003: "He currently suffers from the neurological sequalae of a severe head injury. I believe the injury, a subdural hematoma, was related to the deprivation of clonazepam, which he had been receiving on chronic basis, which led to a seizure and a subsequent head injury." (Dr. Gzesh expert report, Exhibit "Q") Concurring, Dr. Silverman relates plaintiff's fall

to the deprivation of Insulin, withdrawal of Klonopin and the failure of plaintiff to receive any prescription medications on the weekend that he fell.

Defendants were on notice as to Mr. Jackson's past medical problems, which were documented from his incarceration at the Prison in 1998. In fact, as a result of the deprivation of plaintiff's medications in 1998 he attempted to commit suicide by hanging. (Jackson deposition at 59-62, Exhibit "K") Nonetheless, Nurse Byrd acknowledged in her deposition that it was part of her job to review the prior medical records of "weekenders". In a moment of candor, Nurse Byrd testified: "**A:** You want an honest answer. **Q:** Yes, please. **A:** I don't have the time for weekenders to pull their old charts." (Byrd deposition at 77, Exhibit "B") Dr. Gessner, the Prison Medical Director, also testified that "Records for a weekender are not pursued in the same way as records for a regular inmate," despite the fact that this practice violated express Prison policy that medical care for re-incarcerated individuals be coordinated to ensure continuity of care. (Gessner deposition at 80, Exhibit "I")

Defendants have tried to suggest that Mr. Jackson's injuries were related to a number of factors besides his failure to get his medications in the Prison, such as low sodium or alcohol withdrawal. The legal issue here is whether the actions of the Prison were a substantial factor in contributing to Mr. Jackson's injuries. There is a dispute here between the conclusions in the expert reports for plaintiff and defendants. It appears that nowhere do any of the defendants' experts state with reasonable medical certainty that the failure of Mr. Jackson to receive his prescription medications in combination with each other, and with his existing health problems, are unrelated to his fall.

There is also a disagreement between plaintiff and defendants concerning the length of time that must be considered regarding the number of days plaintiff did not receive the medications prescribed to him by Dr. Gessner. Defendants have obtained reports from physicians who based their conclusions solely on the events that transpired on the weekend of May 28, 2000. However, Drs. Silverman and Gzesh, who have provided separate reports concerning the cause of plaintiff's injuries, have examined the entire medication administration records maintained for plaintiff by the Prison. Thus, Drs. Silverman and Gzesh have taken into consideration what actually occurred, as admitted by Deborah Perretta testifying as defendant Wackenhut's corporate representative and reflected in Exhibit "O": plaintiff never received his medications correctly on a daily basis.

Defendants repeatedly suggest that Mr. Jackson voluntarily failed to bring his Klonopin and other medications to the Prison, while ignoring the fact that it was Mr. Jackson's testimony that he brought enough medication with him to last the duration of his weekend incarcerations. Due to the fact that defendants have conveniently lost, destroyed or misplaced these records, as they have done so with many others, they are in no position to challenge this fact. However, to the extent that defendants believe they have evidence sufficient to address this issue, that only further underscores that genuine issues of material fact on causation exist and must be decided by the jury.

In Mr. Jackson's own words: **"I bring it in, they lose it. They tell me they lost it, they can't find it. They thought I had been released, and they threw it in the trash."** (Jackson deposition at 53, Exhibit "K") (emphasis supplied) The custom of the Prison to fail to give "weekenders" their prescription medications was known to both the

medical and correctional staff, as indicated in the deposition testimony, heretofore cited, of Nurse Byrd and Correctional Officer Gardener.

Several medical personnel responsible for plaintiff's care expressed a clear awareness of the danger of denying Klonopin to someone in plaintiff's position. However, that knowledge did not serve as a catalyst for Dr. Gessner, Nurse Byrd, Nurse Snell, or Health Services Administrator Laureen Robertson, to give plaintiff the medication that was readily available in the prison infirmary. Defendants' policy of stocking Klonopin was followed by the Prison according to Nurse Snell; Nevertheless, plaintiff did not receive Klonopin as prescribed because he was just a "weekender". As indicated in the reports of Drs. Silverman and Gzesh, this intentional and deliberate indifference to plaintiff's health posed an unreasonable, but foreseeable, risk that he would and did suffer serious medical harm.

Plaintiff's diabetic diet was not authorized until April 3, 2000, according to the available records. Of the fourteen weekends he was incarcerated, the number of days he received all of his medication as prescribed by the Prison's physician was 0. Defendants have even resorted to essentially suggesting that plaintiff stopped drinking and stopped taking his Klonopin that lead to his injuries. They reach this erroneous conclusion by misinterpreting a statement from Dr. Gzesh about plaintiff's use of Klonopin while away from prison. Dr. Gzesh clarified the proper interpretation of his comment in his letter of February 4, 2003 report, wherein he indicated plaintiff was *deprived* his Klonopin on the days he was incarcerated. Of course, it is undisputed that at a minimum, defendants did not give plaintiff Klonopin the weekend of May 28, 2000, when defendants now acknowledge he suffered a subdural hematoma.

Defendants have also argued blood test results indicate there was Klonopin in plaintiff's system when he was examined for emergency treatment at Crozer-Chester Medical Center. However, review of the reports to which defendants refer illustrate that defendants' attempt to distort the record extends to even rewriting their own expert reports. The fact is, the reports indicate urine tests conducted at Crozer-Chester Medical Center indicated the level of benzodiazepines in plaintiff's system.

Literature that defendants' expert, James D. Menapace, references in his report contradicts defendants' suggestion that there is no genuine issue of material fact concerning the presence of Klonopin in plaintiff's system:

> The duration of excretion of detectable amounts of drug in the urine following the last intake is *highly variable*. A general rule of thumb is five plasma half-lives. *This is simply a rough estimate* given the following variables: route of administration, amount of drug taken, frequency of use, individual metabolism, urinary pH, and drug storage within the body.

In addition, the table Dr. Menapace references in his report from the text, <u>Clinical Management of Poisoning and Drug Overdose</u>, Second Edition, lists the following variables as affecting the length of time Klonopin would be detectable in a person's system: "drug metabolism and half-life; subject's physical condition, fluid balance, and state of hydration; and route and frequency of ingestion." The text further concludes *"These are general guidelines only."*

Despite these express reservations in the literature that Dr. Menapace relies upon to form his opinion, defendants inexplicably present Dr. Menapace's statement to the Court as conclusive evidence of a disputed fact. Dr. Silverman notes in his latest report that he reviewed the deposition transcript of defendants' various medical personnel, including Dr. Gessner, wherein she specifically rejected the notion that the variables

associated with determining how long plaintiff had received his Klonopin were without dispute:

Q     [By Plaintiff's Counsel]:  Last question, five half lives is that a number of days?

A     [Dr. Gessner]:  No, it depends on the half life.  So, if you take a drug that's out of your system or say the drug level you reach is a steady state level and you – it's the length of time its takes for that blood level to be cut in half.  It depends on how you metabolize it.  If that's 24 hours, normally after it's cut in half by five, we can consider it to be out of your system.

Q:     Does the half life change depending upon the patient's weight?

A:     It depends on many, many things, but there's – that's why there's a range, but certain drugs are known to have long half lives, some are very short.

Q:     Does it change if they have other medical conditions?

A:     Yes.

Q:     Does it change if they're taking other medications for those medical conditions?

A:     Yes, within a certain range.

(Gessner deposition at p. 120-121, Exhibit "I")

Furthermore, as defendants have repeatedly emphasized, defendant Wackenhut is contractually obligated to operate the Prison and provide medical care to the inmates. Defendant Wackenhut's corporate representative, Deborah Perretta, testified that plaintiff never received his medications correctly on the days he was incarcerated.  More specifically, Ms. Perretta unequivocally testified that plaintiff never correctly received all of his medications on a daily basis, despite the risk he might suffer from the sudden loss

of consciousness syndrome, complications associated with his diabetes, or other life-threatening consequences:

> Q    [By Plaintiff's Counsel]:  Are records indicating the drugs that were administered to him available to show what medications he received –
>
> A    [Ms. Perretta]:  Medication administration records are, yes.
>
> Q:    The records, have you seen or had an opportunity to review records for every weekend that he was incarcerated?
>
> A:    Yes.
>
> Q:    Based on his records, did he receive his medication -- all the medications that he was supposed to receive on a daily basis?
>
> A:    Based on the record, no.

(Perretta deposition at p. 70, Exhibit "R")  There is no record that defendants ever sought plaintiff out on any of the forty-three days he was incarcerated to ensure he received his medications as required by Prison policy.  Specifically, defendants' policy Number 405.18 required that Prison personnel, "Locate inmate(s) that failed to take their medication and have them report to the medical unit to receive their medication or to sign a refusal form. . . . Order any medication needed to continue physician's orders."

In addition, Dr. Silverman noted in his February 2, 2004, expert report that he also reviewed exhibits from each of the aforementioned depositions, incident reports, Prison security and voluminous medical policies, as well as the medical records for plaintiff. Further, Dr. Silverman's opinion that defendants' deliberate indifference to plaintiff's serious medical needs caused plaintiff's injuries was formed not merely from all of those pertinent records, but also from the medical records from Crozer-Chester Medical Center.

Finally, it must be underscored that Dr. Silverman is and has been treating Mr. Jackson for several years and was able to observe the consequences of his injuries.

Mr. Jackson tried to get the Prison to give him his prescription medication, including having his doctor fax the prescription to the Prison, and taking his medications on several occasions to the Prison by himself. Why would Mr. Jackson want to discontinue his Klonopin, as defendants assert, particularly since he was advised of the deleterious effects of doing so, including seizures, headache and the type of medical problems that resulted in his fall? This fact was expressly addressed at Mr. Jackson's deposition of February 20, 2003, when defendants' counsel asked "As far as your medicines--- the Effexor, the Trazadone and the Klonopin – did you always take that every day, those medicines?" Mr. Jackson's unequivocal response was "Yes." Mr. Jackson further reiterated his physician's warning concerning the consequences of the sudden withdrawal syndrome:

> A:    [Mr. Jackson]: That's one thing Silverman drilled into my head: once you start this, you don't stop unless I tell you to and how to stop. You have to – he said, you have to wean yourself off of these medications.
>
> Q:    [By defendants' counsel]: So the only time you didn't take those medicines would have been when you were in the Prison; is that correct?
>
> A:    That's correct.

(Jackson deposition at 100, Exhibit "K")

Mr. Jackson was receiving 5 mg of Klonopin, which is a substantial amount. Defendants' experts do not discuss whether Mr. Jackson could simply stop taking Klonopin, even if he desired, without severe withdrawal effects. This is why a physician advises patient to gradually reduce Klonopin over a period of weeks or even months.

Defendants place great emphasis on the so-called negative benzodiazepine test at Crozer-Chester Medical Center on May 28, 2000.  First of all, there is no defense expert who opines that the test reliably measures for the presence of **all** benzodiazepines, including Klonopin.  In a medical article entitled "Serum & Urine Drug Screen Testing in the ED" by Kirk C. Mills, M.D., (see Exhibit "S") it is stated that there are over 21 different benzodiazepines available in the United States (including Klonopin) and that "a negative test does not rule out the possibility that BZD's are responsible for a patient's condition due to a negative result."  Dr. Mills writes that "Therefore, BZD's lacking that particular metabolite will have a lower affinity for detection and may be missed by standard screening methods (e.g. clonazepam, flunitrazepam)."  Clonazepam is the generic name for Klonopin, which is the prescription medication that Mr. Jackson was prescribed.  Parenthetically, it is noted that in paragraph 14 of Wackenhut's Motion for Summary Judgment, an Internet medical article is referenced and attached as an exhibit to defendant's motion.

### F.    Liability of Individual Defendants.

As plaintiff has stated in paragraph 26 of his answer to defendants' motion for summary judgment, the only individual defendants against whom plaintiff is prosecuting this lawsuit are Prison Nurse Byrd, Prison Nurse Snell, Warden James Janecka, Prison Superintendent George W. Hill, and Chairman of the Delaware County Board of Prison Inspectors, Charles Sexton.

Nurse Byrd, as previously indicated, was in charge of giving prescription medication to "weekenders" including plaintiff, Jackson.  The basis for liability of Nurse Byrd is as follows: Byrd had a duty to distribute and administer prescription medications

to plaintiff, Jackson, under the written Prison policy, and she knowingly failed to do that for non-medical reasons. Nurse Snell knew that plaintiff was suffering from Klonopin withdrawal, but she failed to give him his medication, which was available at the Prison.

The basis for liability against Warden James Janecka, Prison Superintendent George W. Hill and Chairman of the Delaware County Board of Prison Inspectors, Charles Sexton, is that they knew or should have known that the Prison's written policy regarding prescription medications for "weekenders" was unworkable in practice and they willfully disregarded their duty to weekend prisoners. Plaintiff has previously cited testimony that the Prison policy here was a nightmare, and it was common knowledge among nursing staff and correctional staff that inmates did not get their required prescription medications. The custom of the Prison was actually to ignore the serious medical needs of weekend prisoners in this regard. It is argued that where a policy or custom of deliberate indifference is common knowledge among prison staff, then those in charge at the Prison are not isolated from liability.

With respect to defendants' imposition of the "Political Subdivision Tort Claims Act" to insulate their liability, in the case of <u>Wade v. City of Pittsburgh</u>, 767 F.2d 405, 1985, the Court held that the Political Subdivision Tort Claims Act " has no force when applied to suits under the Civil Rights Act. The result follows whether the suit to redress federal rights is brought in state or Federal Court. Were the rule otherwise, a state legislature would be able to frustrate the objectives of a Federal statute." With regard to the defendants' arguments that they enjoyed qualifies immunity, there is no qualified immunity available to a municipality or similar governmental employer or policy making individual sued in their "official capacity" under 42 U.S.C. 1983. <u>Owen v. City of</u>

Independence, 455 U.S. 622 (1980); Hynson v. City of Chester, 827 F.2d 923 (3rd Circuit 1997). In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Court held that defendants are not protected from liability on the basis of qualified immunity, if their conduct violates clearly established or constitutional rights, which a reasonable person would have known. In the instant case, there are clearly established constitutional rights under the Eighth Amendment for medical care of prisoners. It is argued that individual defendants in their capacities as Prison administrators and Prison nursing staff should have known about these rights.

      **G.**      **Defendants Raise Genuine Issues Still In Dispute.**

With respect to Wackenhut's contention that Mr. Jackson presented himself in an intoxicated state at the Prison, it is difficult to believe that Mr. Jackson could show up intoxicated at the Delaware County Prison and not be held over, nor his conduct reported to the Court. Defendants destroyed all records of plaintiff's urinalysis tests, and there are no records that showed Mr. Jackson was intoxicated. (Burgwald deposition at 20-23, Exhibit "U") Defendants attached some computer printouts, which are supposed to show that Mr. Jackson was in the main Prison, but they do not show what he was doing at the main Prison or that he was put in the cell as a result of disciplinary action for being intoxicated.

Defendant Wackenhut cites Mahan in its brief. The case involved a prisoner, who did not get his depression medication. Mahan is to be distinguished from the instant case, since the Mahan Court concluded that no reasonable fact finder could find that the Prison was subjectively aware of Mahan's condition, requiring intervention. This is far different

from Jackson's case, where there was actual knowledge of plaintiff's serious medical needs by the Prison medical staff.

Defendants have also tried to suggest that this is a medical malpractice case in which the issue is over adequacy of treatment. This is a distortion of the facts, since the issue involving Mr. Jackson is not the adequacy of medical judgment, but the failure to give him his prescription medication.

Defendants also argue that plaintiff failed to identify a specific policy maker or show that there was a general policy. Again, this is rebutted by the statement of Nurse Byrd that the problem with the prescription medication among the weekenders at the Prison was common knowledge among the nursing staff, as well as the statement of Correctional Officer Sean Gardner that "weekenders" did not get their medications. Both nursing staff and correctional officer were aware of the situation, and Dr. Gessner, the Prison Medical Director, received actual notice from Mr. Jackson's psychiatrist.

**H.    Relevant Precedents Weigh Against Entry of Summary Judgment.**

By way of precedent, plaintiff would point out a similar case, United States v. Fayette County, 599 F.2d 573 (3rd Cir. 1979). An inmate with a serious heroin withdrawal problem was incarcerated in Fayette County Prison for approximately six and a half weeks after his arrest on narcotics charges. He admitted to Prison officials that he was a serious heroin addict, and although he informed Prison officials about his habit, he was afforded no medical treatment during the first ten days of his incarceration. After ten days, a Prison physician examined him, but did not provide adequate medical treatment. His injuries were essentially the pain and suffering associated with withdrawal. The District Court dismissed plaintiff's civil rights complaint, but later the Third Circuit

Court of Appeals reversed, citing the Supreme Court case of Estelle v. Gamble, supra, and noting that deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment proscription against cruel and unusual punishment.

Interestingly, the Court based its decision in part on Pennsylvania Law that provides that prisoners shall receive a medical examination after admission to an institution. As defendants have pointed out in their brief on page 21, citing 61 P.S.A. § 1 and 37 Pa. Code § 95.232 a (1), a prisoner is required to be examined by a physician within 48 hours of their admission. This was not done in Mr. Jackson's case.

Judge Baylson discussed requirements for municipal liability under the Civil Rights Law in the case of Mason v. Abington Township Police Dept. (No. 01-1799, E.D.Pa. 2002), where the Court wrote at paragraph 18: "In order to prevail against the municipality under § 1983, Monell requires a plaintiff to demonstrate that there was a "direct causal link" between a violation of his rights and a policy or a custom of the municipality. See City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996). As explained by the Third Circuit, "Policy is made when a `decision maker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1986) (plurality opinion)) (alteration in original, other internal quotation marks omitted). Customs are "`practices of state officials . . . so permanent and well settled' as to virtually constitute law." Id. (quoting Monell, 436 U.S. at 691) (other internal quotation marks omitted). Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir.

2000). After identifying the policy or custom that caused the injury, the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the `moving force' behind the injury alleged." Id. at 276 (quoting Board of County Comm'rs v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). If the policy or custom identified does not facially violate federal law, causation must be established by "demonstrating that the municipal action was taken with `deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Berg, 219 F.3d at 276 (quoting Brown, 520 U.S. at 407)."

Another case of precedential value is <u>Chase v. Ward</u> (No. 98-4100, E.D.Pa. 2000), involving a Civil Rights claim of deprivation of medical treatment against Delaware County Prison. In this case, a prisoner under the care of Wackenhut, sued for inadequate medical treatment. Plaintiff alleged that he was not treated for painful and irritating sores over his body for six weeks, despite sending numerous letters to Prison administrators complaining about the lack of medical treatment. Judge Waldman found that plaintiff's allegations concerning insufficient medical treatment under the Eighth Amendment were sufficient to withstand dismissal. The Court stated that deliberate indifference might be shown by the delay of necessary medical treatment for non-medical reasons. The Court also stated that a medical need is serious if it is one that has been diagnosed by a physician as requiring treatment. It is argued that both of these statements are applicable to the case at bar.

A case which is factually close to the Jackson case is <u>Natalie v. Camden County Correctional Facility</u> (318 F.3d 575, 3d Cir. 2003). In this case, Natalie was a diabetic who was arrested and taken to the Camden County Correctional Facility. Natalie

informed Prison employees that he was an insulin-dependent diabetic and that was noted on his chart. Prior to admission to the Prison, a physician treating Natalie at the hospital gave him a dose of insulin and wrote a note indicating that Natalie "must have insulin while incarcerated," but the note did not indicate how often the insulin should be administered. Twenty-one hours after being admitted to the Prison, Natalie received his first dose of insulin at that facility. He was released later the same day, and two days later Natalie suffered a stroke, attributing this stroke to the failure of the Prison to administer the insulin during the first twenty one hours of his incarceration. The District Court granted Summary Judgment to the Prison on Natalie's Section 1983 claim, ruling that he had failed to show a policy or custom of deliberate indifference to the medical needs of inmates.

The Third Circuit Court of Appeals reversed, holding that there was sufficient evidence in the record that Prison employees were deliberately indifferent to Natalie's serious medical needs to survive a Summary Judgment Motion. The Appeals Court pointed out that Prison officials ignored the evidence of his need for insulin and that a reasonable jury could conclude that Prison employees knew that Natalie was an insulin-dependent diabetic, and if insulin were not administered as required, he would suffer adverse health consequences. The Court also pointed out that there was evidence here that Prison employees delayed medical treatment for non-medical reasons. It is argued that this is similar to the Jackson case where non-medical reasons played a role in the denial of medication to Mr. Jackson.

Finally, the Natalie Court in paragraph 47 discusses when the acts of a government employee may be deemed to result from the governmental entity for which

the employee works.  Quoting the <u>City of Canton</u>, 489 U.S. 378, (1989), the Appeals Court stated that when a policy or custom exists where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."

## IV.    <u>CONCLUSION AND SUMMARY</u>

The Prison, which was jointly operated and controlled by Wackenhut and Delaware County, exhibited a policy of deliberate indifference to the serious medical needs of plaintiff.  This policy was a substantial factor in causing plaintiff's injuries.  In particular, defendants' policy with respect to distributing necessary prescription medication to weekend inmates was unworkable in practice and defendants knew it. Defendants violated their own policy with respect to Mr. Jackson, when they failed to give him his prescription medication as his doctor had requested from the Prison doctor, and pursuant to orders issued by the Prison Medical Director, Dr. Victoria Gessner.

The medical staff admittedly viewed "weekenders" as inferior inmates whose medical treatment was secondary to the "regular inmates."  Neither the Prison Medical Director nor any of plaintiff's treating nurses reviewed his medical files from his 1998 incarceration.  As set forth, <u>supra</u>, those files would have alerted defendants to the seriousness and extent of plaintiff's medical ailments.

Without proper medical justification, defendants prescribed medication to plaintiff that the Prison Medical Doctor believed could kill plaintiff, while failing to give him his proper medications.  They failed to authorize a diabetic diet for plaintiff for most

of his incarceration and failed to give him his Insulin on numerous occasions.  Even if plaintiff allegedly appeared at the Prison intoxicated, which plaintiff contests, there was no effort to provide the appropriate medical care to him.

Defendants forced "weekenders" to comply with unwritten policies that placed an unreasonable burden on weekend inmates to bring their medications with them, apparently for purely financial reasons.  Finally, defendants failed to train their personnel about critical Prison written medical policies for prescription medication, lost medication for weekenders, and failed to distribute prescription medication.

There are genuine issues of material fact as to whether the Prison exhibited a policy of deliberate indifference toward the serious medical needs of the weekend inmates, including Mr. Jackson.  The Prison violated its own written regulations by failing to give prescription medication to plaintiff.  The medical and correctional staff testified that "weekenders" frequently failed to get their medications and that was "common knowledge" at the Prison. Nurse Byrd testified that this failure was a frequent topic at staff meetings. The Lieutenant in charge of the "weekenders" testified that correctional officers were unfamiliar with the Prison's written policy and there was no training in this policy. Prison medical records on the weekend of May 28, 2000 confirm Mr. Jackson was not given his required prescription medications.

Mr. Jackson testified that he was taking his Klonopin before he went to the Prison on the week of his fall, and there is no reason to believe that he would have stopped taking his prescription medications, given the serious withdrawal symptoms and the dangerous consequences of that action.  Mr. Jackson's treating physicians stated in their expert reports that the failure of the Prison to give him his medications in combination

was a substantial factor in causing his injuries. There is no indication that the test, which Mr. Jackson received in the Emergency Room to detect some benzodiazepines, reliably includes Klonopin. Defendants have offered no correlation between the amount of Klonopin in one's system and the severity of withdrawal effects.

WHEREFORE, Plaintiff requests that the Court find that there are genuine issues of material fact with respect to the issues submitted by the defendants in their Motion for Summary Judgment, and that said motion be denied, and that plaintiff receive his day in court.

Respectfully submitted,

Dated: _____

_____
William C. Reil, Esquire
(Pa. I.D. No. 26833)
42 S. 15th Street, Suite 210
Philadelphia, PA 19102

**Howard Rollins, LLC**

_____
John L. Rollins, Esquire
(Pa. I.D. No. 65636)
Derrick Howard, Esquire
(Pa. I.D. No. 59922)
262 South 12th Street, Third Floor
Philadelphia, PA 19107

Attorneys for Plaintiff,
Arthur Jackson, III