**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ARTHUR JACKSON, III | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 02-3230 |
| | : | |
| DELAWARE COUNTY, ET AL | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE TO EXCLUDE TESTIMONY OF LEE M.
SILVERMAN, M.D. AND DANIEL J. GZESH, M.D. UNDER F.R.E. 702**

Plaintiff, Arthur Jackson, III ("Plaintiff" or "Mr. Jackson"), by and through his undersigned counsel respectfully submits this Memorandum of Law in Opposition to Defendants' Motion in Limine to Exclude Testimony of Lee M. Silverman, M.D. and Daniel J. Gzesh, M.D. ("Defendants' Motion in Limine")[1] under Federal Rule of Evidence 702 ("Rule 702").

**I.      Preliminary Statement**

The crux of Defendants' Motion in Limine is that expert testimony Defendants believe Plaintiff intends to elicit from Lee M. Silverman, M.D. ("Dr. Silverman") and Daniel J. Gzesh, M.D. ("Dr. Gzesh") at trial is unreliable and, therefore, should not be presented to the jury for consideration.  As set forth, _infra_, the Court must deny Defendants' Motion because, _inter alia_, Defendants are blatantly attempting to sway the Court with inaccurate and, in some instances, deliberate distortions of the record.  Unlike the expert reports written by Drs. Silverman and Gzesh, the expert reports that Defendants have provided to the Court are significantly limited in their analysis and, therefore, do not present a clear picture of the effects of Defendants' deliberate

---

[1]      Plaintiff Answers and this accompanying Memorandum are submitted in response to defendants Wackenhut Corrections Corporation's and Delaware County's respective Motions in Limine.  Plaintiff

indifference toward Plaintiff's serious, medical needs. For example, Defendants' experts focus their analysis of the cause of Plaintiff's injuries solely on events that transpired the last week of his incarceration. They fail to take into consideration the objective evidence of how Plaintiff reacted in 1998 when he was deprived of his medications and attempted to commit suicide. Defendants' experts fail to discuss the lapses in the Prison's health policies, Defendants' failure to administer Plaintiff's medications to him during any of the fourteen weekends he was incarcerated, or the cumulative effect that had on Plaintiff's health. Instead, Defendants' experts myopically have limited their analysis to reach a conclusion predetermined by the Defendants. Therefore, it is not the opinions of Drs. Silverman or Gzesh that are unreliable, but the legal conclusions drawn by Defendants, based on the biased, incomplete and flawed analysis employed by Defendants' experts.

For example, Defendants argue "Dr. Silverman has formed his opinion on causation without consideration of any objective evidence inconsistent with it . . ." Defendants' Motion in Limine, page 2, ¶ No. 5. Contrary to Defendants' assertions, however, Dr. Silverman specifically noted in his expert report of February 2, 2004, that he "reviewed depositions of Prison medical personnel, security personnel, and administrative staff." A fair and honest reading of those depositions, particularly those of Delaware County Prison's (the "Prison") Medical Director, Dr. Victoria Gessner, Defendant Deborah Perretta, Prison Nurse Miriam Byrd, and Prison Nurse Carol Ann Snell, includes statements from them not admitting liability for Plaintiff's injuries and resulting damages. Nevertheless, Dr. Silverman considered information from individuals

---

incorporates by reference its Answer and Memorandum in Support of his Answer to the All Defendants Motion for Summary Judgment, as if fully set forth herein.

favorable and unfavorable to Plaintiff, and with a reasonable degree of medical certainty, reached his conclusions that Defendants' deliberate deprivation of medical care caused Plaintiff's injuries.

Drs. Silverman and Gzesh's conclusions are based on and are entirely consistent with the substantial weight of the evidence that proves Defendants' acts and omissions throughout Plaintiff's incarceration caused his injuries. All of the physicians that actually treated Plaintiff, and Defendants' experts, James Menapace ("Dr. Menapace"), M.D. and Marc Sageman, M.D. ("Dr. Sageman"), agree that the weekend Mr. Jackson sustained his injuries Defendants' medical staff failed to provide Plaintiff with his prescribed medications, with the exception of two dosages of Insulin at 4.a.m. on May 27 and 28.[2] Drs. Menapace and Sageman do not contest that individuals receiving Klonopin might suddenly lose consciousness if deprived of the medication in an improper manner.

Even the medical staff at the Prison who were deposed recognized, and indeed were trained to determine when an inmate was experiencing withdrawal from use of benzodiazepines.[3] Defendants prescribed Klonopin, Insulin, Trazadone, and Effexor as medications for Mr. Jackson while incarcerated in the Prison on weekends.[4] However, due to the fact that individuals incarcerated only on weekends at the Prison did not receive the same level of medical care that was apparently reserved for "real inmates," Plaintiff was not given his medications after Defendants threw out the supply he brought for the duration of his weekend incarcerations.[5] Dr. Silverman confirmed in his report of

---

[2] See Exhibit "R."
[3] See Exhibit "L."
[4] See Exhibit "I."
[5] See Exhibit "T" and "B."

February 2, 2004, that on various occasions he had to replace Plaintiff's medication for him after it was lost by the Prison.

Even when Plaintiff exhibited signs of distress, Defendants' medical and correctional staff intentionally disregarded Plaintiff's symptoms and failed to follow related Prison policies that directly addressed the proper response to protect plaintiff from serious medical consequences.[6]    As a result of Defendants' overtly discriminatory provision of medical care, repeated lapses in continuity of treatment in light of defendants' written policies, and Defendants' deliberate indifference to several indications that Plaintiff was in dire need of medical care, Plaintiff was subjected to a "nightmarish" situation finally culminating when he sustained a subdural hematoma with subarachnoid hemorrhage.   Drs. Menapace and Sageman acknowledge these injuries were, in fact sustained by Plaintiff; Dr. Silverman's opinion goes one step further to conclude that the cause of Plaintiff's injuries was the systematic denial of proper medical treatment to him after a four month period of time.

Moreover, Dr. Silverman's expert opinion is rendered with an understanding and acknowledgement of just how poorly the weekend inmates were treated concerning their need for medical care.   Weekend prisoners were treated differently than other prisoners with respect to prescription medications, and there was insufficient staff to care for their medical needs.   Nurse Byrd, who testified that the policy of having weekend inmates bring in their own medications was a *"nightmare"* in practice, stated that it was "*common knowledge*" at staff meetings and with the nurses involved, that the Prison policy was a "*difficult situation*", which was discussed by the nurses "at every staff

meeting." (Byrd deposition at 44, 62-63, Exhibit "B")  This sentiment was corroborated by former Correctional Officer Sean Gardner, who stated at page 33 of his deposition: "*They would give their medicine up on Friday when we would take it up there, but they wouldn't get their medication until they were leaving on Sunday.  Some of them never got it.*" (emphasis supplied) (Gardner deposition at 33, Exhibit "C")  Defendants' experts do not address this issue of the systematic, institutional denial of medication to weekend inmates.  Instead, they narrow their search for the cause of Plaintiff's injuries to merely two days at the end of May 2000.

Plaintiff further notes for the Court that neither Drs. Menapace or Sageman discussed the possibility that Defendants' failure to properly medicate Plaintiff on the forty-three days of his incarceration was the cause of Plaintiff's injuries.  Deborah Perretta, Defendants' Health Services Administrator, admitted that Mr. Jackson did not receive his medications correctly on a daily basis from February to May 2000 during the fourteen consecutive weekends he was incarcerated.  (See e.g., Deborah Perretta deposition at 70, 92-93, 105-106, Exhibit "R"; and Exhibit "O") [7]  Drs. Silverman and Gzesh examined the totality of the deprivation of proper medical treatment into consideration when reaching their conclusions on causation.  However, as noted, Drs. Menapace and Sageman limited their focus to just the final weekend of Plaintiff's incarceration when Plaintiff admittedly was denied his Klonopin by the Prison.

---

[6] See Argument Section, Plaintiff's Memorandum of Law in Support of Answer to All Defendants' Motion for Summary Judgment, concerning Defendants Disregarded Their Knowledge of Plaintiff's Serious Medical Needs.

[7] All references to exhibits relied on herein in opposition to Defendants' Motion in Limine are to the exhibits filed along with Plaintiff's Answer and Memorandum in Support of Answer to Motion for Summary Judgment By All Defendants. Exhibit "O" is Plaintiff's graphical chart compiling Ms. Perretta's testimony as Defendant Wackenhut's corporate representative concerning the administration of Plaintiff's prescribed medications to him in 2000.

Defendants reference in their Motion in Limine pages from Dr. Menapace's reports of May 27, 2003 (pages 3-5) and Dr. Sageman's report of June 6, 2003 (pages 23-24) to suggest Dr. Silverman ignored the results of blood tests that allegedly indicate there were no traces of benzodiazepines in Plaintiff's body following his collapse at the Prison. However, the conclusions reached by Drs. Menapace and Sageman concerning Plaintiff's continued use of Klonopin are not based on blood tests. To the contrary, both based their conclusions on urine tests and studies that indicate the approximate half-life of Klonopin in Plaintiff's system. As set forth in Dr. Silverman's report, his opinion on causation was formed by actively reviewing, _inter alia_, the same medical records Defendants reference in their Motion in Limine, Dr. Silverman's unique experiences as Plaintiff's treating physician prior to and after his injuries, consultation with Dr. Gzesh, and the few medical records Defendants had not misplaced, lost or destroyed concerning Plaintiff.

In addition, Defendants suggest, incorrectly, that Plaintiff voluntarily stopped taking his Klonopin several days prior to his injuries. However, Plaintiff testified at his deposition that he tried to get the Prison to give him his prescription medication, including having his doctor fax the prescription to the Prison, and taking his medications on several occasions to the Prison on his own initative. Dr. Silverman acknowledged that he faxed and re-faxed Plaintiff's prescription to the Prison medical personnel in compliance with the Prison policy. (Dr. Silverman expert report of 2/204, Exhibit "G")

When Plaintiff was asked at his deposition of February 20, 2003, about Plaintiff's continued use of Klonopin while not incarcerated he responded unequivocally that he was taking it and explained that he was concerned about the harmful effects of not taking the

medication properly: "That's one thing Silverman drilled into my head: once you start this, you don't stop unless I tell you to and how to stop. You have to – he said, you have to wean yourself off of these medications." Defendants' counsel concluded questioning Plaintiff by asking "So the only time you didn't take those medicines would have been when you were in the Prison; is that correct?" Mr. Jackson responded, "That's correct." (Jackson deposition at 100, Exhibit "K")

Mr. Jackson was receiving 5 mg of Klonopin, which is a substantial amount. Defendants' "experts" do not discuss whether Mr. Jackson could simply stop taking Klonopin, even if he desired, without severe withdrawal effects. This is why a physician advises patients to gradually reduce Klonopin over a period of weeks or even months. As Plaintiff's treating physician, Dr. Silverman, did not recommend to Plaintiff that he stop taking his Klonopin, but in fact, communicated directly with Dr. Gessner to reiterate the need for Plaintiff to continue receiving his prescribed medications. As Plaintiff's treating physician, Dr. Silverman was also in the unique position to know if Plaintiff was exhibiting symptoms of withdrawal from alcohol or Klonopin on the days that Plaintiff was not incarcerated.

Furthermore, Dr. Gzesh wrote in his report of February 4, 2003: "He [Plaintiff] currently suffers from the neurological sequalae of a severe head injury. I believe the injury, a subdural hematoma, was *related to the deprivation* of clonazepam, which he had been receiving on chronic basis, which led to a seizure and a subsequent head injury." (Dr. Gzesh expert report, Exhibit "Q") (emphasis supplied) Concurring, Dr. Silverman attributed Plaintiff's fall to the deprivation of Insulin, withdrawal of Klonopin and the failure of plaintiff to receive any medications on the weekend that he fell. Celsus Ebba,

M.D., Mr. Jackson's personal physician, stated in a report "To a degree of medical certainty elevated blood sugar as a result of noncompliance with Insulin dosages could lead to a change of mental status and even more so if other medications, such as anti-seizure medications and anti-psychotic medications were withheld. The lack of medications could cause syncope, seizure, falls and even sudden death from cardiopulmonary event." (See Dr. Ebba Report, Exhibit "H")

Defendants' Motion in Limine is premised on the erroneous argument that Dr. Silverman ignored relevant blood tests when rendering his opinion. First, Defendants are incorrect that their experts rely upon the results of blood test in drawing their conclusion that Plaintiff voluntarily stopped taking his Klonopin. To the contrary, Defendants' experts were referring to urine tests as the basis for that opinion. As set forth more fully, infra, irrespective of whether urine or blood tests indicated there were no benzodiazepines in Plaintiff's system, the medication may not have been detected for reasons other than his failure to take the medication on days he was not incarcerated. Second, Dr. Silverman noted among the list of documents he reviewed, the medical records obtained from Crozer-Chester medical records to which Defendants refer. Third, the literature Dr. Menapace references in his report in support of his conclusion that Plaintiff had not taken his Klonopin several days before his injuries clearly notes that the length of time Klonopin might have been detected in Plaintiff's system varies based on a number of factors:

> The duration of excretion of detectable amounts of drug in the urine following the last intake is **_highly variable_**. A general rule of thumb is five plasma half-lives. **_This is simply a rough estimate_** given the following variables: route of administration, amount of drug taken, frequency of use, individual metabolism, urinary pH, and drug storage within the body.

In addition, the table Dr. Menapace obtained from the text, <u>Clinical Management of Poisoning and Drug Overdose</u>, Second Edition, lists the following variables as effecting the length of time Klonopin would be detectable in a person's system: "drug metabolism and half-life; subject's physical condition, fluid balance, and state of hydration; and route and frequency of ingestion." The text further concludes ***"These are general guidelines only."*** Despite these express reservations in the literature that Dr. Menapace relies upon to form his opinion, Defendants inexplicably present Dr. Menapace's statement to the Court as conclusive evidence of a disputed fact.

Even Dr. Victoria Gessner, the Prison Medical Director, noted at her deposition that metabolism and other factors effect the length of time that Klonopin may be detectable in an individual's system:

> Q:    [By Plaintiff's Counsel]:  Last question, five half lives is that a number of days?
>
> A     [Dr. Gessner]:  No, it depends on the half life.  So, if you take a drug that's out of your system or say the drug level you reach is a steady state level and you – it's the length of time its takes for that blood level to be cut in half.  If depends on how you metabolize it.  If that's 24 hours, normally after it's cut in half by five, we can consider it to be out of your system.
>
> Q:    Does the half life change depending upon the patient's weight?
>
> A:    It depends on many, many things, but there's – that's why there's a range, but certain drugs are known to have long half lives, some are very short.
>
> Q:    Does it change if they have other medical conditions?
>
> A:    Yes.
>
> Q:    Does it change if they're taking other medications for those medical conditions?
>
> A:    Yes, within a certain range.

(Gessner deposition at p. 120-121, Exhibit "I")  Thus, Dr. Silverman relied upon the entire record to form his opinion, and did not selectively ignore pertinent details as Defendants suggest.

Finally, according to Plaintiff, when he reported for incarceration in February 2000 he was also informed that he would receive a diabetic diet.  (Jackson deposition at p. 101, Exhibit "K")  However, the breakfast he received from the Defendants consisted of doughnuts, and other sweets for lunch.  (Jackson deposition at p. 76 and 103, Exhibit "K")  In fact, according to the records produced by Defendants, Plaintiff's diabetic diet was not authorized to begin until April 3, 2000 and only to last until May 3, 2000.  (Byrd deposition Exhibit "B", attached Diet Order Form)  On the weekend of May 28, 2000, plaintiff received a high sodium nitrate lunch consisting of processed meat.  (Jackson deposition at p. 76-77, Exhibit "K")[8]  Dr. Silverman takes all of these facts into consideration when he opines that the combined effect of Defendants denying Klonopin and Insulin to Plaintiff the weekend he collapsed, struck his head on the concrete and suffered a subdural hematoma, was caused by Defendants.  Conversely, Defendants' experts do not address the cumulative effect of Plaintiff not being denied his various prescribed medications.

Defendants attempt to confuse the record with other baseless, unsubstantiated arguments to give the appearance that Plaintiff's experts' testimony is unreliable and must be rejected by the Court.  To the contrary, valid medical opinions that are formed over years of study, examination of the plaintiff, and review of relevant medical records is permissible under Daubert, particularly concerning well-documented ailments, like the

---

[8] Defendants were unable to produce documentation to refute Mr. Jackson's recollection of the numerous non-diabetic meals he was served.

sudden loss of consciousness individuals experience when they are deprived of benzodiazepines, like Klonopin.    Accordingly, Plaintiff respectfully requests that Defendants' Motion in Limine be denied.

## II.    Argument

### A.    Standard of Review

Federal Rule of Evidence 702, Testimony by Experts ("Rule 702") states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct. 2786, 125 L.2d 469 (1993), the United States Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony pursuant to Rule 702.    As further explained in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), "The objective of that [Daubert] requirement is to ensure the reliability and relevancy of expert testimony.    It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

The "helpfulness" standard of Rule 702, which requires that scientific evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue -- a condition that goes primarily to relevance -- requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.    In determining whether a theory

or technique is scientific knowledge that will assist the trier of fact, so as to be the basis

of admissible evidence under Rule 702, a key question to be answered is (1) ordinarily,

whether the theory or technique can be and has been tested; (2) a pertinent consideration

is whether the theory or technique has been subjected to peer review and publication,

although the fact of publication, or lack thereof, in a peer-reviewed journal is not a

dispositive consideration; (3) the court should ordinarily consider the known or potential

rate of error of a particular scientific technique; (4) the assessment of reliability permits,

but does not require, explicit identification of a relevant scientific community and an

express determination of a particular degree of acceptance of the theory or technique

within that community, as (a) widespread acceptance can be an important factor in ruling

particular evidence admissible, and (b) a known technique that has been able to attract

only minimal support within the scientific community may properly be viewed with

skepticism; and (5) the inquiry is a flexible one, and the focus must be solely on

principles and methodology, not on the conclusions that such principles and methodology

generate.  Rule 702 is to be liberally applied to err in favor of permitting testimony, as

opposed to precluding it.  See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 743 (3d

Cir. 1994)

    **B.    Drs. Silverman's and Gzesh's Conclusions On Causation
            Are Well-Known and Documented In The Medical Profession.**

    As noted, supra, Dr. Menapace relied upon studies reflected in Clinical

Management of Poisoning and Drug Overdose, Second Edition, to form his opinion

concerning the approximate half-life of Klonopin in an individual's system.  Although

Plaintiff and his respective experts disagree that the approximate duration of the

medication in Plaintiff's system definitely was three days as Dr. Menapace opines, other

information in <u>Clinical Management of Poisoning and Drug Overdose</u> should be brought to the Court's attention.

For example, on page 807 of that text the authors note that "The specific mechanism of benzodiazepine interaction with ethanol is complex and not completely understood." In discussing the withdrawal syndrome that some patients receiving Klonopin experience, the authors state:

> Physiologic addiction, characterized by somatic withdrawal symptoms after cessation of the therapy, occurs with benzodiazepines. Clinically, the benzodiazepine withdrawal syndrome is similar to barbiturate or alcohol withdrawal; however, benzodiazepine withdrawal occurs less frequently and is usually less severe. Withdrawal is more likely to occur if (1) the duration of therapy is greater than 4 months, (2) high doses have been taken, (3) the drug is abruptly discontinued, and (4) a short-acting drug is used. . . . The onset and severity of symptoms will vary with the type of benzodiazepine involved.

<u>Clinical Management of Poisoning and Drug Overdose</u>, pp. 812-813.

Dr. Silverman specifically warned Defendants when Plaintiff was initially incarcerated in February 2000 that Plaintiff might be susceptible to injury due to the withdrawal syndrome. Plaintiff testified that he also tried in vain to alert Defendants to the possibility that he was exposed to serious health complications if he did not receive his medications in a proper and timely manner, but Defendants' still ignored the warnings.

Prison Nurse, Carol Ann Snell, vividly testified about the effects of the withdrawal syndrome an individual experiences when suddenly being deprived of their Klonopin:

> Q:    [By Defendants' Counsel]: When you said that Librium is used to bring somebody down from Benzodiazepine, what do you mean by that?

13

A:      [By Nurse Snell]:  You don't want somebody who has been on Benzodiazepine long term to come off of those completely without coming down in gradual steps.  When you're saying coming down, I mean without coming away from that medication in gradual steps.

Q:      If they've been on Benzodiazepine for a long period of time and they just go cold turkey, if you will, if they stop, what happens?

A:      Well, over a period of time, because Benzodiazepine could stay in your system for a considerable amount of time.  So over a period of time, the eventuality is if they do not receive that medication, at some point.  When I say some point, I'm talking like anywhere between a week to two-week interval, they are going to have problems.  They're going to shake.  They're going to have detox symptoms.

Q:      They're going to have withdraw symptoms?

A:      Yes, they are.

(Snell deposition at p. 40-41, Exhibit "L")

Despite this knowledge that an inmate on Klonopin or other benzodiazepines might have problems if their withdrawal from use of Klonopin is not tapered, Nurse Snell testified that weekend inmates, like Plaintiff, were not given Klonopin even in emergency situations:

Q:      [By Defendants' Counsel]:  Nurse Snell, what if Mr. Jackson would appear on the weekend on a Friday without his medications, say he didn't bring his Klonopin, what would be done?

A:      [Nurse Snell] Well, unless the nurse got approval from the medical director at that time or the physician on call, which is usually the medical director on the weekend, to give from *our own count our own narcotic count* - -

Q:      Do you keep Klonopin in stock?

A:      We keep some, not usually any quantity.  Maybe for emergency situations, we keep a card perhaps the card is like thirty pills.

Q:    [By Defendants' Counsel]: What would you consider an emergency?

A:    [By Nurse Snell]: If we have somebody in-house who is having a major panic attack, claustrophobic, having problems breathing.

Q:    You said in-house, is that opposed to a weekender?

A:    As a weekender, yes.

Q:    Why wouldn't you have it for weekenders?

A:    Because weekender people are not - - they're still under the care of their own physician. Five days a week they're receiving whatever follow up they need to supposedly from their own doctor.

(Snell deposition at p. 37-38, Exhibit "L") Defendants' policy on Use of Controlled Substances Number 405.5 required the Prison stock Klonopin for Mr. Jackson, just like any other inmate: "WCC health facilities will maintain a minimum stock of controlled substances necessary for the sound practice of medicine and dentistry in a correctional environment. Any time these controlled substances are no longer needed at a facility, the stock must be immediately removed from the facility."

Therefore, the records reviewed by Dr. Silverman were more than sufficient to reach the conclusion that Defendants' refusal to heed the warnings it received concerning Plaintiff's serious medical condition, and the well-documented withdrawal syndrome, supported his conclusion on causation. Conversely, Drs. Menapace and Sageman give little weight or consideration to the possibility that Defendants' deliberate indifference to Plaintiff properly receiving his Klonopin was the cause of his injuries.

C.    **Drs. Silverman and Gzesh's Proposed Testimony "Fit" The Facts Of This Case.**

As indicated above, Drs. Silverman's and Gzesh's reports are based on more than a cursory review of records without examining Plaintiff, like Dr. Menapace, or the

opinion reached by Dr. Sageman based on selective information.  To the contrary, Drs. Silverman and Gzesh based their reports on years of work as practitioners and direct, first-hand treatment of Plaintiff's ailments.  Thus, Drs. Silverman's and Gzesh's proposed testimony is consistent with the principles enunciated by the Third Circuit in In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 743 (3d Cir. 1994) ("Paoli Railroad").

Paoli Railroad concerned a suit brought by 38 people who had either worked in or lived adjacent to a rail yard (the "Paoli Railroad Plaintiffs").  The Paoli Railroad Plaintiffs sought damages resulting from exposure to polychlorinated biphenyls (PCBs). Following consolidation, the Honorable Robert F. Kelly of the United States District Court for the Eastern District of Pennsylvania granted summary judgment in favor of the defendants on all claims except those for property damage and response costs under Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), and plaintiffs appealed. The Court of Appeals reversed and remanded, but on remand the District Court again granted summary judgment in favor of the defendants.  The Paoli Railroad Plaintiffs again appealed to the Third Circuit.

The Third Circuit held that for purposes of the rule of evidence requiring experts to rely on data of the type reasonably relied upon by experts in a particular field, it is the judge, not the expert, who determines reasonable reliance.  The Court also held that the Paoli Railroad Plaintiffs' medical expert's methodology used to opine about damages sustained by some of the Plaintiffs was properly excluded because the expert had not examined the Plaintiffs, nor did the Court deem as reliable the medical history the expert received for the Plaintiffs.  However, the Court held that the District Court violated the

tenets of Rule 702, Daubert, and its progeny by excluding testimony from the expert that was premised on examinations and history the expert actually conducted and gathered.

In this regard, Drs. Silverman's and Gzesh's opinions and resulting conclusions are far more reliable than those of Drs. Menapace and Sageman. Regarding Dr. Menapace, he never even examined Plaintiff to properly determine if he still lingered from the effect of the subdural hematoma he sustained on May 28, 2000. Dr. Sageman conducted a brief examination of Plaintiff, but limited his discussion to the possibility that Plaintiff's injuries all resulted from deprivation of his Klonopin by Defendants for only a two day period of time.

Conversely, Drs. Silverman and Gzesh personally examined Plaintiff both prior to and after his injuries at the Prison. They had observed and treated him for his ailments, and were familiar with the progress he was making with his treatments. Dr. Silverman engaged in the standard procedures of differential diagnosis by reviewing voluminous records generated as a result of Plaintiff's injuries, and was able to determine that Plaintiff's injuries were caused by Defendants. Thus, Drs. Silverman's and Gzesh's methodologies used to determine the cause of Plaintiff's injuries are consistent and permissible under the prevailing standards:

> [W]e think that evaluation of the patient's medical records, like performance of a physical examination, is a reliable method of concluding that a patient is ill even in the absence of a physical examination. . . Hence, we think that generally, a doctor only needs one reliable source of information showing that the plaintiff is ill and either a physical examination or medical records will suffice—but the doctor does need at least one of these sources.

Paoli, 35 F.3d at 762.

**D.      Dr. Silverman's Opinion On Causation Takes Into Account
         <u>Objective Evidence Received From Plaintiff and Defendants.</u>**

Again, one of Defendants' assertions is that Dr. Silverman's opinion on causation was formed without consideration of any objective evidence inconsistent with his conclusions.  However, this erroneous and misleading accusation could have only been reached by Defendants as a result of an unintentional misinterpretation of the expert report submitted by Dr. Silverman, or as Defendants' continuing attempt to limit, distort and confuse the record in this case.  Contrary to Defendants' assertions, Dr. Silverman specifically noted in his expert report of February 2, 2004, that he "reviewed depositions of Prison medical personnel, security personnel, and administrative staff."  In addition, Dr. Silverman noted that he also reviewed exhibits from each of the aforementioned depositions, incident reports, Prison security and voluminous medical policies, as well as the medical records for Plaintiff.  Further, Dr. Silverman's opinion was formed not merely from all of those pertinent records, but also from the medical records from Crozer-Chester Medical Center, which is where Plaintiff was taken after he sustained his injuries while in Defendants' custody and care.  Finally, Defendants' place no significance on the fact that in addition to thoroughly reviewing various documents concerning Plaintiff's injuries, Dr. Silverman relied upon his direct, first hand knowledge of Plaintiff's medical condition prior to the incident on May 28, 2000, and since that time.

**E.      Defendants' Assertions That Dr. Silverman Ignores
         <u>Relevant Tests Is Erroneous And Intentionally Misleading.</u>**

Defendants also assert that Dr. Silverman did not consider any blood test results, when in fact the blood test results from Plaintiff's emergency treatment at Crozer-Chester

Medical Center are reflected in the medical records Dr. Silverman specifically indicated

in his February 2, 2004, expert report were reviewed.    Additionally, Dr. Silverman

clearly took into consideration Mr. Jackson's history of alcohol use when forming his

opinion on causation.  He noted in his report of January 21, 2003, that Plaintiff was

subject to binge drinking.  Nevertheless, by examining Plaintiff since his injuries to the

present, Dr. Silverman was able to eliminate Plaintiff's alcohol use as the cause of his

injuries.  Instead, Dr. Silverman determined the following:

> [H]e had a history of binge alcohol abuse.  At first he had periods of
> sobriety with infrequent binges and then largely long periods of sobriety
> with very infrequent binges.  My understanding is that he had a history of
> liver disease probably related to his alcohol use and chronic pain.  In spite
> of this he had a good response to the medication that I used to treat him for
> his anxiety and depression.  He was always punctual had a very clear
> sensorius and no cognitive problems whatsoever.  He never appeared
> intoxicated in my office.   He was very articulate, intelligent and
> spontaneous in regards to his interactions with me.
>
> After the closed head injury that occurred in prison there is a significant
> change in regards to Mr. Jackson's personality, cognition, and speech.
> There is no question in my mind whatsoever that this change was due to
> the closed head injury sustained in prison.  In addition, since there has
> been a period now of several years since the injury occurred and the large
> majority of these symptoms have persisted without significant
> improvement, it is my belief that they are now chronic and permanent.

(See Dr. Silverman's Report of January 21, 2003)    Dr. Silverman specifically

incorporated this report into his final report of February 2, 2004; thereby placing before

the Court Dr. Silverman's examination of Plaintiff with regard to his alcohol use,

successful treatment, and current problems which manifested themselves after Plaintiff's

collapse on May 28, 2000.

Defendants' emphasis on the so-called negative benzodiazepine test at Crozer-

Chester Medical Center on May 28, 2000, is misplaced irrespective of whether it is based

on a blood or urine test. There is no defense expert who opines that the test reliably measures for the presence of **all** benzodiazepines, including Klonopin. In a medical article entitled "Serum & Urine Drug Screen Testing in the ED" by Kirk C. Mills, M.D., (see Exhibit "S") it is stated that there are over 21 different benzodiazepines available in the United States (including Klonopin) and that "a negative test does not rule out the possibility that BZD's are responsible for a patient's condition due to a negative result." Dr. Mills writes that "Therefore, BZD's lacking that particular metabolite will have a lower affinity for detection and may be missed by standard screening methods (e.g. clonazepam, flunitrazepam)." Clonazepam is the generic name for Klonopin, which is the prescription medication that Mr. Jackson was prescribed.

> **F.**    **Dr. Silverman Considered Alternative Theories of Causation, And Within A Reasonable Degree of Medical Certainty, Determined Defendants' Caused Plaintiff's Injuries.**

Defendants assert that Dr. Silverman's expert report fails to address alternative theories of causation relative to Plaintiff's injuries. However, Dr. Silverman specifically discussed within the context of his report, the impact and affect the various drugs Plaintiff was prescribed and receiving, his alcohol use, and Defendants' deprivation of Plaintiff's medications both prior to and on the weekend of May 28, 2000.

Conversely, Drs. Menapace and Gzesh attempt to "place the bunny in the hat" by limiting the focus of the time that Plaintiff did not correctly receive his medications from the forty-three days he was incarcerated in 2000, to only the two days that passed the final weekend he was incarcerated in Delaware County. In this regard, Dr. Silverman's expert report is more reliable than those generated by Defendants experts because Dr. Silverman does not dismiss, without justification or discussion, the testimony of

Defendants' corporate representative, Deborah Perretta, who confirmed under oath that Plaintiff did not receive any of his medications correctly during the forty-three days he was incarcerated.

### G.    Dr. Silverman Did Not Solely Rely On Plaintiff's Statements.

Further to this point, Defendants assert that Dr. Silverman's expert opinion should be excluded because he has relied upon "inaccurate and inconsistent statements" from Plaintiff. As set forth more fully, infra, any statements from Plaintiff that are inconsistent relate to his credibility, not that of Dr. Silverman's. Moreover, Defendants once again, intentionally overlook the fact that Dr. Silverman specifically references much more than Plaintiff's statements to form his opinion on causation. Dr. Silverman's opinion was formed based on various documents, both favorable and unfavorable to Plaintiff, as well as knowledge of Plaintiff's medical condition that was formed over a period of years, not two hours as with Dr. Menapace.

Defendants further suggests that the fact that Dr. Silverman's testimony should be excluded because he indicated incorrectly that he began treating Plaintiff in 1998 and there is a reference in a letter to Plaintiff's counsel concerning Plaintiff's sobriety when he appeared for a medical examination. Defendants have not cited to any case directly on point with this argument, because no court has precluded an otherwise valid expert opinion because of a typographical error.

Moreover, it is important to underscore the fact that Dr. Silverman did not attempt to conceal any facts from Defendants that might suggest an inconsistency in his opinion concerning the cause of Plaintiff's injuries. It is only as a result of receiving Dr. Silverman's records from him are Defendants even able to determine that the correct year

he began treating plaintiff was August 1996, not August 1998. Dr. Silverman's obvious typographical error is hardly the basis on which to exclude his testimony.

Similarly, Dr. Silverman has consistently been candid with the Court and Defendants concerning Plaintiff's alcohol use, even noting that Plaintiff has binged on alcohol while being treated by Dr. Silverman prior to the incident on May 28, 2000. Defendants merely seek to misconstrue ordinary words to give them sinister meaning. Just because Dr. Silverman, wrote Plaintiff did not "appear" intoxicated in his office, does not mean that Dr. Silverman did not detect alcohol in his system through other means.

Finally, with regard to Defendants' desperate attempt to exclude Dr. Silverman's testimony, Defendants assert that Dr. Silverman was blatantly lead to his conclusions by Plaintiff's counsel. This attack upon Dr. Silverman and Plaintiff's counsel is without merit. Again, Defendants' attempt to mislead the Court by taking statements out of context and/or limiting those statements to only what Defendants want the Court to read or hear. Although Plaintiff's counsel provided questions to Dr. Silverman to obtain his opinion requested in his letter of January 21, 2003, concerning Plaintiff's treatment, the final question presented to Dr. Silverman requested that he "Please address any other concerns you deem relevant to Mr. Jackson's injury sustained on May 28, 2000." Thus, Dr. Silverman was given an open-ended opportunity to expound on his conclusions and thoughts. In addition, before addressing Plaintiff's counsel's questions, Dr. Silverman wrote a lengthy introduction to his response to frame the context in which he determined Defendants were liable for Plaintiff's injuries. Dr. Silverman also provided reports on

February 20, 2001, and the February 2, 2004, to Plaintiff's counsel that demonstrate Dr. Silverman held a consistent view of Defendants' culpability for Plaintiff's injuries.

Regarding the arguments Defendants have asserted for excluding the expert testimony of Daniel J. Gzesh, Plaintiff responds that Dr. Gzesh also treated Plaintiff both prior to and after he sustained his injuries on May 28, 2000. As the Paoli Railroad Court observed, an examination of an individual presents a reliable basis for an expert to form an opinion on a particular matter. Here, Dr. Gzesh based his opinion on years of direct, first-hand knowledge of Plaintiff's condition as Plaintiff's treating physician.

### H.    Relevant Case Law Does Not Support Exclusion.

Defendants have confused the issue of whether the proffered testimony from Drs. Silverman and Gzesh is scientifically valid with whether this Court believes Plaintiff's experts have correctly applied the appropriate methodology. Essentially, the inquiry proposed to the Court by Defendants, would require the Court to determine whether, in this particular case, it believes the experts have applied the science correctly. See e.g., Glastetter v. Novartis Pharms. Corp., 252 F.3d 986 (8th Cir. 2001). Not only does this take the Court beyond the legitimate scope of a Daubert inquiry, but it also takes the Court beyond the scope of its scientific knowledge. Thus, neither Dr. Silverman nor Dr. Gzesh are required to find a single piece of scientific data which, standing alone, proves the causal connection between Plaintiff's injuries and the alternative suggested by Defendants' expert.

As noted in Rosen v. CIBA-Geigy, 78 F.3d 316, 319-20 (7th Cir. 1995), cert. denied, 519 U.S. 819 (1996), this is almost always impossible because it is the combination of many pieces of evidence, no one of which is sufficient, which makes up a

causation judgment. Defendants have merely attempted to focus their argument on the methodology of aggregating evidence to reach a final conclusion in hope that the Court will concur that this is the method Drs. Silverman and Gzesh must have followed. This defense line of argument is clearly wrong. Aggregation of scientific evidence is how science is done. A contrary holding reflects a fundamental misunderstanding of the scientific process, particularly as it relates to medical causation issues.

In Briedor v. Sears, Roebuck & Co., 722 F.2d 1134 (3d Cir. 1983), the Third Circuit reversed a judgment for the manufacturer and retailer of a refrigerator and remanded in a products liability action in which it was alleged that the refrigerator was defective. The Third Circuit held that the district court abused its discretion to the extent that the allegedly speculative nature of the testimony was the basis for the district court's refusing to permit the expert to state his opinion as to the probable cause of the fire. According to the Third Circuit, the district court abused its discretion because the testimony fell within the ambit of Rule 702 since it was helpful to the trier of fact in determining the origin of the fire. Stressing that helpfulness is the touchstone of Rule 702, the court declared that the mere fact that the expert could not identify a specific defect in the refrigerator in which the fire allegedly began did not mean that he was speculating when he offered his expert opinion as to the cause of the fire. Moreover, the appellate court stated, the expert's testimony indicating the probable cause of the fire was an electrical malfunction in the refrigerator thermostat would be helpful to the jury because it would provide an explanation of how a fire could have started in the upper part of the refrigerator, as opposed to the expert testimony of a defense witness that the fire started outside the refrigerator.

The Third Circuit observed that the testimony was not speculative or lacking foundation in that the expert had eliminated all possible causes of fire except for a malfunction in the refrigerator thermostat.  The court found the error to be harmful as affecting the buyers' substantial rights by impairing their ability (1) to counter evidence that the fire started outside the refrigerator, and (2) to prove that a fire that started inside a refrigerator could have escaped and caused their house to catch fire.  See also, Linkstrom v. Golden T. Farms, 883 F.2d 269 (3d Cir. 1989) (Third Circuit held that the district court erred in refusing to permit plaintiff's farm safety expert to testify regarding safety practices a reasonable and prudent farmer would follow since testimony would have been helpful to jury).

In Marks v. Mobil Oil Corp., 562 F.Supp. 759 (E.D. Pa. 1983), aff'd without op 727 F.2d 1100 (3d Cir.), a personal injury action arising out of a collision between a small car and the defendant's tanker truck, the Third Circuit stated that expert testimony concerning aerodynamic effects was clearly helpful to the trier of fact under Rule 702. The owner of the tanker truck had apparently objected to the expert testimony of the plaintiffs' witness to the effect that the excessive speed of the truck and its aerodynamic effect on the small car was the proximate cause of the accident, on the basis that he was not qualified to render an opinion on the effect of a large speeding tanker on nearby vehicles. The court noted that under the circumstances of the case--that is, where the accident had occurred rapidly and with only a few eyewitnesses to it--expert testimony was clearly of assistance to the trier of fact, and both the plaintiff and the defendant had presented such evidence. The court stated that the attacks on the expert testimony went to the weight of his opinions, rather than to their admissibility as evidence.

Thus, as the controlling precedent in this Circuit indicate, this Court's task in determining scientific validity is not whether Drs. Silverman and Gzesh used an accepted methodology correctly, but whether they have expressed opinions which adhere to the "intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152. Contrary to what Defendants seem to suggest, adhering to the intellectual rigor of the expert's discipline does not mean producing opinions in which there is no dispute regarding whether a scientific methodology was correctly applied or whether the evidence relied upon supports the conclusion reached.

## III.    Conclusion and Summary

As the Court noted in Wallace Motor Sales, Inc. v. American Motors Sales, 780 F.2d 1049, 1062 (1st Cir. 1985), "[T]here is a distinction between proof which allows the jury to make a 'just and reasonable inference' of damages and proof which only provides a basis for 'pure speculation or guesswork.' " quoting Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed 652 (1946). Plaintiff's expert have provided to the Court opinions of causation that are just and reasonable inferences based on the substantial weight of the evidence that demonstrates Defendants' deliberately deprived Plaintiff of his prescribed medications. Defendants have either ignored relevant facts to suggest only their experts could be right about the case of Plaintiff's injuries sustained on May 28, 2000, taken statements and events out of context, or latched onto minor issues, like typographical errors, to challenge medical opinions specifically concerning Plaintiff that were formed by his treating physicians over a number of years.

Daubert requires that the testimony offered by Plaintiff be reliable and relevant. In this regard, the opinions of Dr. Silverman and Dr. Gzesh easily meet this standard.

**WHEREFORE,** Plaintiff respectfully requests that the Court deny Defendants' Motion to exclude the testimony of Lee M. Silverman, M.D. and Daniel J. Gzesh, and that Plaintiff receive his day in court.

Respectfully submitted,

Dated:  April 5, 2004                                    _____

John L. Rollins, Esquire
(Pa. I.D. No. 65636)
Derrick Howard, Esquire
(Pa. I.D. No. 59922)
262 S. 12th Street, Third Floor
Philadelphia, PA 19107
(215) 545-0522


William C. Reil, Esq.
(Pa. I.D. No. 26833)
42 S. 15th Street, Suite 210
Philadelphia, PA 19102

ATTORNEYS FOR PLAINTIFF