**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ARTHUR JACKSON, III | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| DELAWARE COUNTY; WACKENHUT | : | |
| CORRECTIONS CORPORATION C/O | : | |
| PRENTICE HALL CORP.; WACKENHUT | : | |
| CORPORATION; DELAWARE COUNTY | : | |
| BOARD OF PRISON INSPECTORS; | : | |
| CHARLES SEXTON, CHAIRMAN OF | : | |
| DELAWARE COUNTY BOARD OF | : | |
| PRISON INSPECTORS; GEORGE HILL, | : | |
| SUPERINTENDENT OF DELAWARE | : | |
| COUNTY PRISON (GEORGE W. HILL | : | NO. 02-3230 |
| CORRECTIONAL FACILITY); JAMES | : | |
| JANECKA, WARDEN OF DELAWARE | : | |
| COUNTY PRISON; DEBORAH | : | |
| PERRETTA, HEALTH SERVICES | : | |
| ADMINISTRATOR OF DELAWARE | : | |
| COUNTY PRISON; MARGARET | : | |
| CARRILLO, M.D., DELAWARE | : | |
| COUNTY PRISON; DR. FREDERICK, | : | |
| DELAWARE COUNTY PRISON; DR. | : | |
| HOLLAND HULL, DELAWARE | : | |
| COUNTY PRISON; MERRIAM BYRD, | : | |
| NURSE, DELAWARE COUNTY | : | |
| PRISON; CAROL SNELL, NURSE, | : | |
| DELAWARE COUNTY PRISON | | |

**DEFENDANTS' REPLY TO PLAINTIFF'S ANSWER TO DEFENDANTS'
MOTION IN LIMINE TO PRECLUDE TESTIMONY OF DRS. DANIEL J. GZESH
AND LEE M. SILVERMAN UNDER F.R.E. 702**

Defendants hereby Reply to Plaintiff's Answer to Defendants' Motion In Limine to

Preclude the Testimony of Drs. Lee M. Silverman and Daniel J. Gzesh, and offer the below brief

in support of said reply. Plaintiff's Answer to Defendants' Motion ignores most of the substantive

issues raised by Defendants therein and instead restates his liability and causation case and

further attempts to deflect the court's attention from those issues to improperly raised issues

concerning Defendants' experts.  Finally, in his ten page long "Preliminary Statement" Plaintiff feigns indignation and further attempts to distract the court with inflammatory comments about Defendants' motivations such as alleged "inaccurate, and in some instances, deliberate distortions of the record."  However, except for undersigned counsel's mistaken references to urine tests as blood work, there are neither inaccuracies nor distortions of the record in Defendants' Motion.

Plaintiff is correct in his statement at the beginning of his 10 page diatribe that "the crux of Defendants' Motion in Limine is that expert testimony Defendants believe Plaintiff intends to elicit from Lee M. Silverman, M.D. … and Daniel J. Gzesh, M.D. … at trial is unreliable and therefore should not be presented to the jury for consideration."  None of Plaintiff's arguments and opinions concerning the analysis of Defendants' experts which follows, is at all relevant to that issue.  The issue is the reliability of <u>Plaintiff's</u> experts, not that of Defendant's experts.

Nor is the issue Plaintiff's counsel's ability to recite and argue the strengths of his case. The issue is whether his experts' conclusions can be relied upon if their methodology involves reviewing, but dismissing without comment or discussion evidence on the record which is inconsistent with their conclusions.

A central point of Defendants' Motion is that Drs. Silverman and Gzesh ignore evidence of record which contradicts their conclusions.  Plaintiff goes to great lengths to assure the court that the Doctors reviewed depositions and medical records and other unspecified "information from individuals" containing evidence unfavorable to their patient.  As helpful and self-serving

as this is[1],  however, it largely misses the point.  Although it is unclear from their reports what specific evidence each of the doctors did review in the first instance, the major issue isn't whether the doctors read the documents, it is whether they address the evidence in any meaningful way in their reports.

For instance, Dr. Gzesh presumably knew that Plaintiff was an alcoholic, since he was actively treating him, and he also presumably knows from his medical training that alcohol withdrawal is an obvious alternate cause of the incident at the prison in which the Plaintiff lost consciousness and fell, striking his head. However,  nowhere in his reports does he address the issue of whether withdrawal from alcohol, rather than withdrawal from Klonopin and/or insulin might be an alternative cause of the fall at prison.  The absence of the barest thread of a discussion of the issue in his reports is what leads to the inference that he ignored the evidence, even if the Court gives him the benefit of the doubt that he familiarized himself with it in the first instance.

Similarly, Plaintiff assures us that Dr. Silverman reviewed all deposition transcripts, yet in the only one of his three reports which even touches on the issue of withdrawal from alcohol as an alternative cause, Dr. Silverman inexplicitly states that "given that Mr. Jackson was not

---

[1] Plaintiff's representations to this effect in his brief, it should be noted are not evidence.  The only <u>evidence</u> in this case of what <u>evidence</u> the doctors even reviewed, much less considered and evaluated in forming their opinions is what their reports state.  Dr. Gzesh's 7/25/00 report mentions Crozer-Chester Hospital records and obliquely references a prior treatment several years prior.  His 2/4/03 report mentions no evidence or record at all, and appears to base the opinion expressed therein entirely on his own treatment of the plaintiff. There is no mention of any deposition transcripts or prison records, or social security administration records in either report.  Dr. Silverman mentions Crozer-Chester Hospital records in his 1/21/03 report, and, in his 2/4/04 report, the "records of Arthur Jackson III regarding the injury" including specifically "depositions of prison medical personnel, security personnel, and administrative staff" as well as unspecified "exhibits to these depositions, incident reports, Prison security and medical policies, and medical records for Arthur Jackson".  Notably absent is his patient's own deposition testimony, and the report of the interview of his patient with Dr. Marc Sageman which occurred over six months previous, on June 6, 2003 both of which, as noted above containing explicit admissions that he was drinking regularly during the period of his incarceration.  We have no direct evidence that the doctors reviewed any other evidence, although we can presume that they were familiar with their own records.

intoxicated at the time nor was he drinking on a regular [sic], it is my belief that the seizure was more likely due to abrupt cessation of the Klonopin and lack of insulin."  What makes this statement inexplicable is the 'given' that ignores the existence of numerous uncontradicted points of evidence to the contrary, including the sworn deposition testimony of Plaintiff himself, that confirm that he was, in fact drinking and doing so regularly during the time in question.  So, if we take as a 'given' that Dr. Silverman read the transcript of Plaintiff's testimony, and that of Guard Sean Gardner, who described Plaintiff as "falling down drunk" nearly every weekend admission except the one in which the incident occurred, as well as the report of Dr. Marc Sageman, which contains that same admission by Plaintiff (that he was regularly drinking during this period), made in the presence of his own attorney, then we are left with the inescapable conclusion that Dr. Silverman has ignored this evidence, a conclusion which is further buttressed by the fact that none of this evidence is referenced, much less discussed in any of his three reports prepared for this litigation.

We also know, because he participated in it, that Dr. Silverman was aware of Plaintiff's 1996 Social Security disability application in which he claimed nearly identical cognitive deficits to those which Dr. Silverman now ascribes to his fall at the prison four years later.  However, none of Dr. Silverman's three reports prepared specifically for this litigation bother to mention it, much less discuss it or attempt to reconcile it with his current opinion on the causation of Plaintiff's damages.  Dr. Gzesh's reports do not mention or discuss it either, and he reaches the same conclusion as Dr. Silverman with regard to the causation of  Plaintiff's claimed cognitive deficits.  Yet, Plaintiff assures the Court that Dr. Gzesh reviewed all relevant evidence. Logically, Plaintiff must have either been lying about having the deficits when he applied to the Social Security Administration, or he must have already had the deficits prior to the fall at the

prison.  Perhaps he got better in the interim?  Not likely, since he was claiming, and was awarded a **permanent** disability as a result of them, but we don't know because neither Dr. Gzesh or Dr. Silverman discuss the issue **at all**.

In his Brief in support of his Answer to the Motion[2], Plaintiff insists over and over that "Dr. Silverman relied on the entire record to form his opinion" and "Dr. Silverman takes all of these facts into consideration when he opines".  Yet, Plaintiff does not point to anything in Dr. Silverman's three reports that support this statement, preferring instead to merely recite various excerpts from various witness' testimony which are consistent with (but not even discussed within) his opinion.  Even if Dr. Silverman is presumed to have read these transcripts, there is nothing in the record to suggest that he 'relied' upon them, or that he 'took them into consideration".  The fact that they exist, and even the 'fact' that they were made available to Dr. Silverman for review, do not lead us inexorably to the conclusion that Dr. Silverman gave them measured and thoughtful –or any- consideration, especially where his reports neither discuss them, nor the larger issues raised by their existence (i.e. a discussion on the effects of causes and effects of alcohol withdrawal versus Klonopin or insulin withdrawal).

Then there is the issue of causation of Plaintiff's alleged cognitive deficits. Contrary to the considered opinions of Drs. Silverman and Gzesh that Plaintiff suffered certain cognitive deficits, such as inability to remember to take his medications, and inability to maintain attention to complete a task, solely as a result of his fall at the prison, there is highly probative evidence on the record that Plaintiff in fact already suffered from these exact deficits.  That evidence is a 1996 Social Security Disability proceeding in which Plaintiff claimed identical cognitive deficits had already rendered him completely disabled.

---

[2] On page 10, for instance.

So, it then becomes relevant to inquire upon what did Drs. Silverman and Gzesh base their opinion on causation of these injuries? According to Plaintiff, "Drs. Silverman and Gzesh examined the totality of the deprivation of proper medical treatment into consideration when reaching their conclusions on causation.[sic]"[3] To the degree that this statement makes any sense at all, it appears to acknowledge that the good doctors were viewing the available evidence through the lens provided by their patient's attorney, which appears to have completely filtered out the aforementioned Social Security proceeding, as there is no reference to it anywhere in any report or even in Plaintiff's Brief. This is particularly troubling with respect to Dr. Silverman, who, as noted elsewhere herein, actively participated in that proceeding on behalf of Mr. Jackson, but apparently developed amnesia thereafter until suddenly meeting the Plaintiff two years later, in 1998, as discussed more fully below (and previously, in Defendants' Brief in support of their motion).

Defendants also contend that Dr. Silverman's own inaccurate statements further undermine his reliability. Contrary to Plaintiff's own completely inaccurate statement that Defendants cited no case in support of this proposition, Defendant's cited to and discussed at length Pearson v. Young, 2002 U.S. Dist. Lexis 26263 (W.D. Ok. 2002) which held that such statements, even in the absence of evidence that they were intentionally made to mislead the court, were an additional *Daubert* basis for exclusion because they indicated at a minimum, a lack of intellectual rigor.

The first of the two inaccurate statements made to the court by Dr. Silverman concerned his representation, repeated verbatim in two of his three reports addressed to Plaintiff's counsel[4]

---

[3] Plaintiff's Brief, page 5
[4] And therefore, obviously intended for consideration by the court in this litigation

is that he began treating Plaintiff in August, 1998, when in fact his treatment began two years earlier. Plaintiff attempts to dismiss this as a "typo", and in buttressing that argument, states incorrectly that the only way Defendants even became aware of this discrepancy is due to the production by the Doctor of his own records. There are four problems with these contentions.

First, there is nothing in the record other than Plaintiff's statement in the brief in support of his answer to support that this was a "typo". The doctor himself has never explained the discrepancy, and is not doing so now via the argument of counsel.

Second, the "typo" was repeated in two separate reports, authored nearly two years apart.

Third, the doctor's production of records does not support this explanation, but rather makes it more implausible, for it was not from that production which began with 1998 records, that Defendants learned of this misstatement; it was from the records provided under subpoena by the Social Security Administration of the Plaintiff's 1996 disability application, for which Dr. Silverman provided a transcribed "telerecorded message".

Thus, Dr. Silverman's own response to the records subpoena *further compounded* his misstatement by inexplicably omitting the records of his treatment of the plaintiff from 1996-1998, including any mention of the disability proceeding itself.

Fifth and finally, as noted in Pearson, *supra* it is not necessary for the statement to have been made with an intention to deceive the court to raise a *Daubert* issue, it is the fact of the misstatement in the first instance which functions as an indicator of lack of intellectual rigor. Id.

The second misstatement made by the Doctor, contained in his 1/21/03 report to Mr. Rollins, is that Plaintiff "never appeared intoxicated in my office". The basis for defendants'

casting of this statement as inaccurate is Dr. Silverman's own office notes of 1/28/00 documenting "+ETOH today, a '32 oz' beer … mild alcohol intoxication".  Plaintiff responds in his answer that Defendants are "'twisting the ordinary meaning of the word' 'appeared' and that this note did not necessarily mean that Plaintiff appeared to be intoxicated, but that Dr. Silverman might have divined his intoxication in some other manner.  It is submitted that this argument itself twists the ordinary meaning of the word "appeared".  Plaintiff "appeared" in Dr. Silverman's office on 1/28/00, apparently for treatment, and he was "mildly intoxicated", according to the doctor's own notes.  There is nothing tortured about that particular reading of the phrase "appeared in my office intoxicated."  Plaintiff is the one adding two more words to the phrase that aren't there to make it say "never appeared [to be] intoxicated in my office" leaving us to guess how the subject came up between the Plaintiff and Dr. Silverman in the first place on that date.   Did he trip over furniture on the way in the door?  Did he smell of alcohol?  Was he slurring? We don't know.  Why?  Because the doctor never attempted to reconcile his notes with that statement in that report, and still hasn't even in response to this motion.  Where is his affidavit explaining either of these inconsistencies?  Why didn't he appear for his noticed deposition[5] where he could have presumably offered these absurd explanations under oath for the Court's consideration?

        An additional point of Defendants' motion was that the reliability of Dr. Silverman's testimony is further called into question by the blatant leading question and answer style of his reports.  Ignoring the obvious (and stated) concern that this raises the issue of the Doctor's credibility and bias by shaping his opinions to fit Plaintiff's legal theories, Plaintiff offers the presumed exculpatory fact that the final question put to Dr. Silverman in one of his reports was

---

[5] See, Statement of Dennis Herbert, Esquire, attached hereto as Exhibit B.

an open-ended invitation to "address other concerns which you deem relevant", an offer which the doctor, apparently satisfied that he had already been adequately led to the promised land, declined.  The open ended question hardly cured the blatant and unapologetic leading which proceeded it, and which is found throughout two of his three reports.

Plaintiffs have accused Defendants of deliberately misconstruing the record in support of their Motion in Limine to preclude the testimony of Drs. Gzesh and Silverman.  However, in each and every instance of a cite to the record to which Plaintiff points in this contention, Defendant has attached a copy of the evidence itself as an exhibit to the motion.  All of the doctors reports are attached in their entirety.  The actual notes of Dr. Silverman's treatment are attached.  The actual prison infirmary records are attached.  The 'telerecorded message' of Dr. Silverman in the 1996 Social Security disability proceeding, and Plaintiff's own handwritten submission to that proceeding in which he documents the same cognitive disabilities for the Judge as he presents to the Court today and attributes to the conduct of Defendants, are all attached to the Motion as exhibits.

Conversely, Plaintiff here makes several misleading and out of context citations to the record which do not benefit from similar documentation.  In his response to ¶ 23 of Defendant's motion, Plaintiff states that Mr. Sean Gardner "testified at his deposition that the prison routinely failed to dispensed [sic] weekend inmates their medications while they were incarcerated. Instead, the Prisons [sic] medical staff simply held unto [sic] the medication until it time [sic] for the inmate' [sic] refill, then they gave it back to them.  As Mr. Gardner noted, 'Some of them never got it.' (Mr. Gardner's deposition at 33, Exhibit 'C')."  First of all, an examination of page 33 of Mr. Gardner's deposition makes it clear that he testified to no such thing.  The testimony provided was an answer to Mr. Howard's question "Do you recall, sir, if there were any

complaints made to you by the inmates regarding their ability to get their medications from the

infirmary or medical department?".  The colloquy continued:

> A. Yes.
>
> Q. There were?
>
> A. Yes.
>
> Q. Tell me what you recall, please.
>
> A. They would give up their medicine on Friday when we would take it up there, but they wouldn't get their medication until they were leaving on Sunday.  Some of them never got it.

Complete Transcript of Deposition of Sean Gardner, page 33, Exhibit A.  The colloquy goes on

to discuss Mr. Gardner's response to these *complaints,* such as advising them to submit a formal

grievance.  *The testimony offered does not state that the conditions described were actually*

*occurring as Plaintiff suggests that it does, just that Mr. Gardner had received complaints from*

*some prisoners alleging that they were*[6].  Furthermore, it is clear from the entirety of Mr.

Gardner's testimony that he is not referring to *dispensing the medication* when he says that "they

wouldn't get their medication until they were leaving on Sunday.  Some of them never got it.",

but was rather referring to their unused medication being returned to them, or not, on Sunday

when they went home.  In fact, Mr. Gardner testified that he was unfamiliar with and had never

seen the prison policy for dispensing medications, known as document No. 405.18.  What he was

familiar with, and what he testified to throughout was the policy and practice of taking prisoner's

medications from them upon admission so that they could be dispensed by the infirmary: "Their

medications they couldn't have in the jail with them, so they would be set to the side and would

---

[6] Moreover, Mr. Gardner was not even certain that the complaints were for any particular weekend or from any particular prisoner, including the Plaintiff.  Exhibit A, pages 36-37.

be sent up to the jail to the nurse to hand out. That's how that worked if they brought them in."
Deposition of Sean Gardner, page 35, lines 11-15, Exhibit A.

Plaintiff also suggests to the Court that Defendants, in arguing that Dr. Silverman's opinion is unreliable and should be excluded because it is based upon inaccurate and inconsistent statements from Plaintiff "once again, intentionally overlook the fact that Dr. Silverman specifically references much more than that Plaintiff's statements to form his opinion on causation. Dr.Silverman's opinion was formed based on various documents, both favorable and unfavorable to Plaintiff as well as knowledge of Plaintiff's medical condition that was formed over a period of years…" What is offered as the basis for the contention that Defendant's have intentionally overlooked anything? Nothing. What *is* offered is the argument that Dr. Silverman "specifically references much more than Plaintiff's statements to form his opinion". What 'specifically' constitutes this "much more"? Apparently, "various documents, both favorable and unfavorable to Plaintiff, as well as knowledge of Plaintiff's medical condition" We may not know what the 'various documents' are, but they apparently don't include the records of the Social Security Proceeding, the two years of treatment following that (and preceding the fall at the prison), the two hour interview with Dr. Sageman, or even the sworn deposition testimony of Plaintiff himself -both on the subject of Plaintiff's drinking during the period of his weekend incarcerations -neither of which are mentioned in his reports, and both of which are presumed out of existence by his explicit taking as a 'given' that Plaintiff was **not** drinking.

CONCLUSION

Notwithstanding Plaintiff's attempts to deflect the Court's attention with a recap of his liability theory and his issues with Defendant's experts, Defendant's core arguments to preclude

the testimony of Doctors Silverman and Gzesh as unreliable under <u>Daubert</u> are unanswered. Similarly, the only evidence available to the Court on the subject of what the Doctors reviewed and considered is what is within the four corners of their reports. Nothing the Plaintiff says in his response about what they knew or considered is evidence. Dr. Gzesh's reports mention nothing other than Crozer-Chester Hospital records and his own treatment of the Plaintiff. Dr. Silverman's reports mention various non-specific "records of plaintiff's injury" and unspecified depositions, but discuss none of them or relate them in any meaningful way to his conclusions, except to the extent that they support those conclusions.

Both Doctors, in their reports, ignore the implications of the results of the lab work which show no traces of Klonopin in Plaintiff's system at the Hospital to which he was taken immediately after his fall, despite his multi-year chronic and high level dosage use of the medication.

Both Doctors, in their reports ignore the possibility that Plaintiff's fall at the prison was a result of alcohol withdrawal, rather than withdrawal from Klonopin and/or insulin as they opine. Both doctors, despite being in a "unique position to know" as a result of their treatment of the Plaintiff ignore entirely the fact that Plaintiff was drinking regularly and heavily during this period, and Dr. Silverman, even goes so far as to take it as a "given" that Plaintiff was not drinking at all, in the ONLY attempt by either doctor to address the possible alternative cause for this fall: alcohol withdrawal.

Both Doctors, in reaching their opinions that Plaintiff now suffers from cognitive deficits such as inability to remember to take his medications and inability to maintain attention on-task, as a direct result of his fall at the prison, ignore the fact that Plaintiff claimed to be completely

disabled from these same cognitive deficits nearly four years prior in a successful application to the Social Security Administration, in which Dr. Silverman even participated!

Doctor Silverman also ignores his own written and expressed misgivings about his patient's truthfulness, as well as his own office notes concerning Plaintiff's continuing alcoholism, and his own records pertaining to how long he has been treating Plaintiff and goes so far as to make not one but two blatantly false statements himself to the Court in his reports prepared specifically for litigation, thereby further undermining his reliability.

Finally, two of Dr. Silverman's three reports continue to be blatantly shaped by Counsel's leading questions, which the Doctor explicitly recites and answers in each report, questions which both lead him to the needed medical conclusions, but to legal conclusions as well.

For all of the foregoing reasons, Daubert and its progeny require the exclusion of their testimony under F.R.E. 702 as unreliable.

Respectively submitted,

MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN

By:/s/ David F. White
    DAVID F. WHITE, ESQUIRE
    Attorney I.D. No. 55738
    TIMOTHY J. HARTIGAN,  ESQUIRE
    Attorney I.D. No. 666421
    620 W. Germantown Pike, Suite 350
    Plymouth Meeting, PA  19462
    Attorneys for Defendants,
    Wackenhut Corrections Corporation,
    The Wackenhut Corporation
    and James Janecka, Deborah Perretta,
    Margaret Carrillo, M.D., Dr. Frederick,
    Dr. Holland Hull, Meriam Byrd, and Carol Snell

Dated: April 16, 2004